2020-1992

# United States Court of Appeals for the Federal Circuit

**In re: VIVINT, INC.,**

**Appellant**

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Reexamination No. 90/020,115**

## APPELLANT'S CORRECTED PRINCIPAL BRIEF

Robert Greene Sterne
Jason D. Eisenberg
William H. Milliken
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

*Counsel for Appellant Vivint, Inc.*

Dated:  November 13, 2020
Corrected:  December 4, 2020

**U.S. Patent No. 6,717,513, Claim 1:**

A method of monitoring and controlling remote equipment, comprising the steps of:

a) determining a state of at least one parameter of at least one piece of the remote equipment;

b) communicating a message indicative of the state from the piece of remote equipment to a computer server as an incoming message;

c) enabling a user to remotely configure or modify a user-defined message profile containing outgoing message routing instructions, the user-defined message profile being storable on the computer server;

d) enabling a user to remotely send command messages to the remote equipment via the computer server to remotely control the remote equipment;

e) determining whether an incoming message is an incoming exception message indicative of improper operation of the piece of remote equipment;

f) if it is determined in step e) that an incoming message is an incoming exception message, forwarding at least one outgoing exception message based on the incoming message to at least one user-defined communication device specifiable in the user-defined message profile, wherein the user can remotely configure or modify the user-defined message profile by remotely accessing the computer server.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 20-1992

**Short Case Caption** In re: Vivint, Inc.

**Filing Party/Entity** Appellant Vivint, Inc.

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/29/2020

Signature: /s/ Robert Greene Sterne

Name: Robert Greene Sterne

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Vivint, Inc. | | Vivint Group, Inc. |
| | | APX Group, Inc. |
| | | APX Group Holdings, Inc. |
| | | Legacy Vivint Smart Home, Inc. |
| | | Vivint Smart Home, Inc. |
| | | 313 Acquisition LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Sean C. Flood, Sterne, Kessler, Goldstein & Fox PLLC | Joseph Mutschelknaus, Sterne, Kessler, Goldstein & Fox PLLC | |
| George Howarah, Sterne, Kessler, Goldstein & Fox PLLC | | |
| Lauren Schleh, Sterne, Kessler, Goldstein & Fox PLLC | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Vivint, Inc. v. Alarm.com, No. 2:15-cv-392 (D. Utah.) | Vivint, Inc. v. Alarm.com Inc., No. 19-2438 (Fed. Cir.) | Vivint, Inc. v. Alarm.com Inc., No. 19-2439 (Fed. Cir.) |
| Vivint, Inc. v. Alarm.com Inc., No. 17-2218 (Fed. Cir.) | Vivint, Inc. v. Alarm.com Inc., No. 17-2219 (Fed. Cir.) | Vivint, Inc. v. Alarm.com Inc., No. 17-2220 (Fed. Cir.) |
| Reexamination No. 90/014,007 (U.S.P.T.O.) | Reexamination No. 90/014,521 (U.S.P.T.O.) | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................ i

TABLE OF CONTENTS .................................................................. iv

RULE 47.5 STATEMENT OF RELATED CASES ............................................ xii

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE..............................................................4

    A.    David Sandelman and colleagues invent a novel system for
monitoring the status of remote equipment..........................................4

    B.    Alarm.com makes three failed AIA attacks on the '513 patent. ...........6

    C.    Alarm.com repackages its failed IPR arguments into a
reexamination request and the Central Reexamination Unit
grants reexamination. ............................................................11

        1.    Alarm.com's reexamination request .........................................11

        2.    Vivint's petitions to vacate the reexamination .........................13

    D.    The Examiner rejects the claims as unpatentable and the Board
affirms on appeal. ...............................................................16

SUMMARY OF THE ARGUMENT .......................................................18

ARGUMENT .........................................................................20

STANDARD OF REVIEW ..............................................................20

I.    The Board erred in finding a substantial new question of patentability........20

    A.    A question of patentability that has already been considered and
rejected by the Office is not a "substantial new question of
patentability" within the meaning of the reexamination statute. ........21

    B.    The arguments in Alarm.com's reexamination request were
already considered and rejected by the Board in the '1091
Decision and were therefore not "new." ...........................................24

    C.    The Office has systematically made this error since 2012.................28

II.    The Office acted arbitrarily and capriciously in granting the
reexamination request after the Board rejected identical arguments
under 35 U.S.C. § 325(d)..........................................................29

A.    Section 325(d) applies with full force to ex parte reexaminations...................................................................29

B.    The Office's maintenance of this reexamination proceeding notwithstanding § 325(d) was arbitrary and capricious. .....................32

    1.    The Office's grant of reexamination was flatly inconsistent with the Board's denial of the '1091 petition under § 325(d). .........................................................................32

    2.    OPLA legally erred in refusing to terminate the reexamination..........................................................................33

C.    The Office routinely fails to conduct the correct analysis. .................42

III.    The appointment scheme for APJs is unconstitutional under the Appointments Clause.......................................................................43

IV.    This ex parte reexamination violated the Administrative Procedure Act because the APJs of the Board are no longer qualified to preside over formal adjudications. ...........................................................45

CONCLUSION AND RELIEF SOUGHT ...........................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2015-01997, Paper 14 (P.T.A.B. Apr. 7, 2016) ............................................9

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2016-00116, Paper 39 (P.T.A.B. May 2, 2017) ...........................................12

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2016-00129, Paper 13 (P.T.A.B. May 3, 2016) ............................................9

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2016-00161, Paper 43 (P.T.A.B. May 10, 2017) .........................................12

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2016-00173, Paper 40 (P.T.A.B. May 2, 2017) ...........................................12

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2016-01080, Paper 11 (P.T.A.B. Nov. 17, 2016) ........................................13

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2016-01091, Paper 1 (P.T.A.B. May 24, 2016) ...........................................12

*Alarm.com Inc. v. Vivint, Inc.*,
    IPR2016-01091, Paper 11 (P.T.A.B. Nov. 23, 2016) ..........................1, 9, 10, 11

*Ariosa v. Illumina*,
    IPR2014-01093, Paper 81 (P.T.A.B. May 24, 2016) .........................................31

*Ariosa v. Verinata Health*,
    IPR2013-00276, Paper 63 (P.T.A.B. May 24, 2016) .........................................31

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
    941 F.3d 1320 (Fed. Cir. 2019) ...............................................................*passim*

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
    412 U.S. 800 (1973) ..............................................................................33

*Automated Merchandising Systems, Inc. v. Lee*,
    782 F.3d 1376 (Fed. Cir. 2015) ..............................................................39

*In re Boloro Global Ltd.*,
    963 F.3d 1380 (Fed. Cir. 2020) ..........................................................43

*Butz v. Economu*,
    438 U.S. 478 (1978)..........................................................................50

*Chisholm v. Def. Logistics Agency*,
    656 F.2d 42 (3d Cir. 1981) ..............................................................33

*Contractors Transp. Corp. v. United States*,
    537 F.2d 1160 (4th Cir. 1976) ....................................................33, 38

*Dell Inc. v. Acceleron, LLC*,
    818 F.3d 1293 (Fed. Cir. 2016) .......................................................20

*Dickinson v. Zurko*,
    527 U.S. 150 (1999)....................................................................46, 51

*Edmond v. United States*,
    520 U.S. 651 (1997)..........................................................................45

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988)..........................................................................50

*Five Points Rd. Joint Venture v. Johanns*,
    542 F.3d 1121 (7th Cir. 2008) .........................................................51

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)..........................................................................49

*Goldberg v. Kelly*,
    397 U.S. 254 (1970)..........................................................................50

*Heinl v. Godici*,
    143 F. Supp. 2d 593 (E.D. Va. 2001) ..............................................21

*IBG LLC v. Trading Techs. Int'l, Inc.*,
    757 F. App'x 1004 (Fed. Cir. 2019) .................................................33

*Immigration & Naturalization Serv. v. Yueh-Shaio Yang*,
    519 U.S. 26 (1996)............................................................................38

*Johnson v. Ashcroft,*
    286 F.3d 696 (3d Cir. 2002) ................................................................36

*Lucia v. SEC,*
    138 S. Ct. 2044 (2018).........................................................................48

*MCM Portfolio LLC v. Hewlett-Packard Co.,*
    812 F.3d 1284 (Fed. Cir. 2015) ..........................................................20

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992)............................................................................48

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018)........................................................................44

*Patlex Corp. v. Mossinghoff,*
    771 F.2d 480 (Fed. Cir. 1985) ...............................................21, 22, 27

*In re Portola Packaging, Inc.,*
    110 F.3d 786 (Fed. Cir. 1997) .....................................................20, 22

*R.A. Holman & Co. v. SEC,*
    366 F.2d 446 (2d Cir. 1966) ...............................................................47

*Rambus Inc. v. Rea,*
    731 F.3d 1248 (Fed. Cir. 2013) ..........................................................46

*Ramspeck v. Fed. Trial Exam'rs Conference,*
    345 U.S. 128 (1953)......................................................................49, 50

*In re Recreative Techs. Corp.,*
    83 F.3d 1394 (Fed. Cir. 1996) .....................................................*passim*

*SAS Inst., Inc. v. Iancu,*
    138 S. Ct. 1348 (2018)........................................................................40

*Shaw's Supermarkets, Inc. v. Nat'l Labor Relations Bd.,*
    884 F.2d 34 (1st Cir. 1989).................................................................33

*Sierra Club v. E.P.A.,*
    719 F.2d 436 (D.C. Cir. 1983).............................................................33

*In re Swanson*,
    540 F.3d 1368 (Fed. Cir. 2008) ...................................................*passim*

*Tokyo Kikai Seisakusho, Ltd. v. United States*,
    529 F.3d 1352 (Fed. Cir. 2008) ...........................................................34

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ...............................................................................41

*United States v. Arthrex, Inc.*,
    No. 19-1434 (U.S. Oct. 13, 2020)........................................................44

*Virk v. INS*,
    295 F.3d 1055 (9th Cir. 2002) .............................................................38

*Vivint, Inc. v. Alarm.com Inc.*,
    754 F. App'x 999 (Fed. Cir. 2018) ......................................................12

*Wong Yang Sung v. McGrath*,
    339 U.S. 33 (1950) ...............................................................................49

**Statutes**

5 U.S.C. § 554(a) .........................................................................................46

5 U.S.C. § 556(b) .................................................................................46, 51

5 U.S.C. § 559 ..............................................................................................51

5 U.S.C. § 706(2)(A)...........................................................................19, 29

5 U.S.C. § 7521 ......................................................................47, 48, 49, 51

5 U.S.C. § 7521(a) .......................................................................................46

28 U.S.C. § 1295(a)(4)(A) ............................................................................3

35 U.S.C. § 3(c) .....................................................................................48, 51

35 U.S.C. §§ 141(b) .......................................................................................3

35 U.S.C. § 302 ............................................................................................35

35 U.S.C. § 303 .................................................................................2, 22, 27

35 U.S.C. § 303(a) ....................................................................21

35 U.S.C. § 306 ....................................................................3, 46

35 U.S.C. § 314(a) ...............................................................*passim*

35 U.S.C. § 315(b) ...............................................................*passim*

35 U.S.C. § 315(d) ....................................................................31

35 U.S.C. § 315(e) ....................................................................13

35 U.S.C. § 315(e)(2) ...............................................................31

35 U.S.C. § 316 ....................................................................51

35 U.S.C. § 325(d) ...............................................................*passim*

Administrative Procedure Act................................................*passim*

American Invents Act ....................................................................28

Appointments Clause ....................................................................52

Leahy-Smith America Invents Act ....................................................1, 11

## Other Authorities

37 C.F.R. § 1.181 ....................................................................14

37 C.F.R. § 1.181(a) ....................................................................14

37 C.F.R. § 1.181(a)(3) ...............................................................14, 16, 35

37 C.F.R. § 90.3(a)(1) ....................................................................3

154 Cong. Rec. H7233-01 (July 29, 2008) (statement of Rep. King) ....................47

157 Cong. Rec. S1376 (March 8, 2011) (statement of Sen. Kyl).
    Section 325(d) ....................................................................30

H.R. Rep. 107-120 ....................................................................23

*Hearings Before the Subcomm. On Commerce, Justice, Science, &*
*Related Agencies of the H. Comm. on Appropriations,* 112................47

MPEP § 2225 ...........................................................................35

MPEP § 2240 ...........................................................................23

MPEP § 2242(I) ..........................................................23, 24, 26

MPEP § 2242(II)(A) ................................................................24

MPEP § 2246(II) ......................................................14, 16, 35

MPEP § 2294 ...........................................................................35

No. 90/014,521, Decision Sua Sponte Vacating Ex Parte
    Reexamination Request Filing Date (U.S.P.T.O. Aug. 7, 2020).......................13

No. 90/014,544, Decision Sua Sponte Vacating Ex Parte
    Reexamination Request Filing Date (U.S.P.T.O. Aug. 7, 2020).......................13

## RULE 47.5 STATEMENT OF RELATED CASES

The following related cases are currently pending before this Court: *Vivint, Inc. v. Alarm.com Inc.*, Nos. 19-2438 and 19-2439. Nos. 19-2438 and 19-2439 were previously before this Court in *Vivint, Inc. v. Alarm.com Inc.*, Nos. 17-2218, -2219, -2220. The Court's decision in Nos. 17-2218, -2219, -2220 is reported at 754 F. App'x 999 (Fed. Cir. 2018) (Prost, O'Malley, and Hughes, JJ.).

Additionally, the following proceedings may affect or be directly affected by this Court's decision in the pending appeal: *Vivint, Inc. v. Alarm.com*, No. 2:15-cv-392 (D. Utah); Reexamination No. 90/014,007 (U.S.P.T.O.).

# INTRODUCTION

This appeal arises from Alarm.com's *fourth* attempt to invalidate Vivint's '513 patent. After Vivint sued Alarm.com for infringement, Alarm.com filed three successive petitions for *inter partes* review of the patent. All three were denied. And, in denying the third petition—which Alarm.com filed right before the one-year IPR time-bar set forth in 35 U.S.C. § 315(b)—the Patent Trial and Appeal Board sharply criticized Alarm.com's "serial challenges" to the '513 patent. This behavior, the Board observed—a petitioner's filing "incremental" petitions that use the Board's decisions on earlier failed petitions as a roadmap to bolster the petitioner's later arguments—presents a serious "risk [of] harassment of patent owners" like Vivint, not to mention "frustration of Congress's intent in enacting the Leahy-Smith America Invents Act." *Alarm.com Inc. v. Vivint, Inc.*, IPR2016-01091, Paper 11 at 11–14 (P.T.A.B. Nov. 23, 2016) (citing 35 U.S.C. § 325(d)).

Undeterred, Alarm.com repackaged its third IPR petition—nearly verbatim—into a request for ex parte reexamination of the '513 patent, which it filed months after the § 315(b) bar date had come and gone. The Central Reexamination Unit granted reexamination without even mentioning Alarm.com's failed IPR petitions or the Board's criticisms of Alarm.com's abusive tactics. The Office then continued with this proceeding over Vivint's repeated objections. The Examiner eventually rejected the claims as unpatentable, and the Board—the same adjudicative body that

had rejected Alarm.com's third IPR petition under 35 U.S.C. § 325(d)—affirmed the rejection.

This Court should vacate the Board's decision and order the Office to terminate the reexamination. This proceeding lacked a critical prerequisite to any *ex parte* reexamination: a *new* question of patentability. *See* 35 U.S.C. § 303. The patentability issues set forth in Alarm.com's request were not "new" in any sense of that word; Alarm.com had asserted the exact same arguments in its third failed IPR petition. Indeed, the "substantial new question" standard was established for the precise purpose of preventing "abusive tactics and harassment of patentees through reexamination" such as occurred in this case. *In re Swanson*, 540 F.3d 1368, 1381 (Fed. Cir. 2008).

Additionally, the Office's maintenance of this reexamination proceeding notwithstanding the Board's earlier rejection of identical unpatentability arguments under § 325(d) was arbitrary and capricious. Basic principles of administrative adjudication dictate that like cases should be treated alike. It defies law and logic for the Office to reject an IPR petition under § 325(d), yet a year later ignore § 325(d) and accept identical arguments that are simply repackaged as a reexamination request. Like the substantial-new-question standard, § 325(d) was enacted specifically to prevent patent infringers from harassing patent owners with serial,

2

cumulative attacks on patent validity like Alarm.com's attacks on the '513 patent. This is *the* paradigmatic case for § 325(d)'s application.

This reexamination should never have begun in the first place. The decision below should be vacated and the reexamination proceedings should be terminated.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(b) and 306. The Board issued its decision affirming the Examiner's rejection of claims 1–21 of the '513 patent on May 4, 2020. Vivint timely filed its notice of appeal on July 1, 2020. *See* 37 C.F.R. § 90.3(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the Board committed legal error in finding that Alarm.com's reexamination request presented a substantial new question of patentability, where the Board had previously considered and rejected virtually identical unpatentability arguments when it denied Alarm.com's third IPR petition against the '513 patent.

2.    Whether the Office acted arbitrarily and capriciously in granting the reexamination request notwithstanding 35 U.S.C. § 325(d), where the Board had relied on § 325(d) to reject virtually identical unpatentability arguments when it denied Alarm.com's third IPR petition against the '513 patent.

3.    Whether the Board's decision violated the Appointments Clause, where (i) the panel in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir.

3

2019), impermissibly severed APJs' tenure protections in an attempt to cure APJs' unconstitutional appointments and (ii) APJs remain unconstitutionally appointed principal officers even if removable at will.

4.    Whether the Board's decision was unlawful under the Administrative Procedure Act, where the APJs who rendered the decision on appeal were not qualified to preside over formal adjudications.

## STATEMENT OF THE CASE

### A.    David Sandelman and colleagues invent a novel system for monitoring the status of remote equipment.

The '513 patent discloses and claims a "system and method for monitoring remote equipment such as HVAC equipment." Appx33 (Abstract). The system includes sensors that communicate with the remote equipment and detect "exception conditions" (or "faults") that indicate potential problems with the equipment. *Id.* If the sensor detects an exception condition, the system generates an "exception message" that will notify a user of the problem. *Id.*

Users of the patented system may configure a "message profile" that dictates when and how "exception messages" are sent to different user devices. *Id.* For example, exception messages that are "not very serious (e.g., filter needs cleaning)" can be sent via e-mail, whereas "serious (e.g., low/high refrigerant pressure)" exception messages can be sent via text message. Appx54 (4:5–12). Similarly, different categories of exception messages can be sent to different users or different

user devices. For example, "both the contractor and owner of the premises might be signaled if there is a low/high refrigerant condition," but "only one of them would be notified if a filter needed cleaning." Appx55 (6:8–11). The message profile might also dictate that certain exception messages are "directed to one repair/maintenance entity during regular business hours" and to a different entity at night. *Id.* (6:13–17).

The system can also have each piece of equipment periodically generate an "okay message" indicating that the equipment is working properly. *Id.* (6:23–25). In one embodiment, the system employs a "missing message subroutine" to determine whether all interfaces have "checked in as 'okay.'" *Id.* (6:27–36). If a piece of equipment has not checked in as "okay," a message indicating the identity of that equipment can be sent out "to the proper individuals via the selected media, all in accordance with the user's message profile." *Id.* (6:36–40).

As the specification explains, prior-art systems for remote monitoring had significant limitations because they did not "allow for sufficient flexibility in routing fault messages to a variety of different potential recipients of such messages via a variety of different potential media, depending on the urgency or nature of the fault." Appx53 (2:21–25). Prior-art systems also did not "allow for easy customer modifications" to the "list of who to contact via what means depending on which fault has occurred." *Id.* (2:36–38, 2:43–44). The user-configurable "message profile" of the invention solves these problems with the prior art.

5

Claim 1 is representative of the challenged claims and recites as follows:

A method of monitoring and controlling remote equipment, comprising the steps of:

    a)  determining a state of at least one parameter of at least one piece of the remote equipment;

    b)  communicating a message indicative of the state from the piece of remote equipment to a computer server as an incoming message;

    c)  enabling a user to remotely configure or modify a user-defined message profile containing outgoing message routing instructions, the user-defined message profile being storable on the computer server;

    d)  enabling a user to remotely send command messages to the remote equipment via the computer server to remotely control the remote equipment;

    e)  determining whether an incoming message is an incoming exception message indicative of improper operation of the piece of remote equipment;

    f)  if it is determined in step e) that an incoming message is an incoming exception message, forwarding at least one outgoing exception message based on the incoming message to at least one user-defined communication device specifiable in the user-defined message profile, wherein the user can remotely configure or modify the user-defined message profile by remotely accessing the computer server.

Appx60 (16:26-51).

## B.    Alarm.com makes three failed AIA attacks on the '513 patent.

In June 2015, Vivint filed a patent-infringement lawsuit against Alarm.com asserting the '513 patent and three related patents.[1] Several months later, Alarm.com

---

[1] Vivint's lawsuit also involved two unrelated patents that are not relevant to this appeal.

began filing petitions for *inter partes* review of the asserted patents. All told, between September 2015 and June 2016 (the § 315(b) bar date[2]), Alarm.com filed four waves of IPR petitions—fourteen petitions total—against the four related patents. Of the fourteen petitions, only three have been granted, and none have been granted on the '513 patent.

The table below shows the grounds relied upon by Alarm.com in each IPR and the disposition of each proceeding. The proceedings involving the '513 patent are highlighted.

| Case No. | Patent No. | Date Filed | Claims Challenged | Prior Art Asserted | Disposition |
|---|---|---|---|---|---|
| IPR2015-01995 | 6,535,123 | September 28, 2015 | 1–20 | Scadaware, Britton, Smith | Denied |
| IPR2015-01997 | 6,717,513 | September 28, 2015 | 1–21 | Scadaware, Garton, Austin | Denied |
| IPR2015-02003 | 6,462,654 | September 30, 2015 | 1–28 | Scadaware, Britton, Garton | Denied |
| IPR2015-02004 | 6,147,601 | September 30, 2015 | 1–43 | Scadaware, Britton, Smith | Denied |
| IPR2016-00116 | 6,147,601 | October 30, 2015 | 1, 2, 4–23, 25–31, 33–41 | Shetty, French, Britton, Levac | Denied as to claim 16; granted as to other claims |
| IPR2016-00129 | 6,717,513 | November 2, 2015 | 1–21 | Johnson, BACNet, Joao | Denied |

---

[2] *See* 35 U.S.C. § 315(b) ("An *inter partes* review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner . . . is served with a complaint alleging infringement of the patent.").

| Case No. | Patent No. | Date Filed | Claims Challenged | Prior Art Asserted | Disposition |
|---|---|---|---|---|---|
| IPR2016-00155 | 6,147,601 | November 5, 2015 | 1–3, 22–24, 26, 30, 32, 42–43 | Wewalaarachchi, Honeywell, BACNet | Denied |
| IPR2016-00161 | 6,462,654 | November 6, 2015 | 9–28 | Shetty, Britton, Levac, Garton | Denied as to claims 11–13, 15, 16, 19–21, 23, 24; granted as to other claims |
| IPR2016-00173 | 6,535,123 | November 9, 2015 | 1–20 | Shetty, Britton, Levac | Granted |
| IPR2016-01080 | 6,147,601 | May 20, 2016 | 3, 16, 24, 32, 42, 43 | Shetty, Wewalaarachchi, Britton | Denied |
| IPR2016-01091 | 6,717,513 | May 24, 2016 | 1–21 | Shetty, Joao, Britton, Garton | Denied |
| IPR2016-01110 | 6,462,654 | May 27, 2016 | 1–8 | Shetty, Britton | Denied |
| IPR2016-01124 | 6,462,654 | June 2, 2016 | 11–13, 15, 16, 19–21, 23, 24 | Oberlander, Shetty, Britton, Levac | Denied |
| IPR2016-01126 | 6,535,123 | June 2, 2016 | 3–5, 7–12, 14–16, 18–20 | Oberlander, Shetty, Britton, Levac | Denied |

As this table shows, Alarm.com petitioned for *inter partes* review of the '513 patent three times. The Board denied the first petition on the '513 patent because it found no reasonable likelihood that Alarm.com's primary reference—Scadaware— anticipated the challenged claims or rendered them obvious. *See Alarm.com Inc. v. Vivint, Inc.*, IPR2015-01997, Paper 14 at 31–32 (P.T.A.B. Apr. 7, 2016). The Board

denied the second petition on the '513 patent because it found no reasonable likelihood that Alarm.com's new primary reference—Johnson—was prior art. *See Alarm.com Inc. v. Vivint, Inc.*, IPR2016-00129, Paper 13 at 16–17 (P.T.A.B. May 3, 2016).

One week before the § 315(b) bar date, Alarm.com filed a third petition against the '513 patent, this time relying on Shetty, Joao, Britton, and Garton. *See Alarm.com Inc. v. Vivint, Inc.*, IPR2016-01091, Paper 11 at 5 (P.T.A.B. Nov. 23, 2016) ("'1091 Decision"). The Board, invoking its discretion under 35 U.S.C. § 314(a), denied the '1091 petition. The Board based its denial largely on 35 U.S.C. § 325(d), which provides that, "[i]n determining whether to institute" an IPR, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office."

The Board noted that the '1091 petition "represent[ed] Petitioner's *third* petition specifically challenging each of claims 1–21." *Id.* at 9 (emphasis in original). Moreover, each of the references relied upon by Alarm.com could have been asserted in the earlier petitions—indeed, Alarm.com in fact *had* relied on each of those references in its earlier challenges. *See id.* at 9–10. Alarm.com's '1091 petition, the Board explained, "improperly" "used [the] decisions in the earlier cases as a roadmap to attempt to remedy deficiencies in its earlier petitions." *Id.* at 10; *see*

*also id.* ("[T]he instant Petition is essentially a composite response to our decisions in those earlier proceedings.").

The Board also observed that the '1091 petition was filed only a week prior to the expiration of § 315(b)'s one-year time bar, meaning there could be "no other motivation [for the new petition] apart from the information to be gleaned from Patent Owner's preliminary responses and [the Board's] decisions on institution in the related cases." *Id.* at 11. Indeed, Alarm.com candidly acknowledged that it had used the Board's "earlier decisions to bolster challenges [Alarm.com] advanced unsuccessfully" in its earlier petitions. *Id.* at 11–12.

"These facts," the Board concluded,

> suggest[ed] that this latest proceeding is a case of undesirable, incremental petitioning, in which a petitioner relies on a patent owner's contentions and/or a Board decision in an earlier proceeding or proceedings involving the same parties, the same patent, and the same claims to mount another challenge after an earlier, unsuccessful or only partially successful challenge, by fixing deficiencies, noted by the Board, that were within the petitioner's capacity to avoid in the earlier petition or petitions.

*Id.* at 12. Allowing such "similar, serial challenges to the same patent, by the same petitioner," the Board found, would "risk[] harassment of patent owners and frustration of Congress's intent in enacting the Leahy-Smith America Invents Act." *Id.* (quoting *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, IPR2014-00581, Paper 8 at 12–13 (P.T.A.B. Oct. 14, 2014)). The Board emphasized that "[t]he potential for inequity resulting from a petition's filing of serial attacks against the same claims

of the same patent, while having the opportunity to adjust litigation positions along the way based on either the patent owner's contentions responding to prior challenges or the Board's decision on prior challenges, is real and cannot be ignored." *Id.* at 13 (quoting *LG Elecs. Inc. v. Core Wireless Licensing S.A.R.L.*, IPR2016-00986, Paper 12 at 7–8 (P.T.A.B. Aug. 22, 2016)).

### C. Alarm.com repackages its failed IPR arguments into a reexamination request and the Central Reexamination Unit grants reexamination.

#### 1. Alarm.com's reexamination request

In August 2017—over a year after the '1091 petition was filed and long after the § 315(b) statutory bar date had come and gone—Alarm.com filed the reexamination request that gave rise to this case.

Alarm.com's request was a carbon copy of the failed '1091 petition, with the sole exception of claim 14, which recites a "normal status message." *Compare* Appx65–138, *with Alarm.com Inc. v. Vivint, Inc.*, IPR2016-01091, Paper 1 (P.T.A.B. May 24, 2016).

In the '1091 petition, Alarm.com had cited the Britton reference for this limitation. *See Alarm.com Inc. v. Vivint, Inc.*, IPR2016-01091, Paper 1 at 63 (P.T.A.B. May 24, 2016). In the three IPR proceedings on related patents that were at least partially instituted, the Board held that Britton did not disclose the claimed "normal status message." *See Alarm.com Inc. v. Vivint, Inc.*, IPR2016-00116, Paper

11

39 at 63–69 (P.T.A.B. May 2, 2017); *Alarm.com Inc. v. Vivint, Inc.*, IPR2016-00161, Paper 43 at 51–57 (P.T.A.B. May 10, 2017); *Alarm.com Inc. v. Vivint, Inc.*, IPR2016-00173, Paper 40 at 55–60 (P.T.A.B. May 2, 2017). This Court affirmed on appeal. *See Vivint, Inc. v. Alarm.com Inc.*, 754 F. App'x 999, 1005–06 & n.7 (Fed. Cir. 2018).

For claim 14, Alarm.com's reexamination request replaced Britton with a new reference, Cheng. Alarm.com's only departure from the '1091 petition thus "use[d] information gleaned from the [the Board's] earlier decisions to bolster challenges it advanced unsuccessfully." '1091 Decision at 11–12. Despite having had its nearly identical IPR petition denied under § 325(d), Alarm.com made no attempt in its reexamination request to address why reexamination was proper given that statutory provision (which expressly applies in both IPRs and ex parte reexaminations).

Approximately a month after Alarm.com filed the reexamination request, the Central Reexamination Unit granted reexamination. Appx976–985. Like Alarm.com's request, the decision granting reexamination did not acknowledge the three denied IPRs, discuss § 325(d), or address whether the request included only "the same or substantially the same prior art or arguments [that] were previously presented to the Office" in the denied IPR petitions or during original prosecution.

*See id.* Nor did the decision explain why the reexamination request included a

substantial *new* question of patentability. *See id.*[3]

## 2. Vivint's petitions to vacate the reexamination

Vivint timely filed a petition under 37 C.F.R. § 1.181 to vacate the

reexamination order. Appx1523–1537; *see* 37 C.F.R. § 1.181(a) (providing that

"[p]etition may be taken to the Director . . . [t]o invoke the supervisory authority of

---

[3] This is not the only instance of Alarm.com attempting to use the reexamination as an end-run around the one-year time bar. As shown in the table above, Alarm.com filed four IPR petitions against Vivint's '601 patent. Three out of the four petitions were denied, and the Board denied the final petition (filed just before the § 315(b) date) on grounds similar to those the Board relied on in denying Alarm.com's '1091 petition. Namely, the Board found the final petition on the '601 patent "a case of undesirable, incremental petitioning" that "risk[ed] harassment" of Vivint. *Alarm.com Inc. v. Vivint, Inc.*, IPR2016-01080, Paper 11 at 12 (P.T.A.B. Nov. 17, 2016). Alarm.com then repackaged its unsuccessful fourth IPR petition— nearly verbatim—into a request for reexamination. *See* Reexamination No. 90/014,007 (U.S.P.T.O.). That request was granted; the case is still pending before the Patent Office.

Alarm.com later filed a *second* request for reexamination of the '601 patent. *See* Reexamination No. 90/014,521. That reexamination was terminated because Alarm.com was estopped under 35 U.S.C. § 315(e) from pursuing the grounds in its request. *See* No. 90/014,521, Decision Sua Sponte Vacating Ex Parte Reexamination Request Filing Date (U.S.P.T.O. Aug. 7, 2020). On the same day the Office terminated that second request, it likewise terminated yet another Alarm.com reexamination request—this one concerning the '654 patent—on estoppel grounds. Reexamination No. 90/014,544, Decision Sua Sponte Vacating Ex Parte Reexamination Request Filing Date (U.S.P.T.O. Aug. 7, 2020).

Vivint has since alerted the Board in the first reexamination of the '601 patent about the Office's terminations of the second '601 patent reexamination and the '654 patent reexamination. The Board has not yet acted on that information.

the Director in appropriate circumstances"). Filing such a petition in response to a reexamination order is expressly permitted by the Manual of Patent Examination Procedure. *See* MPEP § 2246(II) ("Separate from the Board's consideration of the SNQ issue, a patent owner may file a petition under 37 C.F.R. § 1.181(a)(3) to vacate the ex parte reexamination order as 'ultra vires.'"). Vivint's petition argued that the reexamination request should have been denied under § 325(d). Vivint noted that "the PTAB . . . already considered the ['1091] petition and decided to exercise its discretion under § 325(d) to deny review"; the reexamination request should have met the same fate. Appx1525. Any other result, Vivint argued, would be arbitrary and capricious under the Administrative Procedure Act: "Were the Director of the CRU, also acting on the PTO Director's behalf, to consider nearly word-for-word identical arguments and refuse to deny reexamination under the same statutory provision, the result would be arbitrary and capricious, and contrary to law." *Id.*

Approximately eight months later, the Office of Patent Legal Administration (OPLA) dismissed Vivint's petition. Appx10841–10857. OPLA determined that it had no discretion to terminate an ongoing reexamination and suggested that Vivint should have filed its petition before reexamination was granted. *See* Appx10846. OPLA also stated that CRU's grant of the reexamination request was not inconsistent with the Board's denial of the '1091 petition because § 314(a) (governing institution

14

of *inter partes* reviews) does not apply in ex parte reexaminations. Appx10848-10855.

Vivint then filed a second petition requesting reconsideration of the Office's decision on the petition. Vivint's request for reconsideration explained that the Office *does* have the authority to terminate an ongoing reexamination proceeding—in fact, as OPLA acknowledged, the Office has said exactly that on at least two prior occasions. S.Add.10 (citing Appx10846 n.1).[4] Moreover, contrary to OPLA's suggestion, Vivint could not have raised its § 325(d) argument prior to the grant of the reexamination because the MPEP expressly prohibits such filings. *Id.* (citing MPEP § 2225). In short, Vivint explained, "the OPLA decision denied Vivint relief on the ground that Vivint did not raise the § 325(d) issue in a way that Office policy expressly prohibits, and instead raised the issue in a way that previous Office decisions have expressly allowed. That is the epitome of 'arbitrary and capricious' agency action prohibited by the APA." *Id.*

Vivint also noted that, even setting aside § 325(d), the Office had independent authority to terminate the reexamination proceeding under the APA. Continued maintenance of the reexamination, Vivint explained, would be arbitrary and

---

[4] *See infra* n.5.

capricious given the Board's rejection of virtually identical arguments in the '1091 Decision. S.Add.11–16.

Finally, Vivint responded to OPLA's observation that § 314(a) does not apply in ex parte reexaminations. That, Vivint argued, is irrelevant. The fact remains that, in denying the '1091 petition, the Board relied on § 325(d), which indisputably *does* apply in ex parte reexaminations. S.Add.12. And there is no logical reason to apply § 325(d) any differently in the two types of proceedings. S.Add.12–16.

OPLA denied Vivint's request for reconsideration and expunged it from the record. Appx12207–12219.[5] OPLA largely reiterated its original reasons for rejecting Vivint's first request to terminate the reexamination. *See id.*

### D. The Examiner rejects the claims as unpatentable and the Board affirms on appeal.

The Examiner rejected all claims as unpatentable. Appx12220–12276. Vivint appealed to the Board, challenging both the merits of the Board's decision and the Office's determination that a substantial new question of patentability existed. *See*

---

[5] The Office's expungement of Vivint's second petition was improper. The MPEP specifically authorizes these sorts of petitions. *See* MPEP § 2246(II) ("Separate from the Board's consideration of the SNQ issue, a patent owner may file a petition under 37 C.F.R. § 1.181(a)(3) to vacate the ex parte reexamination order as 'ultra vires.'"). The Office objected to Vivint's including the petition in the Joint Appendix but advised that it would not object to Vivint including the petition in an addendum to the opening brief. Accordingly, Vivint has included the expunged petition in a supplemental addendum to this brief. S.Add.1–19; *see* Fed. Cir. R. 28(c).

Appx12767–12769. Vivint's arguments on the substantial-new-question issue reiterated that the Office had previously considered and rejected a virtually identical attack on the '513 patent when it denied the '1091 petition, meaning the reexamination request did not present a "new" question. *See id.*

The Board affirmed the examiner's rejection. Of primary relevance to this appeal, the Board rejected Vivint's argument that there was no substantial new question of patentability. Appx23–24. The Board acknowledged that, according to the Manual of Patent Examination Procedure, there can be no substantial new question of patentability where "the same question of patentability" has been "decided in an earlier concluded examination or review of the patent by the Office." Appx23–24 (citing MPEP § 2242(I)). The Board also acknowledged that Alarm.com's '1091 petition had "asserted the same references (Shetty and Joao) against the patent" as Alarm.com asserted in its reexamination request. Appx24. The Board concluded, however, that there was nevertheless a substantial new question of patentability because the Board denied the '1091 petition by invoking its discretion under 35 U.S.C. §§ 314(a) and 325(d). Appx24. That denial, the Board reasoned, "did not constitute a final holding of invalidity or a decision in an earlier concluded examination or review." *Id.*

This appeal timely followed.

## SUMMARY OF THE ARGUMENT

1.    The Board committed legal error in finding that Alarm.com's reexamination request presented a substantial new question of patentability. The invalidity challenges raised in Alarm.com's reexamination request had already been considered and rejected by the Board in the '1091 Decision and therefore were not "new." Indeed, Alarm.com's repeated attacks on the '513 patent are precisely the sort of abusive harassment of patentees that the substantial-new-question standard was designed to prevent. The Board's conclusion otherwise should be reversed.

2.    The Board's decision should be vacated and the reexamination should be terminated for a second, independent reason: Alarm.com's request should never have been granted in the first place in light of 35 U.S.C. § 325(d). The Board denied institution of the '1091 petition based on § 325(d) (among other considerations). Accordingly, CRU should have denied Alarm.com's virtually identical reexamination request under that statutory provision as well. The § 325(d) determination is discretionary, to be sure; but even where an agency has a measure of discretion over a particular matter, it may not apply that discretion in patently inconsistent ways. That is exactly what happened here: the *same agency* applied the *same statute* to the *same factual scenario* but reached a different result. That is the epitome of "agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

18

3.    The appointment scheme for APJs in unconstitutional under the Appointments Clause. While this Court correctly held in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), that APJs were unconstitutionally appointed principal officers, the Court's remedy—severing and invalidating APJs' tenure protections—was flawed for two reasons. *First*, the severance remedy was inconsistent with congressional intent. *Second*, APJs remain unconstitutionally appointed principal officers even if removable at will. Vivint acknowledges that these arguments are foreclosed by *Arthrex* but wishes to preserve them for further review.

4.    Even assuming that the *Arthrex* panel's remedy was proper, the elimination of APJs' tenure protections left APJs unable to lawfully preside over formal adjudications such as the ex parte reexamination below. Under the Administrative Procedure Act, formal adjudications must be heard by the agency itself or by an administrative law judge. Administrative law judges, in turn, are statutorily required to enjoy protection from at-will removal. Because APJs no longer enjoy such protection after this Court's decision in *Arthrex*, they are no longer qualified to preside over formal adjudications. Accordingly, the decision below violated the APA.

# ARGUMENT

## STANDARD OF REVIEW

The proper interpretation of the reexamination statute is a question of law reviewed de novo, "without deference to the [PTO's] interpretation." *In re Portola Packaging, Inc.*, 110 F.3d 786, 788 (Fed. Cir. 1997). The existence of a substantial new question of patentability is a question of fact reviewed for substantial evidence. *See In re Swanson*, 540 F.3d 1368, 1381 (Fed. Cir. 2008). The Court "review[s] the Board's procedures for compliance with the Administrative Procedure Act, 5 U.S.C. § 551 et seq." *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1298 (Fed. Cir. 2016). Constitutional issues are reviewed de novo. *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1287 (Fed. Cir. 2015).

## I.     The Board erred in finding a substantial new question of patentability.

The invalidity challenges raised in Alarm.com's reexamination request had already been considered and rejected by the Board in the '1091 Decision. The reexamination request therefore did not raise a "new" question of patentability.

The Board in this case held otherwise, reasoning that the '1091 Decision would have been relevant to the substantial-new-question issue only if it had addressed Alarm.com's unpatentability arguments *on the merits*, instead of rejecting the '1091 petition "as a case of undesirable, incremental petitioning" that improperly used the Board's decisions in Alarm.com's earlier IPRs as a roadmap. That analysis is flawed. The plain language of the reexamination statute, its legislative history, and

20

the MPEP all make clear that a question of patentability argument is not "new" if it has been previously raised to and rejected by the Office—regardless of whether the prior rejection was on the merits. Indeed, Alarm.com's repeated attacks on the '513 patent are precisely the sort of abusive harassment of patentees that the substantial-new-question standard was designed to prevent. The Board's holding that there was a substantial new question of patentability should be reversed.[6]

### A. A question of patentability that has already been considered and rejected by the Office is not a "substantial new question of patentability" within the meaning of the reexamination statute.

1.    The Office may grant a reexamination request only if it determines that "a substantial new question of patentability affecting any claim of the patent concerning is raised by the request." 35 U.S.C. § 303(a); *see Swanson*, 540 F.3d at 1375. This requirement is intended to "prevent[] potential harassment of patentees." *Swanson*, 540 F.3d at 1375; *see also Patlex Corp. v. Mossinghoff*, 771 F.2d 480, 483 (Fed. Cir. 1985) ("Study of the genesis of the reexamination statute leaves no doubt

---

[6] Section 303(c) of Title 35 bars judicial review of the Director's denial of a request for reexamination on the ground that "no substantial question of patentability has been raised." However, the Director's determination that a substantial new question of patentability *has* been raised is judicially reviewable. *See, e.g.*, *Swanson*, 540 F.3d at 1381 (reviewing PTO's determination that substantial new question of patentability was present); *Heinl v. Godici*, 143 F. Supp. 2d 593, 596 (E.D. Va. 2001) ("[B]ecause § 303(c)'s language and rationale address only PTO decisions to deny reexamination petitions, the statute does not bar review of PTO decisions to grant reexamination.").

that the major purpose of the threshold determination whether or not to reexamine is to provide a safeguard to the patent holder."). When Congress enacted the reexamination statute in 1980, it noted that "[t]he possibility of harassing patent holders" was a "classic criticism of some foreign reexamination systems," and so Congress wished to "ma[k]e sure it would not happen here." *Patlex*, 771 F.2d at 483–84 (quoting 96th Cong., 2d Sess. 594 (1980)). "The legislative record and the record of the interested public reflect a serious concern that reexamination not create new opportunities for abusive tactics and burdensome procedures" that would "harass the patentee and waste patent life." *In re Recreative Techs. Corp.*, 83 F.3d 1394, 1397 (Fed. Cir. 1996).

**2.**     In 2002, Congress amended § 303 to provide that the Office is not precluded from finding a substantial new question of patentability merely on the basis that the asserted art was previously cited to the Office. *See id.* at 1375–76 (citing 35 U.S.C. § 303(a) (2002)).[7] However, Congress made clear that it was not "diminish[ing]" the requirement of a "new" question. *Id.* at 1380 (citing H.R. Rep. 107-120, 2001 WL 729310, at *3 (June 28, 2001)). "As was true before the amendment, an 'argument already decided by the Office . . .' cannot raise a new

---

[7] The 2002 amendment overturned this Court's decision in *Portola Packaging*, 110 F.3d 786, which held that the Office may not grant reexamination based solely upon prior art that was previously before the Office (regardless of whether the art was actually addressed by the Office).

22

question of patentability." *Id.* (quoting H.R. Rep. 107-120). Thus, a challenger may not "simply repeat[]" "identical" arguments that have "previously been raised and overcome." *Id.* (quoting *Recreative Techs.*, 83 F.3d at 1396–97). The House report accompanying the 2002 amendment "stressed" that "the amendment is not a license to abuse patentees and waste the life of a patent." H.R. Rep. 107-120, 2001 WL 729310, at *3.

In short, as this Court has observed, the courts must remain "mindful that Congress intended that they continue to 'judiciously interpret the "substantial new question" standard to prevent cases of abusive tactics and harassment of patentees through reexamination.'" *Swanson*, 540 F.3d at 1381 (quoting H.R. Rep. 107-120, 2001 WL 729310, at *3); *see also* MPEP § 2240 ("The substantial new question of patentability requirement protects patentees from having to respond to, or participate in unjustified reexaminations.") (citing *Patlex*, 771 F.2d 480).

**3.** Section 2242 of the Manual of Patent Examination Procedure provides guidance to examiners on the application of the substantial-new-question standard. That section provides that a question of patentability is not "new" if it has been "decided in an earlier concluded reexamination or review of the patent by the Office." MPEP § 2242(I). "An earlier concluded reexamination or review of the patent," in turn, includes

> (A) the original examination of the application which matured into the patent; (B) the examination of the patent in a reissue application that

has resulted in a reissue of the patent; (C) the examination of the patent in an earlier concluded reexamination or supplemental examination; (D) the review of the patent in an earlier concluded trial by the Patent Trial and Appeal Board, such as a post-grant review, *inter partes* review, or covered business method review of the patent; or (E) any other contested Office proceeding which has been concluded and which involved the patent.

*Id.* The manual further explains that a "'substantial new question of patentability' is *not* raised by prior art presented in a reexamination request if the Office has previously considered (in an earlier concluded examination or review of the patent) the same question of patentability as to a patent claim favorable to the patent owner based on the same prior art patents or printed publications." MPEP § 2242(II)(A) (citing *Recreative Techs.*, 83 F.3d 1394).

### B. The arguments in Alarm.com's reexamination request were already considered and rejected by the Board in the '1091 Decision and were therefore not "new."

**1.** As explained above, *see supra* Statement of the Case, Alarm.com's reexamination request was a nearly verbatim copy of the '1091 petition. The request differed from the '1091 petition in only one minor respect: for dependent claims reciting a "normal status message," Alarm.com replaced Britton—which the Board had already held did not render obvious that limitation—with a different reference, Cheng.

These patentability arguments were therefore not "new" in any sense of that word. Alarm.com had already made these arguments once—in its third IPR petition

against the '513 patent—and the Board rejected them, concluding that Alarm.com had already had two chances to invalidate the '513 patent and was not entitled to a third. Vivint should not have had to defend a *fourth* attack on the patent that essentially duplicated the third (and came well after the § 315(b) bar date to boot). Indeed, this case exemplifies the "abusive tactics and burdensome procedures" that "harass the patentee and waste patent life" that the substantial-new-question standard is supposed to prevent. *Recreative Techs.*, 83 F.3d at 1397.

     **2.**     The Board found a substantial new question of patentability only by misreading § 2242 of the MPEP. The Board acknowledged that a "new" question of patentability is not presented if the same question was previously "decided in an earlier concluded examination or review of the patent by the Office." Appx23–24 (quoting MPEP § 2242(I)). However, the Board concluded that there had been no earlier "review of the patent by the Office" here because the '1091 Decision denied institution instead of addressing Alarm.com's patentability arguments on the merits. Appx24.

     The flaw in this reasoning is that, while a final written decision as to patentability is *one example* of "an earlier concluded examination of review of the patent by the Office," it is by no means the *only* example. The MPEP makes this clear: it also (in language the Board ignored) defines "[a]n earlier concluded reexamination or review of the patent" as "*any other contested Office proceeding*

*which has been concluded and which involved the patent*." MPEP § 2242(I) (emphasis added). The manual does not say that the examination must have "concluded in a final written decision" or "concluded on the merits"; it simply says "concluded."

The '1091 petition fits the definition set forth in the MPEP. It was a "contested Office proceeding"; it "has been concluded"; and it "involved the patent." It also involved the same questions Alarm.com raised in this reexamination. Thus, the MPEP in fact demonstrates that the reexamination request did not raise a "new" question.

It is worth emphasizing again that Alarm.com's actions here are exactly the sort of "abusive tactics" and "harass[ment]" that Congress wished to proscribe when it passed both the original and amended reexamination statute. *Recreative Techs.*, 83 F.3d at 1397. Preventing such tactics was the *raison d'etre* of the substantial-new-question standard. Thus, the strength of the case against finding a substantial new question is at its apex here, where a reexamination request repeats an argument that was *already rejected* as a "similar, serial challenge[]" that "risk[ed] harassment" of the patent owner. '1091 Decision at 12. The Board's conclusion that the rejection of

the '1091 petition was irrelevant to the substantial-new-question inquiry was thus deeply ironic.[8]

**3.**     In any event, even if the Board's reading of the MPEP were defensible—and it is not—the Board's conclusion still would have been wrong.

This Court has made clear that "when a section of the MPEP is inconsistent with the statute it must yield to the legislative purpose." *Recreative Techs.*, 83 F.3d at 1398; *see also Patlex*, 771 F.2d at 487 (voiding MPEP provisions requiring the PTO to resolve doubts in favor of granting reexamination as "contrary to the statutory mandate of 35 U.S.C. § 303"). Given the concerns motivating Congress's establishment of the substantial-new-question standard, concluding that Alarm.com's request presented a "new" question within the meaning of § 303 would do violence to the statute and contravene Congress's clear intent. That is, "[w]hen Congress enacted 35 U.S.C. § 303 for the purpose of protecting the patentee, it could not have intended an implementation that would negate this protection." *Patlex*, 771 F.2d at 487.

---

[8] To make matters worse, Alarm.com's abuse of the ex parte reexamination process is not limited to this patent. *See supra* n.3. Alarm.com filed not one but two ex parte reexamination requests concerning Vivint's '601 patent and an ex parte reexamination request concerning Vivint's '654 patent after a campaign of mostly unsuccessful IPR petitions against those patents.

The Board's reading of the MPEP accomplished precisely such "an implementation": it forced Vivint to defend itself against a fourth attack on the '513 patent on grounds that Vivint had already addressed and overcome. The statute does not permit that result—regardless of what the MPEP says.

### C. The Office has systematically made this error since 2012.

The need for judicial review of this practice could hardly be more urgent. Vivint is far from the only patent owner forced to defend against a reexamination request filed by a party who previously filed an IPR petition using the same prior art. Vivint's research has disclosed at least 119 instances since the passage of the American Invents Act in which a third party has used the same prior art in a serial IPR petition and reexamination request and the Office granted the reexamination request.[9]

In short, the Office has routinely disregarded § 325(d), discussed *infra* Section II, and the reexamination statute, flouting congressional intent by ignoring the statute's requirement of a "new" question of patentability and subjecting patent owners to repeated harassing attacks on the validity of their patents. The Court should not permit that practice to continue.

\* \* \*

---

[9] These reexaminations are listed immediately following the conclusion of this brief.

28

The Board erred in finding a substantial new question of patentability. This Court should vacate the Board's decision and remand with instructions to terminate the reexamination.

## II.    The Office acted arbitrarily and capriciously in granting the reexamination request after the Board rejected identical arguments under 35 U.S.C. § 325(d).

Even setting aside the substantial-new-question issue, Alarm.com's reexamination request should never have been granted in the first place in light of 35 U.S.C. § 325(d). Because the Board denied institution of the '1091 petition based on § 325(d) (among other considerations), Alarm.com's virtually identical reexamination request should have been denied based on § 325(d) as well. CRU's grant of reexamination amounts to this: the *same agency* applied the *same statute* to the *same factual scenario* but reached a different result. That is the epitome of "agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A.    Section 325(d) applies with full force to ex parte reexaminations.

Section 325(d) provides that, "[i]n determining whether to institute or order a proceeding under . . . chapter 30 [the chapter relating to ex parte reexamination], or chapter 31 [the chapter relating to *inter partes* review], the Director may take into account whether, and reject the petition or request because, the same or substantially

the same prior art or arguments previously were presented to the Office." Thus, by its plain text, § 325(d) applies to ex parte reexaminations.

This unambiguous statutory language is no accident. The legislative history confirms that Congress intended § 325(d) to apply with full force in ex parte reexaminations. Congress expressed concern that the Patent Office "currently is forced to accept many requests for ex parte . . . reexamination that raise challenges that are cumulative to or substantially overlap with issues previously considered by the Office with respect to the patent." 157 Cong. Rec. S1376 (March 8, 2011) (statement of Sen. Kyl). Section 325(d) was drafted to prevent similar, serial attacks on a patent, whether done though the *inter partes* review process *or* the ex parte reexamination process:

> In the second sentence of section 325(d), the present bill also authorizes the Director to reject any request for ex parte reexamination . . . on the basis that the same or substantially the same prior art or arguments previously were presented to the Office. This will prevent parties from mounting attacks on patents that raise issues that are substantially the same as issues that were already before the Office with respect to the patent.

*Id.*

The legislative history also makes clear that § 325(d) is intended to "complement[]" the protections provided by the estoppels of §§ 315(e) and 325(d). *Id.* The estoppel provisions attach only to grounds on which the Board instituted trial. *See id.* Section 325(d), in contrast, permits the Office to refuse a reexamination

30

request on an issue that was raised in a prior IPR petition *even if* "the request was not granted with respect to that issue"—that is, even if the issue was not addressed on the merits. *Id.* Thus, Congress specifically contemplated a situation such as this, where an ex parte reexamination was filed on an issue that had been previously raised in an IPR petition that was not instituted. And Congress passed § 325(d) as a "complement[ary]" guard against these kind of attacks.

The second OPLA decision accused Vivint of "misquot[ing]" this legislative history, suggesting that Senator Kyl's statements applied only to the estoppel provisions. Appx12215–12216. It is OPLA who misunderstands the import of the legislative history. As the quotations above demonstrate, Senator Kyl was very clear that § 325(d) would "complement[]" the estoppel provisions by preventing serial reexamination requests that mirrored previous IPR petitions *even if the petitions were not instituted* (i.e., in cases where estoppel would not attach).[10]

---

[10] Reflecting the statutory language and the legislative history, the Board has terminated concurrent and subsequently filed ex parte reexaminations based on § 325(d). *See Ariosa v. Illumina*, IPR2014-01093, Paper 81 at 9 (P.T.A.B. May 24, 2016) (holding that "even if Petitioner may not be estopped under 35 U.S.C. § 315(e)(2) from pursuing certain of the grounds of unpatentability it is advocating in its ex parte reexamination request . . . , 35 U.S.C. §§ 315(d) and 325(d) gives us the discretion to terminate the *ex parte* reexamination of the . . . patent"); *see also Ariosa v. Verinata Health*, IPR2013-00276, Paper 63 at 7 (P.T.A.B. May 24, 2016).

**B.     The Office's maintenance of this reexamination proceeding notwithstanding § 325(d) was arbitrary and capricious.**

**1.     The Office's grant of reexamination was flatly inconsistent with the Board's denial of the '1091 petition under § 325(d).**

As described above, mere days before the § 315(b) time bar, Alarm.com filed its third and final IPR petition against the '513 patent. The Board rejected it, deeming the third petition "a case of undesirable, incremental petitioning, in which a petitioner . . . mount[s] another . . . challenge after an earlier, unsuccessful or only partially successful challenge, by fixing deficiencies, noted by the Board, that were within the petitioner's capacity to avoid in the earlier petition or petitions." '1091 Decision at 12. This was a classic case for denial under § 325(d): "the same or substantially the same prior art or arguments" had previously been "presented to the Office" and the Office was not going to consider them again. Alarm.com had had two bites at the apple already; it was not entitled to a third.

Rather than heed the Board's rebuke, Alarm.com waited a year to glean as much information as it could from the IPR proceedings on the related patents, and it then used that information to repackage the '1091 petition into the request that led to this reexamination. That request should have been met with the same fate: denial under § 325(d). But the Office inexplicably ignored the statute, ignored Alarm.com's abusive tactics, and ignored the Board's prior decision. And it gave Alarm.com a *fourth* bite at the apple.

32

That decision should not stand. Such "[p]atently inconsistent application of agency standards to similar situations lacks rationality and is arbitrary." *Contractors Transp. Corp. v. United States*, 537 F.2d 1160, 1162 (4th Cir. 1976); *see also Chisholm v. Def. Logistics Agency,* 656 F.2d 42, 47 (3d Cir. 1981) (agencies "have an obligation to render consistent opinions"). Courts have long recognized that, if agencies are permitted to ignore their own prior decisions without reason, "those subject to the agency's authority cannot use its precedent as a guide for their conduct; nor will that precedent check arbitrary agency action." *Shaw's Supermarkets, Inc. v. Nat'l Labor Relations Bd.,* 884 F.2d 34, 41 (1st Cir. 1989); *accord Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *cf. Sierra Club v. E.P.A.*, 719 F.2d 436, 459 (D.C. Cir. 1983) (an internally inconsistent agency determination is "the hallmark of arbitrary action"); *IBG LLC v. Trading Techs. Int'l, Inc.*, 757 F. App'x 1004, 1008 (Fed. Cir. 2019) (similar). The grant of reexamination here was precisely this sort of inconsistent and arbitrary action.

### 2.    OPLA legally erred in refusing to terminate the reexamination.

After Vivint petitioned to vacate the reexamination proceeding on the ground that the grant of the reexamination request violated §325(d) and the APA, OPLA defended the Office's decision to proceed with the reexamination on several grounds. None withstands scrutiny.

a.    OPLA first suggested that the Office lacked statutory authority to terminate the reexamination once request had been granted. *See* Appx10847; Appx12210–12211. "[O]nce an order granting reexamination has issued," OPLA stated, "the Office is required to conduct reexamination pursuant to 35 U.S.C. [§] 305." Appx12211.[11]

That statement reflects a fundamental misconception of agency authority. "The power to reconsider is inherent in the power to decide." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008). "For this reason, the courts have uniformly concluded that administrative agencies possess inherent authority to reconsider their decisions, subject to certain limitations, regardless of whether they possess explicit statutory authority to do so." *Id.* (collecting cases).[12] Accordingly, given that the Office has the power to grant or deny reexamination in the first instance, it likewise has the authority to reconsider— and set aside—a decision to grant reexamination. The MPEP acknowledges this explicitly, providing that a reexamination may be "concluded[] by . . . terminating

---

[11] The second OPLA decision stated that Vivint did "not dispute that the Office is required by 35 U.S.C. [§] 305 to conduct reexamination once the order has been issued pursuant to 35 U.S.C. [§] 304." Appx12213. That is false: Vivint's second petition stated unequivocally that "OPLA is *not* prohibited from terminating an ongoing reexamination proceeding pursuant to § 325(d)." S.Add.10.

[12] The only circumstance the Court identified in which any agency would *not* be permitted to reconsider a decision is if such reconsideration were forbidden by statute. *See Tokyo Kikai*, 529 F.3d at 1360–61.

the reexamination proceeding." MPEP § 2294. Indeed, OPLA admitted that the Office is authorized to vacate a reexamination order on the ground that "the issuance of the order was an ultra vires action on the part of the Office." Appx10847 n.2; *see also* MPEP § 2246(II) ("Separate from the Board's consideration of the SNQ issue, a patent owner may file a petition under 37 C.F.R. § 1.181(a)(3) to vacate the ex parte reexamination order as 'ultra vires.'").

OPLA also suggested that Vivint should have raised its § 325(d) argument before reexamination was granted. *See, e.g.*, Appx12211–12212. But, as Vivint pointed out (and OPLA acknowledged, *see id.*), Office rules prohibit patent owners from filing *anything* directed to the merits after a reexamination request is filed but before the reexamination is granted. *See* MPEP § 2225 (prohibiting the filing of "papers directed to the merits of the reexamination" after request for ex parte reexamination is filed but before the Office issues a decision on the request); *id.* § 2240 ("No input from the patent owner is considered prior to the determination, unless the patent owner filed the request."); *id.* § 2249 ("The patent owner has no right to file a statement subsequent to the filing of the request under 35 U.S.C. § 302 but prior to the order for reexamination. Any such premature statement will not be acknowledged nor considered by the Office when making the decision on the request and will be returned or discarded at the option of the Office, and will be expunged if inadvertently entered into the record."). And, as OPLA acknowledged, the Office

35

has stated on two prior occasions that petitions to vacate an already-ordered examination under § 325(d) *are* proper. *See* Appx10846–10847 n.1.

OPLA's response was that Vivint should have filed a pre-grant petition anyway and asked the Office to waive the rules. *See* Appx12211–12212. That makes no sense. The agency should not be permitted to penalize Vivint for declining to raise the § 325(d) issue in a way that Office policy expressly prohibits, and instead raising the issue in a way that previous Office decisions have expressly allowed. *Cf. Johnson v. Ashcroft*, 286 F.3d 696, 700 (3d Cir. 2002) (agency acts arbitrarily if it departs from established rules and precedent without a "principled reason").

**b.**   OPLA also stated that CRU's grant of the reexamination request was not inconsistent with the '1091 Decision because the Board "denied review [in the IPR] pursuant to its discretion under 35 U.S.C. [§] 314(a)," which does not apply to reexamination proceedings. Appx10849. This reasoning is likewise flawed.

The Board in the '1091 Decision considered eight factors in determining whether to grant institution. One of those factors was § 325(d) itself, *see* '1091 Decision at 7 & n.9, and the Board spent three full pages (out of 14 total) discussing this factor and why it counseled in favor of denying Alarm.com's petition. *See id.* at 11–14. Moreover, each of the other factors the Board addressed had significant overlap with the § 325(d) inquiry. *See id.* at 9 (noting in connection with the "third factor" that Alarm.com had previously filed two petitions challenging the '513

36

patent); *id.* at 9–10 (noting in connection with the "fourth and sixth factors" that Alarm.com had previously asserted the same prior art in earlier IPRs); *id.* at 10–11 (noting in connection with the "fifth and seventh factors" that Alarm.com had improperly used the Board's earlier decisions "in an effort to perfect its present challenges"). Section 325(d) thus figured *heavily*—indeed, it was almost certainly dispositive—in the Board's denial of the '1091 petition. And given that § 325(d) applies to reexamination proceedings as well, there was no principled reason for the Board to reach a different result in this case.

    **c.**    OPLA also relied on the fact that application of § 325(d) is "*discretionary*, not mandatory." Appx12214. It is surely true that the Office has discretion regarding whether to apply § 325(d) in any given case: the statute provides that "the Director *may* take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office" (emphasis added). But whether an agency has discretion regarding how to treat a situation in the first instance is an entirely different question from whether an agency can treat two identical situations differently without providing any reason for doing so.

    As the Supreme Court has explained, "[t]hough the agency's discretion is unfettered at the outset, if it announces and follows . . . by settled course of adjudication[ ]a general policy by which its exercise of discretion will be governed,

an irrational departure from that policy . . . could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion.'" *Immigration & Naturalization Serv. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996); *see also Virk v. INS*, 295 F.3d 1055, 1059 (9th Cir. 2002) (agency's "arbitrary and unexplained departure" from prior course is an abuse of discretion); *Contractors Transp.*, 537 F.2d at 1162. Once the Office had exercised its discretion to deem Alarm.com's '1091 petition unworthy of consideration under § 325(d), it was not permitted to reverse course and find those same arguments meritorious in considering the reexamination request (at least without offering some explanation for the inconsistency, which it did not do here).

    **d.**    OPLA's second decision appeared to suggest that the APA did not apply to the order for reexamination because it was not a "final agency action." Appx12213–12214. That is flatly wrong. That an agency action is not "final" under the APA means it is not *immediately reviewable*. It does *not* mean that that the action is not reviewable at all, nor does it mean that the agency can do whatever it wants free of the constraints (for example, the prohibition against arbitrary action) imposed by the APA. On OPLA's view, an agency is permitted to act arbitrarily and capriciously any time it wants, except when engaging in final agency action. That cannot be the law.

Indeed, the very case OPLA cited in this portion of its opinion—*Automated Merchandising Systems, Inc. v. Lee*, 782 F.3d 1376 (Fed. Cir. 2015)—demonstrates OPLA's error. There, the Court noted that any "intermediate" (i.e., non-final) agency action that is not explicitly made unreviewable by statute "is subject to review on the review of the final agency action"—i.e., once proceedings are completed and the entire case goes up on appeal. *Id.* at 1381 (quoting 5 U.S.C. § 704). Thus, even though the grant of reexamination was not final, it was ultimately reviewable, and it was still subject to the APA's prohibition against arbitrary and capricious agency action.

**e.**    OPLA also suggested that § 325(d) should apply less stringently in ex parte reexaminations than it should in *inter partes* reviews. *See* Appx10853–10855. The simplest answer to this point is that nothing in the *text* of § 325(d) supports applying the statute differently in the two different contexts. In any event, however, none of the distinctions identified by OPLA supports OPLA's conclusion. Indeed, if anything, the differences between the two types of proceedings counsel in favor of applying § 325(d) *more* stringently in the reexamination context.

**i.**    *First*, OPLA reasoned that, in IPRs, "both parties have a full right of participation throughout the entire procedure" and "a right to appeal the PTAB's final decision to the . . . Federal Circuit," whereas in reexamination proceedings, "the right of a third party requester is limited" and the third party has no right to

appeal. Appx10854. But OPLA did not explain why this means that § 325(d) should have less force in reexaminations, nor is any explanation immediately apparent. In both cases, § 325(d) prevents the patent owner from being subjected to repeated, cumulative, and harassing invalidity attacks that could have and should have been raised in an earlier proceeding.

ii.     *Second*, OPLA observed that the ex parte reexamination statute allows the Office to order reexamination on a claim-by-claim and ground-by-ground basis, whereas the IPR statute establishes "a regime where a reasonable prospect of success on a single claim justifies review of all," *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018). *See* Appx10854. Again, it is not at all clear why this distinction has any bearing on the application of § 325(d); whether review is conducted on all challenged claims or just one, the patent owner is still forced to defend against repetitive and abusive challenges to the patent's validity.

iii.     *Third*, OPLA pointed out that "the standard used for ordering ex parte reexamination"—whether the request raises a "substantial new question of patentability"—"differs from the standard used for instituting *inter partes* review"— whether there is a reasonable likelihood that the petitioner would prevail on at least one of the challenges in the petition. Appx10854. In OPLA's view, the substantial-new-question standard "already substantially afford[s]" patent owners the

"protection . . . against harassment based on repetitive arguments" that § 325(d) provides. *Id.*

This line of reasoning suffers from two problems. The first is that, under the interpretation of the substantial-new-question standard applied by the Office in this case, that standard plainly does *not* afford patent owners sufficient protection against harassment based on repetitive arguments. If it did, Alarm.com's reexamination request would never have been granted in the first place. *See supra* Section I.

The second problem is that OPLA's reasoning reads § 325(d) out of the statute entirely in the context of reexaminations. *Cf. TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (courts should avoid interpretations that render a statutory provision "entirely superfluous in all but the most unusual circumstances"). If Congress had intended the substantial-new-question standard to be the only "protection. . . against harassment" in reexamination proceedings, it would not have explicitly directed that § 325(d) should apply in reexaminations too.

**iv.**    *Fourth*, OPLA noted that the "IPR statute is permissive," whereas, "absent the provisions of 35 U.S.C. [§] 325(d), the ex parte reexamination statute requires the Office to order reexamination if the request is found to raise a substantial new question of patentability." Appx10855. This amounts to saying that, if one ignores the discretion to deny reexamination explicitly conferred by § 325(d), the

Office has no discretion to deny reexamination—in other words, the Office has no discretion, other than the discretion it indisputably has.

**v.**    *Fifth*, OPLA stated that, unlike in *inter partes* reviews, "once an order granting reexamination has been issued, the Office is required to conduct reexamination." Appx10855. As explained above, that is wrong. Moreover, even if it were correct, it would suggest that § 325(d)'s gatekeeping provision is even *more* important in ex parte reexaminations than in *inter partes* reviews (since there would be no other route through which an improperly filed reexamination request could be rejected).

**vi.**    *Sixth*, OPLA observed that "the ex parte reexamination statute does not provide for a filing of a response by the patent owner prior to an order granting reexamination." Appx10855. Quite right—but this simply shows why Vivint could not have raised its § 325(d) argument before the order granting reexamination. *See supra* pp. 35–36. It certainly does not suggest that § 325(d) should apply with less force in ex parte reexaminations than it does in IPRs.

## C.    The Office routinely fails to conduct the correct analysis.

Again, this is not a standalone case. Instead, Vivint's case is one of many on the list of more than a hundred in which the Office has arbitrarily and capriciously ignored prior IPR proceedings when considering whether to grant a reexamination request. *See supra* Section I.C. This Court's intervention is necessary to put a stop

to this abuse of the reexamination system and to ensure that Congress's decision to subject reexamination proceedings to § 325(d) is respected.

<center>*    *    *</center>

This reexamination should never have been granted in the first place. After Alarm.com's '1091 petition was denied under § 325(d), its nearly identical reexamination request should have been denied as well. Patent infringers should not be permitted to use the reexamination process as an end-run around the § 315(b) time bar and a means to continually "harass the patentee and waste patent life," *Recreative Techs.*, 83 F.3d at 1397.

## III.    The appointment scheme for APJs is unconstitutional under the Appointments Clause.

In *Arthrex v. Smith & Nephew*, a panel of this Court held that APJs are principal officers and hence that their appointment by the Secretary of Commerce violates the Appointments Clause. The *Arthrex* panel purported to remedy the constitutional defect by severing and invalidating APJs' tenure protections, which, the panel held, rendered the judges inferior officers. 941 F.3d at 1325. The Court has since made clear that APJs were unconstitutionally appointed principal officers "for purposes of all governmental functions of their office," including their adjudication of ex parte reexamination proceedings like this one. *In re Boloro Global Ltd.*, 963 F.3d 1380, 1381 (Fed. Cir. 2020) (Mem.) (citing *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991); *VirnetX Inc. v. Cisco Sys., Inc.*, 958 F.3d 1333 (Fed. Cir. 2020)). The

<center>43</center>

Supreme Court has since granted certiorari in *Arthrex* to address both the merits of the Appointments Clause question and the propriety of the *Arthrex* panel's remedy. *See* Order, *United States v. Arthrex, Inc.*, No. 19-1434 (U.S. Oct. 13, 2020).

Vivint maintains that this *Arthrex* panel's remedy was flawed in two respects. Vivint acknowledges that these arguments are foreclosed by *Arthrex* but, in light of the Supreme Court's grant of certiorari, raises them here to preserve them for further review.

*First*, the Court erred in severing APJs' tenure protections. Congress intended APJs to adjudicate cases impartially and independently, free from undue influence by other agency officials, and Congress established tenure protections for APJs to ensure that independence. *See infra* Section IV. Severance and invalidation of those provisions was inconsistent with congressional intent and therefore impermissible. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1482 (2018) (constitutionally flawed statutory provision is severable only if "the law remains fully operative without the invalid provision," such that the court can infer that Congress would have enacted the valid provisions independent of the invalid ones).

*Second*, the panel's remedy was insufficient to rectify the constitutional problem. APJs, even if removable at will, remain empowered to issue final decisions with respect to patentability on behalf of the executive branch and therefore remain principal officers. *See Edmond v. United States*, 520 U.S. 651, 662 (1997) ("Whether

one is an 'inferior' officer depends on whether he has a superior."); *see also, e.g.*, *Ass'n of AM. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 39 (D.C. Cir. 2016) (holding that Amtrak arbitrator was a principal officer because there was no "procedure by which [an] arbitrator's decision is reviewable by" the agency head). Accordingly, the APJs who issued the final written decision in this case were unconstitutionally appointed and the decision should therefore be vacated.

## IV. This ex parte reexamination violated the Administrative Procedure Act because the APJs of the Board are no longer qualified to preside over formal adjudications.

Even assuming that the *Arthrex* panel's remedy fixed the constitutional problem with APJs' appointments, the panel unwittingly created an insurmountable *statutory* obstacle to the continued maintenance of ex parte reexamination proceedings. Specifically, the panel's remedy rendered APJs unable to lawfully provide over ex parte reexaminations consistent with the Administrative Procedure Act.[13]

**A.** Section 556 of Title 5, which governs formal adjudications under the APA, requires such adjudications to be conducted by one of three categories of actors: "(1) the agency; (2) one or more members of the body which comprises the agency; or (3) one or more administrative law judges appointed under [5 U.S.C.

---

[13] To the extent the Court views this argument as foreclosed by *Arthrex*, Vivint raises it here to preserve it for further review.

§] 3105." 5 U.S.C. § 556(b). Section 3105, in turn, permits agencies to "appoint as many administrative law judges as are necessary for proceedings required to be conducted in accordance with [5 U.S.C. §§] 556 and 557." Finally, another provision of Title 5, § 7521, prohibits removal of administrative law judges appointed under § 3105 except "for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a).

Ex parte reexaminations are formal administrative adjudications subject to the requirements of 5 U.S.C. §§ 554 and 556. *See Rambus Inc. v. Rea*, 731 F.3d 1248, 1255 (Fed. Cir. 2013) (applying § 554 to ex parte reexamination); *see generally Dickinson v. Zurko*, 527 U.S. 150 (1999) (APA governs proceedings before the Patent and Trademark Office). This proposition follows inexorably from the statutes themselves. Sections 554 and 556 apply "in every case of adjudication required by statute to be determined on the record after opportunity for agency hearing," 5 U.S.C. § 554(a), and ex parte reexaminations fit that description. *See* 35 U.S.C. § 306 (providing patent owner in ex parte reexamination with the right to a hearing before the Board). That means, as explained above, that ex parte reexaminations must be heard by either (1) the agency, (2) members of the body comprising the agency, or (3) one or more administrative law judges.

APJs are not the Patent and Trademark Office, and they are not members of a body comprising the Office.[14] So, if they are to hear formal adjudications under § 556, they must be administrative law judges. *See also* 154 Cong. Rec. H7233-01, 7234–35 (July 29, 2008) (statement of Rep. King) (noting that administrative patent judges are "administrative law judges"); *see also Commerce, Justice, Science, & Related Agencies Appropriations for 2012: Hearings Before the Subcomm. On Commerce, Justice, Science, & Related Agencies of the H. Comm. on Appropriations*, 112 Cong. 196 (Mar. 2, 2011) (statement of USPTO Dir. David Kappos) (similar). And administrative law judges must be subject to the removal protections of 5 U.S.C. § 7521. But—because *Arthrex* decreed that APJs are *not* subject to those removal protections—they are, by definition, not "administrative law judges" within the meaning of § 556. And, because they are not, they can no longer decide ex parte reexaminations pursuant to § 556.

The *Arthrex* panel stated—in a footnote and without offering any supporting analysis—that "the applicable provision to removal of APJs in Title 5 is § 7513," rather than § 7521. 941 F.3d at 1333 n.4. That is incorrect for the reasons just

---

[14] The "[m]embers of the body comprising the agency" clause applies only to agencies that—unlike the Patent and Trademark Office—are themselves multi-member bodies. For example, the "members of the body comprising the" Securities and Exchange Commission are the SEC Commissioners, and the "members of the body comprising the" International Trade Commission are the ITC Commissioners. *See R.A. Holman & Co. v. SEC*, 366 F.2d 446, 455 (2d Cir. 1966).

explained. Moreover, Congress explicitly provided that "[o]fficers and employees of the Office" would be "subject to the provisions of title 5, relating to Federal employees." 35 U.S.C. § 3(c). Those "provisions of title 5" include §§ 3105 and 7521, which, on their face, apply to *all* administrative law judges who hear formal adjudications.

Section 7513, in contrast, applies broadly to "employees" of agencies. No one disputes that administrative patent judges are more than mere employees: they are "Officers of the United States." *See Arthrex*, 941 F.3d at 1328 (noting the parties' agreement that administrative patent judges "are officers as opposed to mere employees"); *cf. Lucia v. SEC*, 138 S. Ct. 2044 (2018) (holding that SEC administrative law judges "Officers of the United States," not mere employees). Accordingly, the provision of Title 5 specifically governing employment protections for administrative law judges—not the provision of Title 5 generally applicable to agency employees—should apply here. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384–85 (1992) ("it is a commonplace of statutory construction that the specific governs the general").

**B.**     This problem is no mere technicality. Congress established removal protections for administrative law judges deliberately, and for good reason. Congress wanted to ensure that administrative adjudications would be conducted either by the agency itself—which could be held accountable through the political process—or

else by independent, impartial decision-makers who were not beholden to the agency that appointed them. *See Wong Yang Sung v. McGrath*, 339 U.S. 33, 52 (1950).

In the years leading up to the APA's passage, many stakeholders complained that agency adjudicators "were mere tools of the agency concerned and subservient to the agency heads in making their proposed findings of fact and recommendations." *Ramspeck v. Fed. Trial Exam'rs Conference*, 345 U.S. 128, 131 (1953). In enacting the APA in 1946, one of Congress's principal goals was to ensure that these adjudicators could decide disputed matters independently and impartially, without interference by the agency. *See Wong Yang Sung*, 339 U.S. at 38–45.[15]

To that end, Congress established certain "formal requirements to be applicable '[i]n every case of adjudication required by statute to be determined on the record after opportunity for agency hearing." *Wong Yang Sung*, 339 U.S. at 48 (quoting APA § 5, 60 Stat. 237, 239, 5 U.S.C. § 1004 (1946)). One of these requirements—found in the predecessor to 5 U.S.C. § 7521—was that such adjudications must be conducted by an adjudicator who is "removable by the agency

---

[15] The idea that executive officers who perform adjudicatory functions should have a measure of independence from the executive has a long pedigree. "[A]s early as 1789 James Madison stated that 'there may be strong reasons why an' executive 'officer' such as the Comptroller of the United States 'should not hold his office at the pleasure of the Executive branch' if one of his 'principal duties' 'partakes strongly of the judicial character.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 530 (2010) (Breyer, J., dissenting) (citation omitted).

in which [she is] employed only for good cause established and determined by the Civil Service Commission . . . after opportunity for hearing and upon the record thereof." *Ramspeck*, 345 U.S. at 132 (quoting APA § 11, 60 Stat. at 244, 5 U.S.C. § 1010 (1946)). These for-cause removal protections, which ensured that the adjudicators' decisions were not unduly influenced by the agency of which they were a part, were a central pillar of the APA. *See Butz v. Economu*, 438 U.S. 478, 513–14 (1978) ("Since the securing of fair and competent hearing personnel was viewed as 'the heart of formal administrative adjudication,' the Administrative Procedure Act contains a number of provisions designed to guarantee the independence of hearing examiners.") (quoting Final Report of the Attorney General's Committee on Administrative Procedure 46 (1941)); *Ramspeck*, 345 U.S. at 131–32.

**C.**    The presence of an independent adjudicator is not simply good practice as a matter of administrative law. This Court has suggested that an "impartial decision maker is [an] essential" element of due process. *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). Accordingly, if there were any doubt about whether the APA requires APJs to have for-cause removal protections—and there is not—the constitutional-avoidance canon would resolve it. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.").

50

**D.**    Section 556(b) contains a savings clause providing that "[t]his subchapter does not supersede the conduct of specified classes of proceedings . . . by or before boards or other employees specially provided for by or designated under statute." This provision, however, does not alter the analysis above.

As explained, ex parte reexaminations are subject to the formal-adjudication requirements of the APA, which include the strictures of § 556. *See* 35 U.S.C. § 316; *Belden*, 805 F.3d at 1080. And another provision of the APA, 5 U.S.C. § 559, provides that "[s]ubsequent statute[s] may not be held to supersede or modify . . . sections 3105 . . . or 7521 of this title, . . . except to the extent that [they] do[] so expressly." *See also Dickinson*, 527 U.S. at 155 (noting that § 559 expresses "[a] statutory intent that legislative departures from the norm must be clear"); *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1127 (7th Cir. 2008) (APA cannot be amended "by implication").

Given § 559, if Congress wished to carve out an at-will removability exception for APJs, it would have had to do so expressly. But Congress did not do that. It did the opposite, providing that "[o]fficers and employees of the [Patent and Trademark] Office shall be subject to the provisions of title 5, relating to Federal employees." 35 U.S.C. § 3(c). Those "provisions" include 5 U.S.C. § 7521, which

require administrative law judges who hear formal adjudications to have tenure protections.[16]

## CONCLUSION AND RELIEF SOUGHT

This Court should vacate the Board's decision and remand with instructions to terminate the reexamination.

---

[16] Vivint's decision to raise its constitutional and statutory challenges to the Board's composition for the first time in this Court is proper. In *Arthrex*, the Court held that the petitioner's Appointments Clause challenge was timely because it had been "raised before the first body capable of providing it with the relief sought"—i.e., this Court. 941 F.3d at 1320. Raising the argument to the Board, the Court reasoned, would "have been futile" because "[t]he only possibility of correction" would have been "the Director shutting down" the entire *inter partes* review regime. *Id.* Just so here: Vivint's contention is that the Board as currently constituted cannot lawfully decide ex parte reexaminations consistent with the Appointments Clause and the Administrative Procedure Act. There is nothing (or at least nothing short of "shutting down" the whole ex parte reexamination system) that the Board could have done to remedy the alleged defects had they been raised below. Accordingly, these arguments have been timely raised.

**LIST OF GRANTED REEXAMINATIONS IN WHICH
THIRD PARTY HAS USED THE SAME PRIOR ART
IN A SERIAL IPR PETITION AND REEXAMINATION REQUEST**

Reexam. No. 90/014,528 (U.S. Patent No. 10,033,465) (filed June 9, 2020)
Reexam. No. 90/014,527 (U.S. Patent No. 10,270,535) (filed June 9, 2020)
Reexam. No. 90/014,526 (U.S. Patent No. 10,461,866) (filed June 9, 2020)
Reexam. No. 90/014,510 (U.S. Patent No. 9,467,838) (filed May 15, 2020)
Reexam. No. 90/014,509 (U.S. Patent No. 9,445,251) (filed May 15, 2020)
Reexam. No. 90/014,508 (U.S. Patent No. 9,408,055) (filed May 15, 2020)
Reexam. No. 90/014,507 (U.S. Patent No. 8,213,970) (filed May 15, 2020)
Reexam. No. 90/014,502 (U.S. Patent No. 7,567,575) (filed Apr. 29, 2020)
Reexam. No. 90/014,501 (U.S. Patent No. 8,429,231) (filed Apr. 29, 2020)
Reexam. No. 90/014,500 (U.S. Patent No. 6,356,841) (filed Apr. 28, 2020)
Reexam. No. 90/014,491 (U.S. Patent No. D828255) (filed Apr. 8, 2020)
Reexam. No. 90/014,476 (U.S. Patent No. 9,686,193) (filed Mar. 19, 2020)
Reexam. No. 90/014,469 (U.S. Patent No. 9,137,205) (filed Mar. 2, 2020)
Reexam. No. 90/014,439 (U.S. Patent No. 9,645,580) (filed Jan. 21, 2020)
Reexam. No. 90/014,397 (U.S. Patent No. 7,124,205) (filed Oct. 25, 2019)
Reexam. No. 90/014,392 (U.S. Patent No. 9,736,689) (filed Oct. 22, 2019)
Reexam. No. 90/014,385 (U.S. Patent No. 8,805,948) (filed Oct. 1, 2019)
Reexam. No. 90/014,373 (U.S. Patent No. 9,829,589) (filed Sept. 6, 2019
Reexam. No. 90/014,368 (U.S. Patent No. 7,802,310) (filed Aug. 20, 2019)
Reexam. No. 90/014,366 (U.S. Patent No. 9,786,140) (filed Aug. 13, 2019)
Reexam. No. 90/014,363 (U.S. Patent No. 10026281) (filed Aug. 9, 2019)
Reexam. No. 90/014,359 (U.S. Patent No. 6,923,387) (filed Aug. 6, 2019)
Reexam. No. 90/014,347 (U.S. Patent No. 9,805,169) (filed July 29, 2019)
Reexam. No. 90/014,345 (U.S. Patent No. 9,058,412) (filed July 26, 2019)
Reexam. No. 90/014,346 (U.S. Patent No. 9,367,665) (filed July 26, 2019)
Reexam. No. 90/014,344 (U.S. Patent No. 8,990,099) (filed July 25, 2019)
Reexam. No. 90/014,343 (U.S. Patent No. 9,058,413) (filed July 25, 2019)
Reexam. No. 90/014,330 (U.S. Patent No. 7,039,033) (filed June 28, 2019)
Reexam. No. 90/014,286 (U.S. Patent No. 7,951,346) (filed Apr. 16, 2019)
Reexam. No. 90/014,288 (U.S. Patent No. 6,354,479) (filed Apr. 16, 2019)
Reexam. No. 90/014,281 (U.S. Patent No. 6,446,127) (filed Apr. 3, 2019)
Reexam. No. 90/020,128 (U.S. Patent No. 8,155,342) (filed Mar. 22, 2019)
Reexam. No. 90/014,266 (U.S. Patent No. 8,700,996) (filed Feb. 20, 2019)
Reexam. No. 90/014,264 (U.S. Patent No. 7,312,970) (filed Feb. 18, 2019)
Reexam. No. 90/014,228 (U.S. Patent No. 7,124,927) (filed Nov. 1, 2018)
Reexam. No. 90/014,227 (U.S. Patent No. 6,885,055) (filed Oct. 31, 2018)

Reexam. No. 90/014,225 (U.S. Patent No. 8,323,155) (filed Oct. 30, 2018)
Reexam. No. 90/014,222 (U.S. Patent No. 7,341,542) (filed Oct. 19, 2018)
Reexam. No. 90/014,216 (U.S. Patent No. 6,689,019) (filed Oct. 5, 2018)
Reexam. No. 90/014,217 (U.S. Patent No. 6,674,596) (filed Oct. 5, 2018)
Reexam. No. 90/014,201 (U.S. Patent No. 7,129,091) (filed Sept. 13, 2018)
Reexam. No. 90/014,178 (U.S. Patent No. 6,437,692) (filed Aug. 2, 2018)
Reexam. No. 90/014,166 (U.S. Patent No. 6,923,387) (filed July 16, 2018)
Reexam. No. 90/014,156 (U.S. Patent No. 9,511,929) (filed June 25, 2018)
Reexam. No. 90/014,154 (U.S. Patent No. 6,193,631) (filed June 19, 2018)
Reexam. No. 90/014,151 (U.S. Patent No. 6,037,307) (filed June 13, 2018)
Reexam. No. 90/014,145 (U.S. Patent No. 5,606,951) (filed May 30, 2018)
Reexam. No. 90/014,123 (U.S. Patent No. 7,951,346) (filed Apr. 12, 2018)
Reexam. No. 90/014,119 (U.S. Patent No. 7,295,532) (filed Apr. 3, 2018)
Reexam. No. 90/014,108 (U.S. Patent No. 5,451,558) (filed Mar. 12, 2018)
Reexam. No. 90/014,102 (U.S. Patent No. 5,953,911) (filed Mar. 6, 2018)
Reexam. No. 90/014,101 (U.S. Patent No. 5,599,758) (filed Mar. 5, 2018)
Reexam. No. 90/014,097 (U.S. Patent No. 7,199,715) (filed Feb. 23, 2018)
Reexam. No. 90/014,095 (U.S. Patent No. 8,377,129) (filed Feb. 21, 2018)
Reexam. No. 90/014,075 (U.S. Patent No. 7,043,543) (filed Jan. 26, 2018)
Reexam. No. 90/014,056 (U.S. Patent No. 6,959,293) (filed Dec. 15, 2017)
Reexam. No. 90/014,045 (U.S. Patent No. 8,822,148) (filed Nov. 6, 2017)
Reexam. No. 90/014,043 (U.S. Patent No. 8,304,193) (filed Nov. 3, 2017)
Reexam. No. 90/014,042 (U.S. Patent No. 8,329,407) (filed Nov. 2, 2017)
Reexam. No. 90/014,036 (U.S. Patent No. 9,295,482) (filed Oct. 16, 2017)
Reexam. No. 90/014,035 (U.S. Patent No. 8,323,155) (filed Oct. 13, 2017)
Reexam. No. 90/014,032 (U.S. Patent No. 6,689,019) (filed Oct. 13, 2017)
Reexam. No. 90/014,033 (U.S. Patent No. 7,341,542) (filed Oct. 13, 2017)
Reexam. No. 90/014,034 (U.S. Patent No. 7,632,219) (filed Oct. 13, 2017)
Reexam. No. 90/020,115 (U.S. Patent No. 6,717,513) (filed Aug. 2, 2017)
Reexam. No. 90/013,992 (U.S. Patent No. 6,193,631) (filed July 19, 2017)
Reexam. No. 90/013,990 (U.S. Patent No. 8,827,028) (filed July 18, 2017)
Reexam. No. 90/013,980 (U.S. Patent No. 9,254,865) (filed July 12, 2017)
Reexam. No. 90/013,967 (U.S. Patent No. RE43500) (filed June 7, 2017)
Reexam. No. 90/013,968 (U.S. Patent No. RE43528) (filed June 7, 2017)
Reexam. No. 90/013,969 (U.S. Patent No. RE43529) (filed June 7, 2017)
Reexam. No. 90/013,934 (U.S. Patent No. 7,003,357) (filed Apr. 10, 2017)
Reexam. No. 90/013,889 (U.S. Patent No. 6,199,077) (filed Jan. 3, 2017)
Reexam. No. 90/013,868 (U.S. Patent No. 6,202,395) (filed Nov. 30, 2016)
Reexam. No. 90/013,861 (U.S. Patent No. 7,429,827) (filed Nov. 7, 2016)
Reexam. No. 90/013,860 (U.S. Patent No. 7,429,827) (filed Nov. 7, 2016)

Reexam. No. 90/013,829 (U.S. Patent No. 5,606,951) (filed Oct. 5, 2016)
Reexam. No. 90/013,814 (U.S. Patent No. 5,898,849) (filed Sept. 20, 2016)
Reexam. No. 90/013,812 (U.S. Patent No. 8,015,182) (filed Sept. 16, 2016)
Reexam. No. 90/013,813 (U.S. Patent No. 7,756,996) (filed Sept. 16, 2016)
Reexam. No. 90/013,811 (U.S. Patent No. 7,930,299) (filed Sept. 16, 2016)
Reexam. No. 90/013,801 (U.S. Patent No. 5,905,627) (filed Aug. 29, 2016)
Reexam. No. 90/013,791 (U.S. Patent No. 6,923,387) (filed Aug. 8, 2016)
Reexam. No. 90/013,753 (U.S. Patent No. 5,607,454) (filed May 24, 2016)
Reexam. No. 90/013,723 (U.S. Patent No. 5,735,879) (filed Apr. 12, 2016)
Reexam. No. 90/013,709 (U.S. Patent No. RE38551) (filed Mar. 25, 2016)
Reexam. No. 90/013,707 (U.S. Patent No. 7,987,311) (filed Mar. 24, 2016)
Reexam. No. 90/013,690 (U.S. Patent No. 8,584,946) (filed Feb. 9, 2016)
Reexam. No. 90/013,684 (U.S. Patent No. 5,735,879) (filed Jan. 19, 2016)
Reexam. No. 90/013,678 (U.S. Patent No. 8,318,430) (filed Jan. 8, 2016)
Reexam. No. 90/013,671 (U.S. Patent No. 7,955,794) (filed Jan. 4, 2016)
Reexam. No. 90/013,667 (U.S. Patent No. 7,955,794) (filed Dec. 29, 2015)
Reexam. No. 90/013,666 (U.S. Patent No. 7,955,794) (filed Dec. 21, 2015)
Reexam. No. 90/013,649 (U.S. Patent No. D525731) (filed Dec. 9, 2015)
Reexam. No. 90/013,652 (U.S. Patent No. 7,647,633) (filed Dec. 9, 2015)
Reexam. No. 90/013,592 (U.S. Patent No. 8,300,863) (filed Sept. 22, 2015)
Reexam. No. 90/013,586 (U.S. Patent No. 6,292,547) (filed Sept. 14, 2015)
Reexam. No. 90/013,575 (U.S. Patent No. 7,389,836) (filed Aug. 31, 2015)
Reexam. No. 90/013,576 (U.S. Patent No. 7,493,979) (filed Aug. 31, 2015)
Reexam. No. 90/013,554 (U.S. Patent No. 8,388,501) (filed July 27, 2015)
Reexam. No. 90/013,487 (U.S. Patent No. 6,415,280) (filed Apr. 14, 2015)
Reexam. No. 90/013,458 (U.S. Patent No. 6,475,435) (filed Feb 24, 2015)
Reexam. No. 90/013,454 (U.S. Patent No. 5,749,905) (filed Feb. 18, 2015)
Reexam. No. 90/013,446 (U.S. Patent No. 5,997,915) (filed Feb. 17, 2015)
Reexam. No. 90/013,445 (U.S. Patent No. 6,011,040) (filed Feb. 17, 2015)
Reexam. No. 90/013,448 (U.S. Patent No. 6,673,381) (filed Feb. 17, 2015)
Reexam. No. 90/013,450 (U.S. Patent No. 7,172,778) (filed Feb. 17, 2015)
Reexam. No. 90/013,444 (U.S. Patent No. 6,218,930) (filed Feb. 16, 2015)
Reexam. No. 90/013,370 (U.S. Patent No. 6,771,970) (filed Oct. 13, 2014)
Reexam. No. 90/013,206 (U.S. Patent No. 6,658,464) (filed Apr. 9, 2014)
Reexam. No. 90/013,205 (U.S. Patent No. 6,557,054) (filed Apr. 9, 2014)
Reexam. No. 90/013,183 (U.S. Patent No. 5,592,555) (filed Mar. 19, 2014)
Reexam. No. 90/013,175 (U.S. Patent No. 7,587,469) (filed Mar. 7, 2014)
Reexam. No. 90/013,167 (U.S. Patent No. 7,769,605) (filed Feb. 27, 2014)
Reexam. No. 90/013,025 (U.S. Patent No. 7,015,868) (filed Oct. 9, 2013)
Reexam. No. 90/013,022 (U.S. Patent No. 7,123,208) (filed Oct. 9, 2013)

Reexam. No. 90/013,024 (U.S. Patent No. 7,394,432) (filed Oct. 9, 2013)

Reexam. No. 90/013,023 (U.S. Patent No. 7,397,431) (filed Oct. 9, 2013)

Reexam. No. 90/012,931 (U.S. Patent No. 5,978,791) (filed July 26, 2013)

Dated: November 13, 2020
Corrected:  December 4, 2020

Respectfully submitted,

/s/ *Robert Greene Sterne*
Robert Greene Sterne
Jason D. Eisenberg
William H. Milliken
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellant Vivint, Inc.*

# ADDENDUM

# Table of Contents

Decision on Appeal, Reexamination Control No. 90/020,115
(May 4, 2020) ........................................................................Appx1

U.S. Patent No. 6,717,513...............................................................Appx33

Second Petition to Vacate Reexamination (July 23, 2018) ......................... S.Add.1

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/020,115 | 08/02/2017 | 6717513 6717513 | 3750.021REX5 | 8511 |

26111          7590          05/04/2020
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

| EXAMINER |
|---|
| LEUNG, CHRISTINA Y |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/04/2020 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* VIVINT, INC.,
WILLIAM H. MANDIR SUGHRUE MION PLLC (3RD PTY REQ.) and
SUGHRUE MION PLLC (GENERAL)

---

Appeal 2020-001620
Reexamination Control 90/020,115[1]
Patent No. US 6,717,513
Technology Center 3900

---

Before JOHN A. JEFFERY, MARC S. HOFF, and
CHARLES J. BOUDREAU, *Administrative Patent Judges*.

HOFF, *Administrative Patent Judge*.

DECISION ON APPEAL

STATEMENT OF THE CASE

Appellant appeals under 35 U.S.C. § 134 from the rejection of claims
1–21. We have jurisdiction under 35 U.S.C. §§ 134(b) and 306.

We affirm.

The '513 Patent issued to Sandelman on April 6, 2004. The '513
Patent concerns monitoring remote electrical and/or mechanical equipment.
A state of at least one parameter of at least one piece of remote equipment is

---

[1] Appellant states that the real party in interest is Vivint, Inc. Appeal Br. 7.

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

determined. A message indicative of that state is communicated to a
computer server as an incoming message. A user is able to remotely
configure or modify a user-defined message profile containing outgoing
message routing instructions. If the incoming message is determined to be an
exception message, at least one outgoing exception message is forwarded
based on the incoming message to at least one user-defined communication
device specifiable in the user-defined message profile. '513 Patent, col.
3:24–43.

Claim 1 is exemplary of the claims on appeal:

1.      A method of monitoring and controlling remote
equipment, comprising the steps of:
        a) determining a state of at least one parameter of at least
one piece of the remote equipment;
        b) communicating a message indicative of the state from
the piece of remote equipment to a computer server as an
incoming message;
        c) enabling a user to remotely configure or modify a
user-defined message profile containing outgoing message
routing instructions, the user-defined message profile being
storable on the computer server;
        d) enabling a user to remotely send command messages
to the remote equipment via the computer server to remotely
control the remote equipment;
        e) determining whether an incoming message is an
incoming exception message indicative of improper operation
of the piece of remote equipment;
        f) if it is determined in step e) that an incoming message
is an incoming exception message, forwarding at least one
outgoing exception message based on the incoming message to
at least one user-defined communication device specifiable in
the user-defined message profile, wherein the user can remotely
configure or modify the user-defined message profile by
remotely accessing the computer server.

2

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

The prior art relied upon by the Examiner as evidence is:

| Name | Reference | Date |
|------|-----------|------|
| Shetty et al. | US 5,808,907 | Sept. 15, 1998 |
| Joao | US 5,917,405 | June 29, 1999 |
| Garton | US 5,134,644 | July 28, 1992 |
| Cheng | US 6,970,081 B1 | Nov. 29, 2005 |

Throughout this decision, we make reference to Appellant's Brief ("Appeal Br.," filed May 29, 2019), the Reply Brief ("Reply Br.," filed December 23, 2019), the Final Office Action appealed from ("Final Act.," mailed October 30, 2018), and the Examiner's Answer ("Ans.," mailed October 21, 2019) for their respective details.

## REJECTIONS

Claims 1–7 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Shetty and Joao.

Claims 8–13 and 15–21 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Shetty, Joao, and Garton.

Claim 14 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Shetty, Joao, Garton, and Cheng.

## ISSUES

Appellant's arguments present us with the following issues:

1. Does the combination of Shetty and Joao disclose a radio transmitter?

2. Does the combination of Shetty and Joao teach or suggest configuring or modifying a message profile?

3

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

3. Would the proposed combination of Shetty and Joao (with or without Garton or Cheng) change the principle of operation of Shetty?

4. Does the combination of Shetty, Joao, and Garton teach or suggest an interface unit in bi-directional communication with a piece of remote equipment?

5. Did the Examiner err in construing "message generating means"?

6. Does the combination of Shetty, Joao, Garton, and Cheng teach or suggest an interface unit periodically generating a normal status message indicative of the proper operation of a piece of equipment to which a sensor is connected?

7. Did the Examiner err in finding that a substantial new question of patentability ("SNQ") exists?

PRINCIPLES OF LAW

Patent statute 35 U.S.C. § 302 reads, in relevant part, as follows:

> Any person at any time may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301. The request must be in writing and must be accompanied by payment of a reexamination fee established by the Director pursuant to the provisions of section 41. The request must set forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested.

Patent statute 35 U.S.C. § 303(a) reads as follows:

> (a) Within three months following the filing of a request for reexamination under the provisions of section 302, the Director will determine whether a substantial new question of patentability affecting any claim of the patent concerned is

4

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

raised by the request, with or without consideration of other patents or printed publications. On his own initiative, and any time, the Director may determine whether a substantial new question of patentability is raised by patents and publications discovered by him or cited under the provisions of section 301 or 302. The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office.

Patent statute 35 U.S.C. § 304 reads, in relevant part, as follows:

> If, in a determination made under the provisions of subsection 303(a), the Director finds that a substantial new question of patentability affecting any claim of a patent is raised, the determination will include an order for reexamination of the patent for resolution of the question.

The Manual of Patent Examining Procedure (MPEP) § 2242 further explains what constitutes an SNQ:

> [An SNQ exists as to a claim] unless the same question of patentability has already been: (A) decided in a final holding of invalidity by a federal court in a decision on the merits involving the claim, after all appeals; (B) decided in an earlier concluded examination or review of the patent by the Office; or (C) raised to or by the Office in a pending reexamination or supplemental examination of the patent. . . .

> An earlier concluded examination or review of the patent is: (A) the original examination of the application which matured into the patent; (B) the examination of the patent in a reissue application that has resulted in a reissue of the patent; (C) the examination of the patent in an earlier concluded reexamination or supplemental examination; (D) the review of the patent in an earlier concluded trial by the Patent Trial and Appeal Board, such as a post-grant review, *inter partes* review, or covered business method review of the patent; or (E) any

5

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

> other contested Office proceeding which has been concluded
> and which involved the patent.

MPEP § 2242(I) (9th ed. Rev. 08.2017, Jan. 2018).

Section 2242 further indicates that "a prior art patent . . . raises a [SNQ] where there is a substantial likelihood that a reasonable examiner would consider the prior art patent . . . important in deciding whether or not the claim is patentable" and, if so, "the examiner *should find* 'a [SNQ] *unless* the same question of patentability has already been decided as to the claim in a *final holding of invalidity* by a federal court or by the Office in an earlier concluded examination or review of the patent." MPEP § 2242(I)(b) (emphasis added).

> Section 103(a) forbids issuance of a patent when "the differences
> between the subject matter sought to be patented and the prior art
> are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having
> ordinary skill in the art to which said subject matter pertains."

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a) (2000)). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). *See also KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls.").

If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified,

6

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

then the teachings of the references are not sufficient to render the claims prima facie obvious. *In re Ratti*, 270 F.2d 810 (CCPA 1959).

Under 35 U.S.C. § 112(f) and pre-AIA 35 U.S.C. § 112, sixth paragraph, one may use means-plus-function language in a claim, rather than reciting a specific structure for performing a claimed function, and such language "restrict[s] the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015).

ANALYSIS

Claim Construction

Appellant argued at the oral hearing that the '513 patent has now expired,[2] and that, as a result, the Board should apply the claim construction standard set forth in *Phillips v. AWH Corp.*[3] rather than the "broadest reasonable interpretation" standard. Tr. 3.

During reexamination proceedings of unexpired patents, the Board uses the "broadest reasonable interpretation consistent with the specification" standard. *In re NTP, Inc.*, 654 F.3d 1268, 1274 (Fed. Cir. 2011). *See In re CSB-System Int'l, Inc.*, 832 F.3d 1335 (Fed. Cir. 2016). After a patent has expired, claims are to be construed under the *Phillips* "plain meaning" standard, in light of the intrinsic record. *Phillips*, 415 F.3d at 1312–15. The broader standard is employed with respect to an unexpired patent because a patent owner may amend claims to narrow their scope,

---

[2] U.S. Patent No. 6,717,513 expired as of November 2, 2019.
[3] 415 F.3d 1303 (Fed. Cir. 2005).

7

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

recourse which is not available if the patent is expired. *CSB-System*, 832
F.3d at 1341; *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed.
Cir. 2007).

At the oral hearing, Appellant cited the district court's recent claim
construction decision in *Vivint, Inc. v. Alarm.com Inc.*, Case No. 2:15-cv-
392 (D. Utah, Mar. 6, 2020) ("Memorandum Decision"), a case concerning
U.S. Patent No. 6,462,654 ("the '654 Patent"), asserted to have the same
specification as the '513 patent. Tr. 3. In that claim construction decision,
the district court construed the claim term "message profile" in the manner
argued by Vivint, as a "data record including multiple routing instructions
configurable to specify to which communication devices an outgoing
message can be routed in response to an incoming message." Memorandum
Decision, p. 22.

The district court's opinion, having restated Vivint's argument for its
proposed construction, states only that "[h]aving reviewed the specifications
and the criticisms of the prior art, the court is persuaded that 'devices'
should be plural." Memorandum Decision, p. 22.

Appellant did not argue, either in the principal Appeal Brief, the
Reply Brief, or at the oral hearing, that any specific claim construction done
by the Examiner was erroneous or should be changed because the '513
Patent is now expired. Accordingly, we perceive no need to revisit any claim
construction done by the Examiner during prosecution.

8

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

Rejection of claims 1–7 over Shetty and Joao

Appellant argues that the Examiner erred in finding that Shetty inherently discloses a radio transmitter that relays data "over a radio datalink" or "via radio links" to a server. Appeal Br. 24–25. Appellant contends that the Examiner does not make clear why the claimed features would necessarily flow from Shetty. Appeal Br. 25.

Appellant further asserts that the Examiner erred in finding the claim terms "remote" and "over/via a radio data line" to be inherently taught. Appeal Br. 24. Appellant provides no evidence, or even attorney argument, beyond these bare assertions.

We are not persuaded that the Examiner erred. The Examiner finds, and we agree, that Shetty explicitly discloses transmission of data "over a radio datalink" or "via radio links." Shetty teaches that "events stored in the event database may be received from the on-board information manager 120 in any of a number of methods, i.e., over a radio datalink, a satellite datalink, or similar method." Shetty col. 2:23–27. "At a second work site, the data is collected at a second work station 404 via radio links." Shetty col. 3:59–61. We therefore agree with the Examiner's finding that a radio transmitter is suggested by Shetty's teaching of a "radio datalink" or "radio links." Ans. 44.

Appellant contends that the Examiner improperly combines the embodiments illustrated in Figure 1 and Figure 4 of Shetty. Appellant argues that the Examiner did not explain how or why the two embodiments would be combined, and did not provide "articulated reasoning with some rational underpinning." Appeal Br. 28.

9

**Appx10**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

We do not agree with Appellant's argument. The Examiner explains that Figure 4 of Shetty shows a computer network. We agree with the Examiner that one of ordinary skill would understand that multiple computers communicate in such a network. It would have been obvious to have a user interface on one computer in communication with another computer, according to known methods, to yield a predictable result. Ans. 45–46.

Appellant's argument that the Examiner erroneously found "a user on one computer modifying a profile on another computer" to be inherent in Shetty is not persuasive because the Examiner did not rely upon inherency. The Examiner concluded that such modification would have been obvious. Ans. 46.

Appellant's expert Denning opines that Shetty teaches a user interface 110 that allows a user to access the user profile database, but that Shetty does not teach either (a) configuring a message profile or (b) remote configuration or remote modification of a user-defined message profile, as each of the independent claims (1, 5, 7, 8, 15, 19, and 21) recites. Denning Decl. ¶ 61.

We have considered the Denning Declaration, and we do not agree that Shetty does not teach configuration or modification. The Examiner finds that "Shetty discloses 'the user can remotely configure or modify the user-defined message profile by remotely accessing the computer server.'" Ans. 5. In Shetty, "a user interface 110 allows a user to access both the user profile database 106 and the event database 108. The user interface 110 also allows the user to input information relating to the fleet or machine data."

10

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

Ans. 5; Shetty col. 2:34–37. In Shetty, "users can 'access the data stored on the third work station 406 . . . via first and second remote work stations 420, 422." Ans. 5; Shetty col. 4:8–10. We further agree with the Examiner's conclusion that, to the extent that Shetty does not explicitly teach a user on one computer configuring or modifying a profile in the user profile database (which is remotely located on another computer), such configuration or modification would have been obvious. Ans. 5–6. Shetty discloses that its system is customizable, adaptable for the needs of a particular installation, and offers multiple options for users: "different persons, for example the operator, the owner, etc. . . . , may have need for different information." Shetty col. 1:22–23. Because Shetty's Figure 1 illustrates user interface 110, mobile machine 118, and other remote elements, outside the dotted line containing the databases 104, 106, and 108, we agree with the Examiner that one skilled in the art would understand that user interface 110 is remote from the databases. We agree with the Examiner's reasoning that one skilled in the art would have combined the user interface 110 with computer network 412, and/or remote work stations 420, 422, according to known methods, to achieve the predictable result of interfacing multiple computers. Ans. 6.

Appellant's argument that the Examiner failed to explain how and why one would combine Shetty and Joao is not persuasive. Appeal Br. 30. The Examiner finds that Joao teaches a method of monitoring and controlling remote equipment, and teaches enabling a user to remotely send command messages to the remote equipment via the computer server. Final Act. 8. The Examiner concludes that it would have been obvious to modify Shetty in view of the teachings of Joao because the modification would

11

**Appx12**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

"allow a user to remotely respond to the received monitoring messages already disclosed by Shetty or to simply enable the equipment owner to secure the remote equipment as desired." Final Act. 9. We further agree with the Examiner that Shetty and Joao qualify as analogous art, because both references are reasonably pertinent to the problem faced by the inventor. Ans. 47.

Appellant next contends that the proposed combination of Shetty and Joao would change the principle of operation of Shetty, because Shetty employs batch processing, whereas Joao operates in real-time "such that only one notification/message is sent at a time." Appeal Br. 32. "[B]ecause of Shetty's batch processing, the combined system would not satisfy the desire alleged by the Examiner 'to simply enable the equipment owner to secure the remote equipment as desired.'" Appeal Br. 38.

We are not persuaded that the Examiner erred in combining Shetty and Joao. We agree with the Examiner that the asserted combination of references does not propose to bodily incorporate the system of Joao into the system of Shetty. Ans. 50. Rather, the Examiner's asserted combination would simply have allowed Shetty's batch mode system to secure the remote equipment as desired, and to allow a user to send a command message to the equipment, as taught by Joao. *Id.* We agree with the Examiner that Appellant's assertion that Joao's control messages would be delivered "perhaps at midnight or 2 AM" is mere speculation. As the Examiner points out, Shetty teaches that "[i]f the events correspond to the events defined in the profile, then the user is notified." Ans. 50; Shetty col. 3:41–42. We agree with the Examiner's finding that Joao teaches ways to "provide for

12

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

immediate, as well as for a deferred, control" as desired for a particular application. Ans. 51; Joao col. 73:56–57.

In reply, Appellant continues to argue that the Examiner fails to articulate a proper rationale to combine Shetty and Joao (Reply Br. 7–8). Appellant's argument is not persuasive, because Appellant continues to rely on the allegation that the Examiner proposes to convert Shetty from batch processing to real-time operation. Reply Br. 7. As emphasized *supra*, the Examiner's combination of references does not propose such a modification of Shetty. *See* Ans. 48; Final Act. 8–9.

Appellant's argument that the disparate teachings of Shetty and Joao are not obvious to combine is not persuasive. Appeal Br. 39–40. Appellant describes Shetty as a "warning manager 100 [that] provides a method for providing information relating to a mobile machine in a fleet of mobile machines." Appeal Br. 39. Appellant then characterizes Joao as a control apparatus for controlling components of a vehicle. Appeal Br. 40. Appellant then alleges that the system of Shetty is completely different from that of Joao, and re-argues the non-combinability of the references. Appellant does not attempt an argument that Joao teaches away from combination with Shetty. Appellant's arguments against the physical incorporation of Joao into the physical apparatus of Shetty are not persuasive of error, because the standard for obviousness is not whether one reference may be bodily incorporated into another, but whether the combined teachings of the references would have suggested the modification proposed by the Examiner. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). Here, the Examiner concluded, and we agree, that it would have been obvious to

13

**Appx14**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

combine Shetty and Joao, because of Joao's suggestions of "sending a command to control a vehicle equipment system, in response to a received message indicating that the vehicle equipment system has failed or malfunctioned" and of "sending a command to disable a vehicle 'nightly' or as otherwise desired to protect it from theft." Final Act. 9; Joao col. 24:40–52, col. 44:53–58, col. 42:25–35.

Appellant contends that the Examiner exercised impermissible hindsight in combining Shetty and Joao. Appeal Br. 42. Appellant nakedly asserts that Shetty and Joao are directed to different types of inventions — "remotely monitoring construction vehicles" vs. "control apparatuses and methods for vehicles" — such that a person of ordinary skill in the art "would not have the hindsight [sic] to consider combining" them. *Id.* Appellant further contends that the Examiner did not provide reasoning why a skilled artisan would combine the references. Appeal Br. 43.

We do not consider Appellant's argument to be persuasive. As discussed *supra*, we agree with the Examiner that Joao teaches "various reasons to remotely control equipment." Ans. 51. As a consequence, we determine that the Examiner did state a rationale to combine Shetty and Joao having a rational underpinning to support a legal conclusion of obviousness, and we determine that the Examiner did not employ impermissible hindsight in proposing the combination of Shetty and Joao.

Because we are not persuaded that the Examiner erred, we sustain the Examiner's § 103 rejection of claims 1–7 over Shetty and Joao.

14

**Appx15**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

Rejection of claims 8–13 and 15–21 over Shetty, Joao, and Garton

Independent claim 15 recites "an interface unit . . . having a message generating means for generating an incoming message corresponding to a state of the remote equipment." Independent claim 8 contains an identical limitation but refers to "the detected state" of the remote equipment. Independent claims 19, 20, and 21 contain limitations identical to claim 8.

Supplemental to previous arguments against the combination of Shetty and Joao, Appellant argues that the combination of Shetty and Joao does not teach "an interface unit in bi-directional communication with a piece of remote equipment . . . wherein a user may send a command message to the remote piece of equipment via said communication link . . . to thereby control the remote piece of equipment remotely." Appeal Br. 43. Appellant points out that the scope of claim 15 includes both "(i) the server in remote bi-directional communication with the interface unit and (ii) a user capable of sending a command message to the piece of equipment via the communication link and the interface unit to control the piece of equipment." Appeal Br. 44–45. Appellant contends that information manager 120 of Shetty is connected by one-way datalink to event database 108. Appeal Br. 45–46. Appellant argues that Shetty does not disclose or suggest that warning manager 100's user interface 110 is in communication with, or being capable of communicating with, the mobile machines in order to send command messages thereto. Appeal Br. 47.

Appellant's arguments are not persuasive. We agree with the Examiner's finding that Joao, rather than Shetty, is relied upon to teach bi-directional communication. Joao teaches a server in remote bi-directional

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

communication with the interface unit, as well as an interface in bi-directional communication with remote equipment, such that a user can send a command message to the remote piece of equipment to thereby control said equipment. Ans. 24–25, 52. "CPU 4 can be utilized in order to provide control signals to activate and/or to de-activate any one or more of the vehicle equipment systems." Joao col. 35:44–46. We agree with the Examiner that modifying Shetty to include such bi-directional communication and remote equipment command would have been obvious "to advantageously allow a user to remotely respond to the received monitoring messages already disclosed by Shetty" or "to simply enable the equipment owner to secure the remote equipment as desired." Ans. 25. We further agree with the Examiner that Appellant's attack on Shetty individually is ineffective to show the nonobviousness of the combination of Shetty and Joao (and Garton). *See Keller*, 642 F.2d at 425.

Appellant argues that the proposed combination would change the principle of operation of Shetty, in that warning manager 100's user interface would be modified "to also be in communication with the mobile machines 118 through the notification means 112," and such that notification means 112 would be "in communication with the mobile machines 118 instead of, or in addition to, the batch processing means 112." Appeal Br. 49. Appellant's argument again fails because Joao, rather than Shetty, is relied upon to teach a bi-directional communication and remote command of equipment. Ans. 53.

Appellant's argument against the combinability of Shetty and Joao, in that "nothing in Shetty suggests sending . . . command messages to mobile

16

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

machines 118," and that the combination "would require incorporating an additional component," is not persuasive. Appeal Br. 50–51. We agree with the Examiner that the rejections do not propose to merge the entirety of Joao with the entirety of Shetty. Ans. 53. Appellant's argument against the bodily incorporation of features from Joao into Shetty is not persuasive to establish that the Examiner erred. As discussed *supra*, we agree with the Examiner's reasoning that the proposed modification of Shetty in view of Joao would allow a user to remotely respond to received monitoring messages, or to simply enable the equipment owner to secure the remote equipment. Ans. 25.

Appellant argues that the Examiner did not correctly construe "message generating means." Appeal Br. 53. It is Appellant's position that the '513 Patent discloses a three-step algorithm for message generation. Appeal Br. 53.

Applying 35 U.S.C. § 112(f), we find that the Examiner correctly construed "message generating means" as the corresponding structure disclosed in the specification of the '513 Patent: CPU 804, multiplexer 805, and radio 801. Ans. 54; *Williamson*, 792 F.3d at 1347. The '513 Patent teaches that "[t]ogether, CPU 804, multiplexer 805, and radio 801 make up the message generating mechanism of interface unit 10 discussed above." '513 Patent col. 15:57–59.

> Once every 24 hours, the CPU assembles a packet (heartbeat) of data which contains status and operational data of connected monitored equipment and communicates this packet of data to the transport radio module 801. The transport radio module 801 then transmits the information to the remote server as a normal status message as explained above. The CPU 804

17

**Appx18**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

> also monitors the status of the sensing devices 808. The state of
> these inputs is feed [sic] into a virtual Programmable Logic
> Controller (v-PLC) running within the CPU 804. The resultant
> relay outputs of the v-PLC can cause the CPU 804 to assemble
> an exception message packet and pass it on to the transport radio
> 801 for delivery to the remote server.

'513 Patent col. 15:60–16:5.

We agree with the Examiner's finding concerning the three disclosed structural elements (CPU 804, multiplexer 805, transport radio module 801) disclosed in the '513 Patent. Ans. 54. We further agree with the Examiner's determination that the message generating means is not a computer-implemented means-plus-function limitation having a special purpose computer programmed to perform a disclosed algorithm. Ans. 54.

Appellant further contends that Examiner failed to appreciate that the patent's message generating mechanism includes a two-way radio 801. Appeal Br. 54. Appellant's argument is not persuasive. The Examiner finds that Garton teaches the claimed message generating means including a CPU (control processor 30), a multiplexer (in the form of a relay that selects the radio or the telephone communications link as desired), and a radio (two-way radio transceiver 24). Final Act. 21; Ans. 55; Garton col. 2:40–48, col. 5:1–7, col. 5:23–39.

Appellant argues that the Examiner erred in finding that Garton teaches a relay switch, rather than the multiplexer recited in claim 15. Appeal Br. 56. We do not find Appellant's argument persuasive. The Examiner finds, and we agree, that the relay in control processor 30 of Garton performs a function equivalent to a multiplexer because the relay

18

**Appx19**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

selects either a radio or a telephone communications link.  Ans. 26, 56;
Garton col. 5:23–39.

We are not persuaded by Appellant's contention that the Examiner
failed to explain how and why the skilled artisan would combine Shetty and
Joao with Garton. Appeal Br. 57. The Examiner cites to relevant teachings
of Garton and gives reasons why the skilled artisan would have made the
combination ("to provide a structure that enables the advantageous selection
of a different communications link as desired or in the event of a
communications failure"). Final Act. 21; Ans. 56.

Appellant's argument that the Examiner's proposed combination of
Shetty with Joao and Garton would require change in principle of operation
is not persuasive. Appeal Br. 58. As discussed *supra*, contrary to Appellant's
assertions, the Examiner does not propose to modify Shetty to operate in
real-time as Joao operates.

Appellant's contention that the Examiner used impermissible
hindsight in combining Shetty with Joao and Garton is not persuasive. The
Examiner cited pertinent portions of the references, and provided a reason to
combine Shetty and Joao with Garton ("to provide a structure that enables
the advantageous selection of a different communications link as desired or
in the event of a communications failure") having a rational underpinning.
Ans. 26.

We conclude that the Examiner did not err in rejecting claims 8–13
and 15–21, and we sustain the Examiner's § 103 rejection over Shetty, Joao,
and Garton.

19

**Appx20**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

Rejection of claim 14 over Shetty, Joao, Garton, and Cheng

Appellant argues that the combination of Shetty, Joao, Garton, and Cheng does not disclose or suggest an interface unit periodically generating a normal status message indicative of the proper operation of a piece of equipment to which a sensor is connected. Appeal Br. 24, 59. Appellant argues that Cheng provides the same teaching as Britton,[4] which the Board previously found did not provide a message "specifically indicative of [the] proper operation of the piece of remote equipment." Appeal Br. 60–61.

Appellant's argument is not persuasive. We agree with the Examiner's finding that Cheng teaches an interface unit that periodically generates a "normal status message if the sensor to which the interface unit is connected detects a normal status condition indicative of proper operation." Ans. 41–42. For example, Cheng explains that "each appliance 100 includes a status reporter 120 that communicates messages regarding the status of the appliance 100" and that

> the communicated status 121 of the appliance 100 is used as a direct or indirect indication of the security status of the appliance 100. For example . . . the status reporter 120a within the computer 100a reports an 'I'm OK', or 'I am appliance XYZ', message periodically. The absence of an expected 'I'm OK' message from the status reporter 120a could be cause for an alarm.

Cheng col. 3:48–48, 3:55–63.

Further, we do not agree with Appellant that the teachings of Britton, a reference not applied against the claim, are relevant to this ground of rejection. Appeal Br. 60–62. The Board's prior conclusions concerning a

---

[4] U.S. Patent No. 6,040,770.

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

combination of references including Britton, rather than Cheng, are not binding upon this panel in this matter. *See* Ans. 40–41; Appeal Br. 27.

Appellant's argument that Shetty, Joao, Garton, and Cheng are not properly combinable is not persuasive. Appeal Br. 62. We do not agree with Appellant that the Examiner failed to explain how the person having ordinary skill in the art would combine the references. *Id.* The Examiner has cited the pertinent teachings of each reference and given reasons why one of ordinary skill would combine them. *See* Ans. 41–42.

Appellant's argument that the proposed combination of Shetty, Joao, Garton, and Cheng would require an improper change in the principle of operation of (at least) Shetty is unpersuasive. Appeal Br. 63. Appellant argues that the "distributed software controlled security system" of Cheng could not be bodily incorporated into Shetty, Joao, and Garton. *Id.* However, the Examiner does not propose "merging the entirety of Cheng's system with the entirety of Shetty's system," but merely proposes modifying Shetty to include "Cheng's normal status messages with identification." Ans. 60. We agree with the Examiner that Cheng's status messages are not incompatible with Shetty's messages. *Id.*

Appellant's argument that Shetty, Joao, Garton, and Cheng were combined through impermissible hindsight is again unpersuasive. Appeal Br. 64. Similar to the analysis *supra* with respect to Shetty and Joao, we agree with the Examiner's expressed rationale that it would have been obvious to include the equipment identification codes taught by Cheng "in order to advantageously recognize messages from multiple pieces of remote

21

**Appx22**

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

equipment." Ans. 42. We conclude that the Examiner's combination of references does not rest upon impermissible hindsight.

The Examiner did not err in rejecting claim 14 over Shetty, Joao, and Cheng. We sustain the Examiner's § 103(a) rejection.


Substantial New Question of Patentability

Appellant argues in the Brief that no substantial new question of patentability exists because the same question was previously presented to the Board. Appeal Br. 65. Specifically, Appellant argues that because the PTAB denied institution of IPR2016-01091, "based on the same two primary references," Shetty and Joao, the Examiner erred in finding such a substantial new question of patentability.[5] Appeal Br. 66.

Appellant must first request reconsideration of the SNQ before the Examiner before we can review that issue. MPEP § 2274(VI). We observe that Appellant did raise the issue before the Examiner at least in the Response after Final Rejection filed January 30, 2019.

Patent Owner's argument that a substantial new question of patentability does not exist, however, is not persuasive. MPEP § 2242 specifies, in pertinent part, that a substantial new question of patentability exists as to a claim "unless the same question of patentability has already been . . . decided in a final holding of invalidity by a federal court in a

---

[5] Appellant acknowledges that two other petitions for *inter partes* review were filed against the '513 patent, in IPR2015-01997 and IPR2016-00129. These petitions asserted different prior art against the '513 Patent. Both of these petitions were denied. IPR2015-01197, Paper 14 at 9, 26–28 (PTAB April 7, 2016); IPR2016-00129, Paper 13 at 16–17 (PTAB May 3, 2016).

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

decision on the merits involving the claim, after all appeals . . . [or] decided in an earlier concluded examination or review of the patent by the Office." MPEP § 2242(I). An "earlier concluded examination or review of the patent" includes "the review of the patent in an earlier concluded trial by the Patent Trial and Appeal Board, such as a post-grant review, *inter partes* review, or covered business method review of the patent." *Id.*

With regard to the patent under reexamination, while the petition for *inter partes* review (IPR) of U.S. Patent No. 6,717,513 (IPR2016-01091) asserted the same references (Shetty and Joao) against the patent as in this reexamination, there was no "final holding of invalidity" based on these references, and no decision in an earlier concluded examination or review of the patent by the Board. Rather, the Board in the cited proceeding merely weighed the discretionary factors governing whether to institute *inter partes* review, and concluded that the factors weighed in favor of denying institution of review of the '513 Patent based on the petition. IPR2016-01091, Paper 11 at 14 (PTAB Nov. 23, 2016). Because the Board denied institution of *inter partes* review, there was no "review of the patent in an earlier concluded trial by the [PTAB]."

The decision to deny *inter partes* review in IPR2016-01091 did not constitute a final holding of invalidity or a decision in an earlier concluded examination or review. As such, we conclude that the Examiner did not err, and that a substantial new question of patentability exists. *See* MPEP § 2242.

## CONCLUSIONS

1. The combination of Shetty and Joao discloses a radio transmitter.

23

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

2. The combination of Shetty and Joao suggests configuring or modifying a message profile.

3. The proposed combination of Shetty and Joao (with or without Garton or Cheng) would not change the principle of operation of Shetty.

4. The combination of Shetty, Joao, and Garton teaches an interface unit in bi-directional communication with a piece of remote equipment.

5. The Examiner did not err in construing "message generating means."

6. The combination of Shetty, Joao, Garton, and Cheng teaches an interface unit periodically generating a normal status message indicative of the proper operation of a piece of equipment to which a sensor is connected.

7. The Examiner did not err in finding that a substantial new question of patentability exists.

## DECISION SUMMARY

In summary:

| Claims Rejected | 35 U.S.C. § | References | Affirmed | Reversed |
|---|---|---|---|---|
| 1–7 | 103 | Shetty, Joao | 1–7 | |
| 8–13 and 15–21 | 103 | Shetty, Joao, Garton | 8–13 and 15–21 | |
| 14 | 103 | Shetty, Joao, Garton, Cheng | 14 | |
| Overall Outcome | | | 1–21 | |

## ORDER

The Examiner's decision to reject claims 1–21 is affirmed.

Appeal 2020-001620
Reexamination Control 90/020,115
Patent No. 6,717,513

Requests for extensions of time in this *ex parte* reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

<u>AFFIRMED</u>

25



US006717513B1

(12) **United States Patent**
Sandelman et al.

(10) Patent No.: **US 6,717,513 B1**
(45) Date of Patent: *Apr. 6, 2004

(54) **ELECTRONIC MESSAGE DELIVERY SYSTEM UTILIZABLE IN THE MONITORING OF REMOTE EQUIPMENT AND METHOD OF SAME**

(75) Inventors: **David Sandelman**, Fairfield, NJ (US); **Daniel Shprecher**, Highland Lakes, NJ (US); **Joseph Rey**, Fairlawn, NJ (US)

(73) Assignee: **Heat-Timer Corporation**, Fairfield, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/224,243**

(22) Filed: **Aug. 19, 2002**

**Related U.S. Application Data**

(63) Continuation of application No. 09/578,137, filed on May 24, 2000, now Pat. No. 6,437,691, which is a continuation-in-part of application No. 09/317,235, filed on May 24, 1999, now Pat. No. 6,147,601, and a continuation-in-part of application No. 09/401,460, filed on Sep. 22, 1999, now Pat. No. 6,160,477, and a continuation-in-part of application No. 09/433,767, filed on Nov. 3, 1999, now Pat. No. 6,211,782.

(60) Provisional application No. 60/115,305, filed on Jan. 9, 1999.

(51) Int. Cl.[7] .............................................. G08B 29/00

(52) U.S. Cl. ...................... 340/506; 340/511; 340/539.1; 340/3.1; 340/825.36; 340/825.49; 700/17

(58) Field of Search ................................. 340/506, 511, 340/539.1, 3.1, 825.36, 825.49; 700/17

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,061,916 A | * | 10/1991 | French et al. ................ | 340/522 |
| 5,400,246 A | * | 3/1995 | Wilson et al. ...... | 340/825.06 X |
| 5,517,690 A | * | 5/1996 | Linquist et al. ............ | 455/426 |
| 5,526,401 A | * | 6/1996 | Roach, Jr. et al. .......... | 455/426 |
| 5,528,675 A | * | 6/1996 | Lchen .................... | 379/106.01 |
| 5,546,444 A | * | 8/1996 | Roach, Jr. et al. .......... | 455/412 |
| 5,594,740 A | * | 1/1997 | Ladue ...................... | 455/410 |
| 5,629,687 A | * | 5/1997 | Sutton et al. ........ | 340/825.37 |
| 5,729,596 A | * | 3/1998 | Reeder et al. ......... | 379/102.04 |
| 5,734,645 A | * | 3/1998 | Raith et al. ........... | 370/329 |
| 5,748,104 A | * | 5/1998 | Argyoudis et al. .... | 340/870.11 |
| 5,794,210 A | * | 8/1998 | Goldhaber et al. ......... | 705/14 |
| 5,855,008 A | * | 12/1998 | Gholdhaber et al. ........ | 705/14 |
| 5,917,405 A | | 6/1999 | Joao | |
| 6,147,601 A | * | 11/2000 | Sandelman et al. ......... | 340/506 |

* cited by examiner

*Primary Examiner*—Daryl Pope
(74) *Attorney, Agent, or Firm*—Levisohn, Berger & Langsam, LLP

(57) **ABSTRACT**

A system and method for monitoring remote equipment such as HVAC equipment, are provided. A sensor is in communication with a piece of remote equipment. An interface unit, having a message generating mechanism, is capable of receiving signals from the sensors. A central computer server is in communication with the interface unit and is adapted to receive and preferably store messages generated by the interface unit from a variety of different data transports. When a sensor detects an exception condition in a piece of remote equipment, the sensor transmits a signal to the interface unit, and the interface unit generates an incoming exception message and forwards the message to the server. The server forwards at least one outgoing exception message to at least one predetermined user-defined communication device based on the incoming exception message. Multiple outgoing exception messages may be forwarded to multiple communication devices in accordance with a user-defined message profile, or a single outgoing exception message may be forwarded in response to receipt of multiple incoming exception messages. The message profile is remotely configurable by the user.

**21 Claims, 19 Drawing Sheets**





Figure 1



Figure 2



Figure 3a



Figure 3b

Figure 3c



Figure 3d

Case: 20-1992    Document: 14    Page: 107    Filed: 12/04/2020



Figure 4



Figure 5

Case: 20-1992     Document: 14     Page: 109     Filed: 12/04/2020



Figure 6

A
607
Lo Pressure
100
Lo Pressure
B
605
Hi Pressure
101
Hi Pressure
C
608
Condensate Spill
102
Condensate Spill
D
609
Air Flow
606
Fan
Dip 3
15s
Timer 0
E
Timer 0
103
Air Flow / No Fan
F
606
Fan
15s
Timer 1
G
609
Air Flow
Timer 1
Dip 1
104
No Air Flow
H
606
Fan
609
Air Flow
607
Compressor
15s
Timer 3
I
Timer 3
105
Compressor w/No Fan or Air Flow
J
Relay 0
Timer 2
Relay 0
K
607
Compressor
L
Relay 0
110s
Timer 2
M
607
Compressor
Relay 0
Dip 2
106
Short Cycle
N
602
Aux 1
Dip 4
Relay 1
O
602
Aux 1
Dip 4
107
Aux1
P
Relay 1
Q
603
Aux 2
108
Aux2
R
607
Compressor
Event Counter 0
S
607
Compressor
Minute Counter 1
T
606
Fan
Minute Counter 2

Figure 7



Figure 8

| Incoming Message Table Transport A | | | |
|---|---|---|---|
| Key | Element A | Int | nnnn |
| | Data | Int | NNN..N |
| | Element B | Int | nnnn |
| | Element C | Char | $ |
| | Element D | Char | $$$..$ |
| | Element E | Char | $$$..$ |
| | Element F | Int | nnnn |
| | Element G | Int | nnnn |
| | Element H | Char | $$$..$ |
| | Element I | Int | nnnn |

705

| Incoming Message Table Transport B | | | |
|---|---|---|---|
| Key | Element A | Char | $ |
| | Element B | Char | $ |
| | Data | Int | HHH..H |
| | Element C | Char | $ |
| | Element D | Char | $$$..$ |

706

Figure 9



Figure 10

| DeviceTable | | | |
|---|---|---|---|
| Key | MSN | Int | nn |
| Key | SubUnit Number | Char | $$ |
| | Min0 | Char | $$ |
| Key | Device Id | Int | nn |
| | Min1 | Char | $$ |

711A

| | Min9 | Char | $$ |
|---|---|---|---|
| | Device Id | Int | nn |

| Message Type Table | | |
|---|---|---|
| Message Type Id | Char | $ |
| Description | Char | $ |

712A

| Message Code Translation Table | | | |
|---|---|---|---|
| Key | Device Number B | Int | nnnn |
| Key | SubUnit Number | Char | $ |
| Key | Error Number | Char | $ |
| Key | Device Message | Int | nnnn |
| | Message Id | Int | nnnn |

713A

| Valid Device Table | | | |
|---|---|---|---|
| Key | Device Number B | Char | $$ |
| | In Use | Char | $ |
| | Device Number A | Int | nnnn |
| | Batch Id | Int | nnnn |
| | Status | Char | $ |

714A

719

Figure 11

| Device Message Delivery | | | |
|---|---|---|---|
| Key | Message Delivery Id | Int | nnnn |
| | Message Id | Int | nnnn |
| | Device Id | Int | nnnn |
| | In Service | Char | $ |
| | Delivery Attempts | Int | nnnn |
| | Delivery Method | Char | $$$..$ |
| | Retry Interval | Int | nnnn |
| | Wait Time | Int | nnnn |
| | Start Time | Datetime | DD |
| | End Time | Datetime | DD |

720A

| Device Location | | | |
|---|---|---|---|
| Key | Device Location Id | Int | nnnn |
| | Notifact User Id | Int | nnnn |
| | Device Id | Int | nnnn |
| | Installation Date | Datetime | TT:TT |
| | Retirement Date | Datetime | TT:TT |
| | Device Location Name | Char | $$$..$ |
| | Gmt Offset | Int | nnnn |
| | Daylight Savings Time | Char | $$$..$ |
| | Salutation | Char | $$$..$ |
| | First Name | Char | $$$..$ |
| | Middle Initial | Char | $$$..$ |
| | Last Name | Char | $$$..$ |
| | Gender | Char | $$$..$ |
| | Phone | Char | $$$..$ |
| | Extension | Char | $$$..$ |
| | Address 1 | Char | $$$..$ |
| | Address 2 | Char | $$$..$ |
| | City | Char | $$$..$ |
| | State | Char | $$$..$ |
| | Zip | Char | $$$..$ |
| | Manufacturer | Char | $$$..$ |
| | Model | Char | $$$..$ |
| | Serial Number | Char | $$$..$ |
| | Name | Char | $$$..$ |

721A

Figure 12

| Fax Delivery | | | |
|---|---|---|---|
| Key | Message Delivery Id | Int | nnnn |
| | Fax Number | Char | $$$..$ |
| | To Name | Char | $$$..$ |
| | From Name | Char | $$$..$ |
| | Message Text | Char | $$$..$ |
| | Subject | Char | $$$..$ |

722A

| Modem Delivery | | | |
|---|---|---|---|
| Key | Message Delivery Id | Int | nnnn |
| | Modem Address | Char | $$$..$ |
| | Message Text | Char | $$$..$ |
| | Subject | Char | $$$..$ |

723A

| Pager Delivery | | | |
|---|---|---|---|
| Key | Message Delivery Id | Int | nnnn |
| | Phone Number | Char | $$$..$ |
| | Dialed Digits | Char | $$$..$ |
| | Message Text | Char | $$$..$ |

724A

| Phone Delivery | | | |
|---|---|---|---|
| Key | Message Delivery Id | Int | nnnn |
| | Phone Number | Char | $$$..$ |
| | Voice Message File | Char | $$$..$ |
| | Message Text | Char | $$$..$ |

725A

Figure 13

726A

| Delivery Attempt | | | |
|---|---|---|---|
| Key | Delivery Attempt Id | Int | nnnn |
| | Message Delivery Id | Int | nnnn |
| | Device Message Id | Int | nnnn |
| | Attempt Result | Char | $$$..$ |
| | Delivery Attempt Dt | Datetime | TT:TT |
| | Attempt Number | Int | nnnn |
| | Wait Time | Int | nnnn |
| | Binary File | Char | $$$..$ |
| | Attempt Finish | Datetime | TT:TT |
| | Result Text | Char | $$$..$ |

727A

| Device Heartbeat | | | |
|---|---|---|---|
| Key | Device Hb Id | Int | nnnn |
| | Hb Transport | Char | $$$..$ |
| | Hb Data | Char | $$$..$ |
| | Device Id | Int | nnnn |
| | Device Location Id | Int | nnnn |
| | Hb Date | Datetime | TT:TT |

728

| Device Message | | | |
|---|---|---|---|
| Key | Device Message Id | Int | nnnn |
| | Message Id | Int | nnnn |
| | Device Id | Int | nnnn |
| | Device Message DT | Datetime | TT:TT |
| | Device Location Id | Int | nnnn |

710A

| Normalized Message | | | |
|---|---|---|---|
| | Message Delivery Id | Int | nnnn |
| Key | Message Queue Id | Int | nnnn |
| | Status | Char | $ |
| | Device Message Id | Int | nnnn |
| | Next Attempt | Datetime | TT:TT |

Figure 14



Figure 15

Case: 20-1992   Document: 14   Page: 119   Filed: 12/04/2020



Figure 16

US 6,717,513 B1

1

## ELECTRONIC MESSAGE DELIVERY SYSTEM UTILIZABLE IN THE MONITORING OF REMOTE EQUIPMENT AND METHOD OF SAME

### RELATED APPLICATIONS

This is a Continuation Application of U.S. patent application Ser. No. 09/578,137, filed May 24, 2000, now U.S. Pat. No. 6,437,691 which is a Continuation-in-Part application of the following three applications: (i) U.S. patent application Ser. No. 09/317,235, filed May 24, 1999 (now U.S. Pat. No. 6,147,601); (ii) U.S. patent application Ser. No. 09/401,460, filed Sep. 22, 1999 (now U.S. Pat. No. 6,160,477); and (iii) U.S. patent application Ser. No. 09/433,767, filed Nov. 3, 1999 (now U.S. Pat. No. 6,211,782). All three applications claimed domestic priority from U.S. Provisional Patent Application No. 60/115,305, filed Jan. 9, 1999.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to monitoring systems, and more specifically to networks for remotely monitoring the condition of devices such as those employed in heating, ventilating, and cooling (HVAC) systems.

2. Description of the Related Art

It is desirable to be able to monitor remotely equipment that may require periodic preventive maintenance and/or that may require rapid response time should a catastrophic failure occur. For example, the components of a building's HVAC system must be monitored or checked frequently. Preventive maintenance must be performed on a constant basis, particularly with larger systems. Fault or failure conditions may vary in degrees of severity, however the contractor responsible for maintaining the HVAC equipment should be made aware of each failure in due course. Since a contractor, in all likelihood, is responsible for the care and maintenance of the installations of multiple clients, and since fault conditions may occur at any time of day or night, it is not practical for a contractor to remain on-site all the time. Remote detection at a central location (for example, the contractor's office) of fault conditions is desirable and often crucial.

It is further desirable to be able to activate or deactivate a piece of equipment remotely or send it commands remotely. It is also desirable to know the approximate failure rate or frequency of failure of each piece of equipment. One can make installation recommendations as to which model or brand of equipment is best suited for a particular site, and one can anticipate the failure of an already-installed piece of equipment and specific components therein based on how long it is running.

Some remote monitoring devices have been developed. U.S. Pat. No. 5,629,687 to Sutton et al. describes a universal interface for remotely-monitored security or alarm systems. In Sutton et al., a local control unit at a monitored site can, under an event condition, initiate a telephone call to a central control unit to alert a human operator of an event such as an intrusion, fire, or other emergency at the site. The local control unit, via the telephone link, sends a serial number indicative of the specific site and emergency to the monitoring center computer. The monitoring center computer receives the serial number and alerts a human operator as to the emergency. The human operator can then act accordingly, e.g., establish one- or two-way communication with the local site.

2

U.S. Pat. No. 5,748,104 to Argyroudis et al. describes a wireless remote telemetry system or data transport which provides real-time reading and remote control of devices such as electricity meters. A home base unit communicates with remote metering units via cellular telephone lines. The home base unit also communicates with a central controller operated by the electric utility. When the utility determines that there is too much load on the power grid, for example, the central controller can send messages to an appliance to turn off. A customer could also remotely activate or deactivate an appliance via a cellular phone through the home base unit.

U.S. Pat. No. 5,061,916 to French et al. describes a system for remotely reporting, in graphical format, alarms or other conditions in a building's automation system. Sensors in a building are hooked up via a telephone line to control module which is, in turn, hooked up to a central controller. When a sensor detects a fault condition, graphical information is compiled at the central controller and transmitted to one or more remote facsimile machines.

All of the above systems and the prior art are limited in scope because they do not allow for sufficient flexibility in routing fault messages to a variety of different potential recipients of such messages via a variety of different media, depending on the urgency or nature of the fault. Also, the above systems and the prior art do not enable customers and contractors to enter or modify such information easily. As an example, a customer that has an HVAC system with a monitoring network may want to send certain non-emergency condition notifications (e.g., filter needs cleaning) to certain individuals (e.g., contractor/maintenance personnel) via a certain medium (e.g., e-mail) and emergency condition notifications (e.g., low or high refrigerant pressure) to other individuals (building owner, contractor, etc.) via other means (e.g., via beeper or other personal communication device). Such a list of who to contact via what means depending on which fault has occurred may be referred to as a "message profile". The conventional device/contractor interface requires a dedicated land line at both the HVAC device and the contractor; that is, the HVAC system requires its own phone line, and the contractor must have a dedicated modem line as well. Moreover, the conventional system does not allow for easy customer modifications to the message profile. The conventional systems also do not allow the user to determine the failure rate of the equipment or to determine which pieces of equipment are best suited for a specific site.

### SUMMARY OF THE INVENTION

Accordingly, it is an object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment.

It is another object of the invention to provide a system for remotely monitoring multiple pieces of electrical and/or mechanical equipment in a cost-effective manner.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment that can deliver messages to different individuals for different fault conditions.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment that can deliver fault notification messages to different individuals for different fault conditions via different electronic media.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment

US 6,717,513 B1

3

that can receive data via different data transports in different formats and normalize the data so that outgoing information is not transport-specific.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment in which a customer may interactively modify its message profile.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment in which a customer may interactively modify its message profile via the Internet.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment in which a user may interactively alter the operation of a piece of equipment remotely.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment in which the functional logic may be modified.

It is another object of the invention to provide a system for remotely monitoring electrical and/or mechanical equipment which can collect data over time concerning the monitored equipment.

The above and other objects are satisfied by the invention which is a remote equipment monitoring system and method for monitoring remote equipment. In the inventive method, a state of at least one parameter of at least one piece of the remote equipment is determined. A message indicative of the state is communicated from the piece of remote equipment to a computer server as an incoming message. A user is able to remotely configure or modify a user-defined message profile containing outgoing message routing instructions; the user-defined message profile is storable on the computer server in a plurality of tables, the routing instructions being of a number of types of information, and there being provided at least one table for each type of routing instruction. It is determined whether an incoming message is an incoming exception message indicative of improper operation of the piece of remote equipment. If it is determined that an incoming message is an incoming exception message, at least one outgoing exception message is forwarded based on the incoming message to at least one user-defined communication device specifiable in the user-defined message profile. The user can remotely configure or modify the user-defined message profile by remotely accessing the computer server.

The inventive system includes a sensor in local communication with a piece of remote equipment; the sensor detects a state of at least one parameter of the piece of remote equipment. An interface unit is locally connected to the sensor and is provided with a message generating mechanism. A computer server is in remote communication with the interface unit, the server being adapted to receive messages generated by the interface unit. The computer server has a user interface; a user can remotely access the computer server via the user interface to remotely configure a user-defined message profile containing outgoing message routing instructions. The computer server is provided with a data base having a plurality of tables; the routing instructions include a number of types of information, each type of the routing instruction being placeable on its own table. When the sensor detects an exception condition in the piece of remote equipment, the interface unit generates an incoming exception message indicative of the exception condition and forwards the message to the server. The server forwards at least one outgoing exception message to at least one predetermined user-defined remote communication device

4

based on the incoming exception message as specified in the user-defined message profile.

The system can contact a customer or contractor via a number of different media (fax, e-mail, pager, etc.) in case of an equipment failure. The contractor can determine which people to contact and which medium to use for which equipment failure. For example, if the condition is not very serious (e.g., filter needs cleaning), the contractor can set up the system to send a message via e-mail; if, however, it is serious (e.g., low/high refrigerant pressure), then the system can page the contractor and/or send a text message over his personal communication service (PCS). Also, the system includes the capability to send multiple messages to multiple recipients via differing media simultaneously for a given exception condition. Preferably, the system includes a centralized electronic message delivery device or server that routes the various incoming exception messages to the desired individuals via the desired electronic media in accordance with the predetermined message profile. More preferably, the contractor or consumer can access the centralized message server via the Internet and modify the message profile through software on the device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic of a preferred embodiment of a system according to the invention.

FIG. 2 is a schematic of a preferred embodiment of a link between the monitored equipment and the system according to the invention.

FIGS. 3a–d are schematics of links between an end-user's machine and the system according to the invention.

FIG. 4 is a schematic of a preferred embodiment of the electronic message delivery server according to the invention.

FIG. 5 is a flow chart depicting the operation of the system according to the invention.

FIG. 6 is a schematic of a local RF network linking several pieces of equipment together in accordance with an alternative embodiment of the invention.

FIG. 7 is a ladder logic diagram in accordance with the invention for an exemplary air conditioning unit.

FIG. 8 is a schematic of two types of data transport utilized by the invention.

FIG. 9 is a schematic of two Incoming Message Tables each respectively receiving information from the two data transports of FIG. 8.

FIG. 10 is a logic chart illustrating the functioning of the normalization module of FIG. 4.

FIG. 11 is a schematic of the various data tables of FIG. 10.

FIG. 12 is a schematic of the Device Message Table, Delivery Table, and Device Location Table which are part of the relational data base of FIG. 4.

FIG. 13 is a schematic of various tables which contain some of the information of the user-defined message profiles of the invention.

FIG. 14 is a schematic of various tables which contain information of outgoing messages of the invention.

FIG. 15 is a logic chart illustrating the sending out of messages from the system in accordance with the invention.

FIG. 16 is a schematic of the remote interface unit of FIG. 1.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Equipment that needs to be monitored frequently, such as HVAC equipment, preferably operates within certain accept-

US 6,717,513 B1

5

able parameters. Some of these parameters are more crucial to the operation and/or life span of the equipment than are other parameters. For example, a low battery condition might be a lot less serious than a low coolant level condition. Whenever a piece of equipment operates outside its preferred parameters, an "exception" condition is created or said to exist. An exception condition can also be indicative of a regularly scheduled event occurring too often, too infrequently, or not at all. An exception condition could also be indicative of a measured value being beyond the design specification for the equipment.

When a monitored piece of equipment detects an exception condition, it activates its interface to the cellular phone network. The interface effectively acts as a cell phone in a roaming condition. The interface "attempts" to make a telephone call; because it is not recognized as being a resident of the local cell, the local cell (via the cellular network or mobile switching center) contacts the "home cell" of the interface to insure that the interface is in good standing to complete the "call." There really is no home cell; in actuality, what is taking the place of the home cell of a cellular telephone is a message routing service or data transport such as those provided by Aeris or Bell South Cellemetry. When the local cell is contacting the message routing service, it transmits the following information: the serial number of the interface; the multi-digit "phone number" assigned to the interface; and the multi-digit phone number that the interface is "attempting to call." The message routing service tells the local cell that the interface is okay and should not be blacklisted, that the call need not go through, and that the interface should be removed from the "okay to roam" list immediately.

The interface is not really trying to call anyone; the multi-digit phone number it was trying to call represents a multi-digit code of information that is being sent to the message routing service and may represent fault information (e.g., 212-555-1212 means "filter needs cleaning"). The phone number assigned to the interface (which is also sent along with the phone number it is "trying to contact") may not only indicates which unit is doing the transmitting but may also convey fault information, since many of the devices being monitored do not have a large number of different fault conditions. This type of technology, in which information is transmitted in the handshaking portion of a cellular transmitter communicating to a local cell, appears in U.S. Pat. No. 5,594,740 to LaDue and U.S. Pat. No. 5,546,444 to Roach, Jr. et al., and is commonly referred to as using control channel data. In LaDue (the Aeris version), the exception or status information is embedded in the digits of the "phone number" the interface is allegedly calling (the "dialed digits"); in Roach, Jr. (the Bell South Cellemetry version), the exception or status information is embedded in the electronic serial number (ESN) of the interface, a number which identifies the physical hardware of the device. The information which identifies which interface has sent a message may be embedded in the mobile identification number (MIN) assigned to the interface unit. In the Aeris system, the ESN may also contain interface identification information. The structure of the quanta or packets of information transmitted by typical data transports will be discussed in greater detail below.

The present invention expands on this technology and includes the message delivery technique mentioned above. The Aeris or Bell South Cellemetry router transmits the exception data to the inventive message delivery system which forwards the information to the contractor who is responsible for maintaining the faulty equipment. The con-

6

tractor is provided with an account on the message delivery system that he can access via the Internet. The contractor sets up the specific parameters of which exception conditions are reported to which individuals. The contractor also sets up by which media (fax, e-mail, PCS) these individuals are to be notified. Multiple individuals may be alerted as to a exception condition. All of this data constitutes the contractor's message profile. For example, both the contractor and the owner of the premises might be signaled if there is a low/high refrigerant condition, however perhaps only one of them would be notified if a filter required cleaning. The user may also set, as part of the message profile, that different messages be delivered to different individuals at different times of the day, week, month, season, or year. For example, a high priority exception message may be directed to one repair/maintenance entity during regular business hours but be directed to a different repair/maintenance entity at night. Similarly, the same person could be contacted by different means (e.g., fax or PCS) at different times. The content of the messages may also vary as a function of time. In the present invention, the various aspects of a user's message profile are stored in a plurality of look-up tables on a data base, as will be explained below.

In addition to notifying contractors when a problem arises, the interface may be programmed to check in once a day with an "all systems okay" message. This "okay" message also gets routed to the message delivery system. However, instead of being handled by, an exception message subroutine in the message delivery system—the portion of the system which handles the above-mentioned fault messages—, the "okay" message is checked by a missing message subroutine. The missing message subroutine checks the entire list of HVAC interfaces that are supposed to signal "okay" from the message delivery system database. The missing message subroutine compares the entire list to the list of HVAC interfaces that actually checked in as "okay". If an interface failed to check in "okay", the message delivery system sends out the appropriate messages to the proper individuals via the selected media, all in accordance with the user's message profile lodged in the user's account with the message delivery system. The periodic "okay" or status message is not merely limited to providing a status "heartbeat" for the equipment but may also be employed to transmit information about the monitored piece of equipment. As will be explained below, the status message only requires a portion of its digits to convey equipment identification information, thus allowing other information to be transmitted as well. For example, the status message may include statistical information about the equipment such as how many cycles it has performed since the last message, the run time of the motor, etc. The status message may also serve as a reminder for routine maintenance, or it may report very minor or low-priority conditions that are not time sensitive.

The format of the message sent from the failing device to the local cell to the router to the message delivery system is a multi-digit code. The first digit can be for message format (e.g., status message, exception message, etc.). The subaddress is a digit or two reserved to identify to which unit that a transceiver interface is assigned is experiencing an exception condition; i.e., one transceiver interface may be assigned to a building having nine HVAC units, all connected to the transceiver via a bus line, or one interface may be part of a local RF network where each of multiple HVAC units has its own transmitter. The final digits would indicate the specific exception condition.

Because different sites employ different data transports, incoming messages from different locations may have dif-

US 6,717,513 B1

7

ferent structures or formats. Also, one would want the inventive system to be able to accommodate additional formats of transports as they are developed without having to rebuild the server every time. It is thus desirable to convert all of the incoming messages into a single normalized format for ease of subsequent manipulation. The multidigit message received by the message delivery system is normalized, converted into a regular text message, and forwarded to the user/contractor. Information can also include model, brand, installation date, and climate and weather data for the site. Alternatively, much of this type of equipment criteria can be stored at the central data base so that only the equipment identification information need be transmitted.

A number of pieces of equipment may be linked to a single cellular interface via a local RF network. This is advantageous because many buildings have multiple pieces of HVAC equipment, and the provision of each piece with its own cellular interface is expensive. The deployment of a local RF network is also advantageous when the multiple HVAC units are fairly remote and a hardwired connection to a common bus line would be impractical or impossible.

Description will now be given of the preferred embodiments with reference to FIGS. 1–15. FIG. 1 shows an overall view of the inventive system 50. An existing piece of equipment may be monitored, for example; an air-conditioner 2, boiler 3, motor starter 4, heater 5, or any other piece of equipment they may be desired to be monitored. The existing piece of equipment is fitted with an interface unit 10. Periodically, the interface unit 10 sends to the message delivery server 1 a status signal to let the message delivery server 1 know that the equipment being monitored and the interface unit 10 are functioning correctly. When a predetermined exception condition occurs in the piece of equipment being monitored, the interface unit 10 sends an incoming exception message to the message delivery server 1. The message delivery server 1 then routes the message as an outgoing exception message to the appropriate user interface; e-mail 6, fax 7, pager 8, voice 9, etc., according to the message profile as configured by the user of the system 21 via the Internet 122.

The inventive system can be deployed on existing pieces of remote equipment. Various sensors can be added to an air conditioner, a boiler, etc. that can detect various conditions. For example, in an air conditioner, different sensors can be provided throughout the system each to detect a different condition such as low or high pressure, a condensate spill, air flow, fan motion, compressor function, etc. Any and all conventional sensors are contemplated as being usable in the invention, including but not limited to pressure sensors, pitot tubes, motion sensors, photosensors, electrical resistance sensors, moisture sensors, magnetic sensors, and the like.

Whether the sensors are built into the HVAC unit or added later, the various sensors in a monitored piece of equipment are preferably arranged in ladder logic configurations in programmable logic controllers (PLCs). Each sensor is responsible for detecting a certain condition or monitoring a certain parameter. These sensors can be grouped via Boolean logic operators (AND, OR, XOR, NOT, etc.) to provide the circumstances under which an exception condition is defined.

An example of such a ladder logic PLC for a typical air conditioning unit is shown in FIG. 7. Each of sensors 602–609 monitors a different condition/parameter of the unit. Sensor 604 detects low pressure in the coolant, sensor 605 detects high pressure in the coolant, sensor 606 detects

8

if the fan is working, sensor 607 detects if the compressor is working, sensor 608 determines if a condensate spill has occurred, and sensor 609 detects if the compressor is working. Some of the logic is direct and simple. For example, if sensor 605 detects a high pressure condition, high pressure message 101 is sent via the message generating mechanism of interface unit 10. Similarly, if sensor 608 detects a condensate spill, message 102 is sent.

Other rungs of the ladder are more complex. For example, in line F, if sensor 606 detects that the fan is working, timer 1 is activated; if no air flow is detected by sensor 609 before timer 1 times out, the "no air flow" message 104 is sent. If, in line H, sensor 606 detects no fan operation and sensor 609 detects no air flow but sensor 607 detects proper compressor function, and timer 3 times out, "compressor w/no fan or air flow" message 105 is sent (line 1). As another example, message 107 is sent out if sensor 602 detects a logic 0 in "aux 1" input and dip switch 4 is closed (logic 1) by activating relay 1 in line P. Alternatively, if sensor 602 detects a logic 1 in "aux 1" and dip switch 4 is open (logic 0), a message will be sent. In either case, a message 107 is sent in line O.

The dip switches are provided to allow certain portions of the logic to be disabled if a customer is not interested in receiving a certain type of message. For example, a sensor could be set to detect if a compressor is cycling fast and to send a "fast cycle" message in that event. However, if the user has the compressor deliberately set up to cycle fast, the user will not want to receive a constant stream of messages informing him that the compressor is cycling fast. Instead, a dip switch can be set to disable that message from being sent. The conventional dip switch is adjustable on-site. The invention contemplates also enabling the user to set up virtual dip switches via the Internet at a central server as will be explained below.

Each PLC can be different for each unit, type of unit, brand, model, etc. The PLC may be hard wired at the remote installation site in the interface unit 10, or software in the interface unit may simulate the workings of a PLC as a "virtual PLC.". Alternatively, the various sensors can be linked via computer software at a web site that interacts with system 21, or a virtual PLC may be provided on server 1. For example, instead of sending out a low pressure message 100 for a low pressure condition and a high pressure message 101 for a high pressure condition, a user can OR the outputs of sensors 604 and 605 together for the sending out of an "abnormal pressure" message. A user can adjust a logic ladder in the same or similar fashion as one would edit a message profile, e.g., by menu-driven websites, by an automated telephone response system, etc. The user can, of course, request an initial hardwired configuration of the system installer and have that adjusted on-site as needed.

In FIG. 1, each piece of equipment 1–4 is provided with its own interface unit 10. An alternative configuration is shown in FIG. 6. As shown in FIG. 6, four air conditioners 2A–D are each provided with sensor 600 (which generically represents any of sensors 602–609 and any like sensors) and an RF transmitter 601. When an exception condition is detected by sensor 600, or if after a certain period of time, no exception condition is detected, transmitter 601 transmits an RF signal 610 to a common interface unit 10'. Common interface unit 10' includes antenna A for receiving signals 610. Unit 10' sends incoming messages to the electronic message delivery server 1 via link 11 in the same manner as shown in FIG. 1.

Messages from some of the interface units 10 may be delivered by means of wireless transmission over the cellu-

US 6,717,513 B1

9

lar telephone network (see U.S. Pat. Nos. 5,594,740 and 5,546,444). FIG. 2 is a detailed view of link 11 shown in FIG. 1. A message is transmitted from the cellular interface unit 10a via a radio frequency link 13 to a nearby cellular transceiver site 14, the message is then routed to the cellular network or mobile switching center (MSC, e.g., a cellular carrier such as Bell Atlantic) 16 where the message is then delivered via data circuits 17 and via router 51 (e.g., Bell South Cellemetry or Aeris) to the message delivery server 1. As will be clear from the discussion of FIG. 4, reference numerals 11a and 11b refer to different types of links. Specifically, link 11a is for receiving incoming exception and status messages from interfaces 10 which are in regions wired for sending data via the dialed digits control channel; link 11b forwards messages along the ESN channel to the message server 1.

Based on the configuration of the user's message profile, the outgoing exception message (or messages) is then delivered to the specified end device or devices. FIGS. 3a–d show a more detailed view of the various outbound links 12a–d that connect the server 1 to the various electronic media. In FIG. 3a, server 1 sends the message over a telephone line 18a to the Internet 122 and deposits the message in the user's e-mail box 6. In FIG. 3b, server 1 sends the message over a telephone line 18b through the public telephone switched network (PTSN) 19 to the user's fax machine 7. In FIG. 3c, server 1 sends the message over a telephone line 18c to the user's pager service 53 and thence to the user's pager or PCS 8. In FIG. 3d, server 1 sends the message over a telephone line 18d through the PTSN 19 to the user's voice mail box 9. The same message may also be sent to a number of other devices as configured by the user 121 over the Internet 122. The same message that is being sent to a fax machine 7 as described above may also simultaneously be sent to an e-mail 6 recipient via the Internet. Preferably, different messages can be sent to different individuals simultaneously for the same fault condition; for example, the owner of the premises may receive a less-detailed message than the contractor.

A user's message profile can also be configured to store messages on server 1 for delivery at a later time or after certain conditions are met. For example, a contractor may not want his beeper activated every time server 1 receives an incoming exception message. The user profile can be configured to deliver messages on groups or only after several messages have accumulated for the same user/contractor. Optionally, an outgoing exception message may be generated only after several of the same type of incoming message are received; a portion of the memory of server 1 may be devoted to the storing and/or accumulating of messages. Alternatively, a single outgoing exception message may be generated in response to several incoming messages.

In the same way the user profile can be configured, the user can configure virtual dip switches to enable or disable certain error messages. Conventional hardwired dip switches must be adjusted on site at the remote equipment. Virtual dip switches are software subroutines stored in server 1 which allow the user to toggle on or off certain portions of the ladder logic of the PLCs controlling the sensors of the remote equipment. According to the invention, the user can go to a website on the Internet 122 and, through menu-driven commands, enable or disable sections of the ladder logic just as he would be able to by flipping conventional dip switches at the installation site of the remote equipment. Additionally, the user will be able to configure the logic of the PLC remotely via the Internet as well.

10

A user may also control the functioning of a remote device in this way, via the Internet.

The user can enter commands at the website or other Internet interface, and those commands are forwarded to the server 1. In accordance with the user profile, for example, in the same way that exception messages are sent out via links 12a–d, a command message may be sent to the remote device through interface unit 10. Such command messages allow the user to activate, deactivate, and otherwise control the appliance. The interface unit 10 can receive these command messages D because the means by which the unit 10 communicates with the server, e.g., the cellular telephone network, is bi-directional. As a result of this bi-directionality, incoming links 11a–d may also be used to communicate with the devices through their respective interface units 10.

FIGS. 4 and 8–15 show the details of the message delivery server 1. In the preferred embodiment, server 1 includes four hardware devices (separated by heavy lines) 200, 300, 400, and 500. Device 200 is responsible for receiving incoming messages, processing them in accordance with the user's preferences, and routing them for output. Messages may be temporarily stored or accumulated on device 200 before being transmitted to the user if the user's message profile is set up accordingly. Device 300 enables the user 121 to access server 1 and create or edit his message profile residing in relational data base 21 of device 200. Device 400 includes the various drivers 33 which are responsible for transmitting the various messages to the various media (fax, e-mail, etc.). Device 500 includes billing computer 38 for keeping track of the charges and fees associated with the user's use of the service. It should be understood that the specific portions of each hardware device need not be arranged in the precise configuration shown.

At the core of server 1 is a relational data base 21. Incoming messages are received by a specific service designed to handle both the transport method and message formatting. Every interface unit 10 is provided, like a cellular telephone, with an electronic serial number (ESN, to identify the specific interface unit sending the message) and a mobile identification number (MIN, similar to a cellular telephone's phone number). In some instances, the exception or status information is embedded in the dialed digits the interface transmits. The dialed digits control channel module 25 specifically receives messages that are encoded in the control channel's dialed digits (see U.S. Pat. No. 5,594,740). The ESN control channel module 24 receives messages that are encoded in the electronic serial number of the message (U.S. Pat. No. 5,546,444). It is preferable to have both a dialed digits module 25 and an ESN module 24, because some geographic regions employ dialed digit data coding, while other regions employ ESN data coding. Information may be transmitted via the MIN of the interface 10 and also received by message delivery server 1. Services are also available to receive messages for analog modems connected to the public telephone switched network 23, and the cellular digital packet data network 22. As additional methods of transmitting data become available, they can be added to the services layer.

All incoming messages are normalized at the normalization module 26 so that all incoming messages can then be processed without regard to their incoming medium. All incoming messages are passed to the normal message subroutine 27, exception messages are passed on for processing and routing via the user's configuration through the data base 21, and periodic status messages are queued. The

US 6,717,513 B1

11

missing message subroutine 28 compares received status messages with a list of expected messages. Status messages that are not received have an error message generated by the missing message subroutine 28 which are then delivered as configured by the user in his message profile as recorded in the relational database 21.

Messages to be delivered are placed in a message queue 32; as message traffic permits the appropriate drivers 33 request messages from the message queue 32 and route the messages over the appropriate transport. Numeric pages, faxes, voice and DTMF 34 are sent over the PTSN 12b–d, e-mail 35 is sent over the Internet 122. When a driver 33 has successfully delivered, a record is made in the data base 21 by the delivery confirmation subroutine 31 showing time and date of successful deliveries. Undeliverable messages are routed back to the database for generation of undeliverable message errors.

Users 121 connect to an Internet information server 30 via the Internet 122. The Internet information server presents to the user the information pertaining to that user's interfaces. Requests to alter the user's data are passed through active server pages 29 to protect both the integrity and security of the data base 21. All messages and transactions that pass through the system are logged in section 36, the transaction and message logs are then interfaced by section 37 to a billing system 38.

A portion of the memory in relational data base 21 is preferably used to compile data regarding the devices being monitored over time. Such data is sortable by any number of different criteria, including brand of equipment, specific models of equipment, installation date (and thus the age of the equipment), the general local climate in which the equipment is installed (e.g., arid, humid, warm, rainy, etc.), local weather conditions in a given period of time, and the like. This information is usable in a number of different ways. A user can log in via the Internet, for example, and find out the maintenance history of his specific units to see which are the most reliable or most unreliable. Alternatively, a user can check to see which brands or models generally are the most reliable for any given conditions (age, climate, weather, etc.). Additionally, the information may be collated and processed by the operator of data base 21 and published by any number of different criteria. Any of the various messages may be stored for this purpose, e.g., the incoming messages from the interface units, the normalized messages output from the normalization module, the outgoing messages, normal status messages, etc.

An example of the system's operation from the perspective of the user-contractor is as follows. When a user-contractor 121 first signs up with the system 50, he receives an account on the electronic message delivery server 1. Via the Internet, the contractor 121 is prompted through software to enter the pager numbers, cellular telephone numbers, facsimile machine numbers, and Internet addresses of any individuals who are to be contacted in the event of an exception condition in building equipment 2–5 for which the contractor is responsible. The user-contractor 121 may also set the software to notify him of the periodic successful routine status check messages conveyed from equipment 2–5.

FIG. 5 depicts a flow chart of the basic steps that occur when a message is received by server 1. At step S1, the message is received. At step S2, normalization module 26 removes the required elements from the incoming message and arranges them in a normalized format and stores them as a record in a table. Server 1 can now examine a specific

12

element in a message of any received media type. At step S3, it is determined what type of error message has been received. If it is an exception message that requires immediate action, it is passed onto a process to begin configuration of a readable message at step S4 for delivery at step S5. If not, server 1 determines if the received message is a "unit checking in" or a "system ok" status message at step S6. If the user has his message profile so configured, a storing/accumulating step (not shown) may occur between steps S4 and S5. Undefined messages are handled at step S7. If it is configured as a periodic message received to indicate normal operation of a unit, the message is stored at step S8 for use at a later time. Periodically, the list of units that have reported in at step S8 and the list of active units expected to report in (part of database 21) are compared at step S9. Units on the active list that do not appear on the checked-in units list are processed, and units that failed to report in have messages created at step S10. These messages are then posted for further processing and message delivery at step S6.

In the example given, suppose boiler 3 breaks down in a non-catastrophic manner. The fault condition is detected by a sensor (not shown) and encoded to interface 10. Interface 10 transmits a radio message via link 13 to a local cell site 14, which contacts data circuits 17 via cellular network 16. Circuits 17 forward the message to message server 1. If the message is transmitted by the cellular telephone network 16, the ESN arrives via link 11b to ESN channel 24; alternatively, the dialed digits information arrives via link 11a to dialed digits channel 25.

The message is normalized in normalization module 26 and passed along to the normalized message process module 27. Module 27 selects the user's message profile from relational database 21 and in accordance therewith, determines what message gets sent to whom and by which medium. Alternatively or in addition, multiple fault conditions may be linked together via user-configurable ladder logic.

The above explanation was a "user's-eye" view of the macroscopic workings of the inventive system. Additional details concerning some of the inner workings of the preferred embodiment follow. In no way should these details be construed as being limiting of the scope of the invention.

There are many available methods of transporting data; one of the objectives of the invention is thus to use various transport methods and have the received data normalized so the subsequent processes will not be effected by the transport method. FIG. 4 shows data being received in a variety of formats via links 11a–d by device 200. FIG. 8 illustrates two exemplary data transport formats receivable by device 200. A message received from the first transport, "Transport A," is received in the form of a string 700 of information packets having data packet 702. Data packet 702 is the message forwarded to the server by interface unit 10. This particular transport delivers the message in the form of fifteen decimal digits as shown by exemplary data packet 702A.

A different exemplary transport, "Transport B," is shown in FIG. 8 below Transport A. In Transport B, a single packet 701 is received. The single packet is parsed into elements which include a data element 703. An exemplary data element 703A is shown to include eight hexadecimal digits. One of the functions of the system is to be able to accept a wide variety of information formats not just limited to as described above, with Transport A delivering the data in the form of fifteen decimal digits and Transport B delivering the data in the form of eight hexadecimal digits.

US 6,717,513 B1

13

14

On relational data base 21, a number of tables are provided, at least one for each transport, into which the received data is deposited. FIG. 9 shows the tables on data base 21 that are loaded with the data received from Transports A and B. Incoming Message Transport A Table 705 receives data elements 702 from Transport A, and Incoming Message Transport B Table 706 receives data elements 703 from Transport B. A standard data base command is used to insert the data into the next available row in the appropriate table when a data message is received from a transport. Incidentally, the central data base 21 may be provided with and use a conventional off-the-shelf data base processor such as SQL7 sold by Microsoft.

FIG. 10 shows the flow of data for a typical transport. All of the elements shown on FIG. 10 are required for each of the transports with the exception of the Normalized Message Table 710, which is the common table that all received exception messages are deposited into for further processing. The particular interface to a transport is represented generally as device 200, which includes the aforementioned control channels 22–25. Device 200 places the next incoming message from the transport into the corresponding Incoming Message Table 708 by utilizing the database's add row function. The Incoming Message Table 708 maintains the history of all messages received from a transport. When a row is added to the Incoming Message Table 708, the system determines at Step S3 (also see FIG. 5) whether the received message is an exception message or a normal status or "heartbeat" message. If the received message is normal status message, a row containing the received message data is added to the Device Heartbeat Table 727. A detail of the recorded heartbeat elements is shown on FIG. 14 as exemplary table 727A.

If it is determined at Step S3 that the row added to the Incoming Message Table is an exception message, the Normalization Process 709 references a group of data tables 711–714 to validate the received message and translate the exception message from its original format that was best suited for the transport. Data tables 711–714 are provided on data base 21. Each transport requires its own set of data tables. For example, as shown in FIG. 11, tables 711A–714A correspond to Transport A; similar tables (not shown) would be provided for Transport B and any other transports utilized by the system. Device Table 711 is a list of devices manufactured for the transport, Valid Device Table 714 contains a list of devices that have been activated, Message Type Table 712 and Message Code Translation Table 713 are used to form the normalized message that is added to the Normalized Message Table 710. The Normalized Message Table 710 is a single table to which the respective Normalization Processes of all transports adds a row. The Normalization Process is the logical equivalent of normalization module 26 and normal message subroutine 27 of FIG. 4.

FIG. 15 shows the flow of data after a message is deposited into the message queue 32 (see FIG. 4) pending delivery. The Normalized Message Table 710 functions as this queue. When an exception message is added as a row to this queue, a look-up operation is performed in the Device Message Delivery Table 720 (shown in detail in FIG. 12) for all message deliveries that pertain to the exception message pending delivery. Device Message Delivery Table 720 is a table of all delivery methods for all outgoing messages that potentially can be sent. Details of the Device Message Delivery Table 720A contains the information on, how many delivery attempts should be made for a particular message, by what method the delivery should be made, how many times this attempt should be made, how long to wait between attempts, and during what periods of time a message should be sent. Each delivery method i.e. Fax Delivery, Modem Delivery, Pager Delivery, Phone Delivery, etc. has a corresponding delivery process 730–733 and message table 722–725. For example, The Fax Delivery process 730 contains the required hardware and software to interface to the Public Switched Telephone Network (PSTN) and send a fax transmission to fax equipped receiver. The Fax Delivery table 722 contains the actual message to be sent to a fax receiver for each potential fax message. Each delivery process adds a row to the Delivery Attempt table 726 with the result of a delivery attempt. A successful or failed fax delivery is indicated in the table by the addition of a row by the result returned from, the fax hardware interface indicating the delivery result. The telephone delivery process utilizes a text to speech synthesizer to speak the message text to the person who answers the telephone call. Confirmation of deliver is established by the system requesting the person who is receiving the message to make certain actions such as press certain buttons on a touch tone telephone to acknowledge the receipt of the message. Acknowledgement or not is recorded by the Phone Delivery process 733 in the Delivery Attempt table 726.

It can be seen that the previously described user-defined message profile is not a discrete set of instructions that are all stored together, although it would appear so from the user interface, e.g., the website maintained by server 30. Rather, a user's message profile includes multiple elements, each of which is placed on a different table according to the type of data it represents. All of the users' respective delivery instructions are stored on Device Message Delivery Table 720. All of the users' respective facsimile delivery instructions are stored on Fax Delivery Table 722. All of the users' respective pager delivery instructions are stored on table 724. Each entry is identifiable by the "Key" associated therewith, as shown in the various tables of FIGS. 12–14.

The data engine (e.g., SQL 7) selects the next available row in the Normalized Message Table 710. Utilizing the Message Delivery ID, it then selects all records with the same Message Delivery ID in the Device Message Delivery Table 720. The resulting selection list is sorted by Delivery Method and those records that meet the selection criteria for message delivery time, and in service are prepared for message delivery. Each delivery process 730–733 polls the data engine to see if a message is available for delivery in the Device Message Delivery Table 720 with a delivery method that is suitable for its delivery function. If a delivery method is available to be sent the delivery process, for example a fax, the fax delivery process 730 will select the corresponding user defined message for the exception message to be sent from the Fax Delivery Table 722 along with the equipment location, make model, and serial number found in the Device Location Table 721. The delivery process then attempts to send the message to the user defined address found in the delivery table, for example, the fax number found in Fax Delivery table 722.

Each deliverable message is configurable by the user simply by editing the message text found in the delivery tables 722–725. Multiple deliveries are accomplished by having multiple delivery records in the delivery tables 722–725 with the same Message Delivery ID each having a unique delivery address i.e. fax number, phone number, etc. Additional delivery methods are easily added to the system by adding a new delivery transport process and an associated delivery table.

FIG. 16 illustrates the remote interface unit (RIU) 10 used to send messages to the remote server. The RIU contains a

US 6,717,513 B1

15

removable module capable of sending messages to the server over a specific transport shown here as a two way radio 801. The RIU 10 can be connected to a monitored piece of equipment in several ways. An array of inputs 808 can be wired into the monitored piece of equipment's limit, operating and auxiliary sensors. Alternatively or in addition, the RIU 10 can be connected to the monitored equipment's communication interface if equipped by the equipment manufacture via a serial interface 807 or 812.

The central processing unit (CPU) 804 is preferably an industry standard 8-bit micro-controller with 3 general purpose input/output (IO) ports and 2 serial ports. The first IO port is connected to a display 800 that is used to indicate operating modes and conditions of the RIU 10 to a person installing, testing, or servicing the RIU. The second port is in communication with both the monitored equipment and the RIU's power supply. This port of the CPU is buffered and protected by filter 809 which uses standard filter arrangements from unwanted surges and voltage transients that may be present on the sensing devices 808 connected to the RIU. The port is also in communication with the RIU's internal power supply 803. CPU 804 is capable of operating the power supply 803 on and off in order to perform standby battery 802 tests, monitor the presence of line power, and use the frequency of the line power to maintain a time standard. The third IO port is used to connect additional memory 810 to the CPU 804 and to operate output drivers 813, which are typically in the form of relays. The state of the outputs can either be determined by results of decisions made within the CPU 804 or commands received from the remote server via the transport radio 801.

The CPU has two serial interface ports, the first port is connected to a multiplexer 805 that is used to steer the flow of serial data either to the transport radio module 801 or an internal interface 814 used to configure the RIR during manufacturing, testing, and subsequent configuration changes. The transport radio module 801 is connected to the multiplexer 805 via a connector 815; this enables different radio transports to be installed at the manufacture to enable the use of a particular transport best suited for an application. Factors that may effect the transport selection are quantity of data to be sent to the remote server, and wireless networks deployed i.e. control channel over AMP, or CDPD. The second serial interface is connected in parallel to both an RS-232 driver 806 and a RS-485 driver 811, with the respective driver being connected to an interface device, RS-232 807 and RS-485 812. Different equipment manufactures use different interface schemes on their equipment, some use RS-232 and some RS-485. For that reason, the RIU supports both. When one of these interfaces is used to communicate with a piece of equipment's communication port, all internal data maintained by the equipment's internal CPU may be available to the RIU for transmission to the remote sever. Sensing devices 808 may also be connected to the CPU 804 via the input protection circuit 809 when the RS-232 807 or RS-485 812 are used to communicate with the monitored equipment. Together, CPU 804, multiplexer 805, and radio 801 make up the message generating mechanism of interface unit 10 discussed above.

Once every 24 hours, the CPU assembles a packet (heartbeat) of data which contains status and operational data of connected monitored equipment and communicates this packet of data to the transport radio module 801. The transport radio module 801 then transmits the information to the remote server as a normal status message as explained above. The CPU 804 also monitors the status of the sensing devices 808. The state of these inputs is feed into a virtual

16

Programmable Logic Controller (v-PLC) running within the CPU 804. The resultant relay outputs of the v-PLC can cause the CPU 804 to assemble an exception message packet and pass it on to the transport radio 801 for delivery to the remote server.

The invention is not limited to the above description but rather is defined by the claims appearing hereinbelow. Modifications to the above description that include that which is known in the art are well within the scope of the contemplated invention. For example, the invention is designed to be adaptable to all forms of electronic communication, be they cellular telephone, land line telephone, electronic mail, facsimile, text page, voice mail, etc. All forms of electronic media are contemplated as being within the scope of the invention. Also, multiple formats of incoming and outgoing messages are contemplated as included within the scope of the claims and the invention. The user can adjust the format and content of the messages he receives by setting up his message profile accordingly. The invention is also not limited to use in monitoring HVAC equipment but is contemplated to be useful for maintaining all forms of remote equipment. For example, the inventive system and method would prove extremely expedient is monitoring and replacing warning lights on cellular towers, radio transmitter towers, and other remote structures.

What is claimed is:

1. A method of monitoring and controlling remote equipment, comprising the steps of:

 a) determining a state of at least one parameter of at least one piece of remote equipment;

 b) communicating a message indicative of the state from the piece of remote equipment to a computer server as an incoming message;

 c) enabling a user to remotely configure or modify a user-defined message profile containing outgoing message routing instructions, the user-defined message profile being storable on the computer server;

 d) enabling a user to remotely send command messages to the remote equipment via the computer server to remotely control the remote equipment;

 e) determining whether an incoming message is an incoming exception message indicative of improper operation of the piece of remote equipment;

 f) if it is determined in step e) that an incoming message is an incoming exception message, forwarding at least one outgoing exception message based on the incoming message to at least one user-defined communication device specifiable in the user-defined message profile, wherein the user can remotely configure or modify the user-defined message profile by remotely accessing the computer server.

2. A method according to claim 1, wherein step d) is performed remotely over the Internet.

3. A method according to claim 2, wherein the user may enter commands at a website.

4. A method according to claim 1, wherein the at least one remote communication devices specifiable by the message profile includes at least one of a facsimile machine, an e-mail receiving device, a cellular telephone, a beeper, a pager, a PCS device, and a telephone.

5. A method of monitoring and controlling remote equipment, comprising the steps of:

 a) enabling bidirectional communication between at least one piece of remote equipment and a user;

 b) communicating a message indicative of a state of the remote equipment from the remote equipment to a computer server as an incoming message;

US 6,717,513 B1

17

c) enabling a user to remotely configure or modify a user-defined message profile containing outgoing message routing instructions, the user-defined message profile being storable on the computer server;

d) enabling a user to remotely send command messages to the remote equipment via the computer server to remotely control the remote equipment; and

e) forwarding at least one outgoing message based on the incoming message to at least one user-defined communication device specifiable in the user-defined message profile, wherein the user can remotely configure or modify the user-defined message profile by remotely accessing the computer server.

6. A method according to claim 5, wherein the at least one remote communication devices specifiable by the message profile includes at least one of a facsimile machine, an e-mail receiving device, a cellular telephone, a beeper, a pager, a PCS device, and a telephone.

7. A method of monitoring and controlling remote equipment, comprising the steps of:

a) enabling bi-directional communication between at least one piece of remote equipment and a user;

b) communicating a message indicative of a state of the remote equipment from the remote equipment to a computer server as an incoming message;

c) enabling a user to remotely configure or modify a user-defined message profile containing outgoing message routing instructions, the user-defined message profile being storable on the computer server; and

d) enabling a user to remotely send command messages to the remote equipment via the computer server to remotely control the remote equipment.

8. A system for monitoring and controlling remote equipment, comprising:

a sensor in local communication with a piece of remote equipment, said sensor detecting a state of at least one parameter of the piece of remote equipment;

an interface unit, locally connected to said sensor and in communication with the piece of remote equipment, said interface unit having a message generating means for generating an incoming message corresponding to the detected state of the remote equipment; and

a computer server in remote bi-directional communication with said interface unit, said server adapted to receive said incoming messages generated by said interface unit, said computer server having a user interface, a user being capable of remotely accessing said computer server via said user interface i) to remotely configure a user-defined message profile containing outgoing message routing instructions and ii) to remotely control the remote equipment via said user interface by sending command messages to said server, wherein when said message generating means generates an incoming message, said interface unit forwards said incoming message to said server,

and wherein said server forwards at least one outgoing message to at least one predetermined user-defined remote communication device based on said incoming message as specified in said user-defined message profile.

9. A system according to claim 8, wherein said message generating mechanism of the interface unit forwards said incoming messages to said computer server via at least one of a plurality of communication media, said media comprising at least one of a cellular telephone network, radio transmissions, telephone lines, and the Internet.

18

10. A system according to claim 9, wherein said interface unit is adapted to receive command messages directly from said user.

11. A system according to claim 8, wherein when a user sends a command message, said message generating means generates an incoming message in response thereto.

12. A system according to claim 9, wherein when a user sends a command message, said message generating means generates an incoming message in response thereto.

13. A system according to claim 8, wherein said remote communication devices include at least one of a facsimile machine, an e-mail receiving device, a cellular telephone, a beeper, a pager, a PCS device, and a land line telephone.

14. A system according to claim 10, wherein said interface unit periodically generates a normal status message if said sensor to which said interface unit is connected detects a normal status condition indicative of proper operation of said respective piece of equipment to which said sensor is connected, said normal status message including an equipment identification code of said respective piece of equipment.

15. A system for monitoring and controlling remote equipment, comprising:

an interface unit in bi-directional communication with a piece of remote equipment and with at least one communication link, said interface unit having a message generating means for generating an incoming message corresponding to a state of the remote equipment; and

a computer server in remote bi-directional communication with said interface unit, said server adapted to receive said incoming messages generated by said interface unit, said computer server having a user interface, a user being capable of remotely accessing said computer server via said user interface to remotely configure a user-defined message profile containing outgoing message routing instructions,

wherein a user may send a command message to the remote piece of equipment via said communication link and said interface unit to thereby control the remote piece of equipment remotely, and

wherein when said message generating means generates an incoming message, said interface unit forwards said incoming message to said server,

and wherein said server forwards at least one outgoing message to at least one predetermined user-defined remote communication device based on said incoming message as specified in said user-defined message profile.

16. A system according to claim 15, wherein said computer server is adapted to receive command messages from the user and forward said command messages to the remote piece of equipment.

17. A system according to claim 15, wherein when a user sends a command message, said message generating means generates an incoming message in response thereto.

18. A system according to claim 16, wherein when a user sends a command message, said message generating means generates an incoming message in response thereto.

19. A system for monitoring and controlling remote equipment, comprising:

an interface unit in bi-directional communication with a piece of remote equipment and with at least one communication link, said interface unit having a message generating means for generating an incoming message corresponding to a state of the remote equipment; and

a computer server in remote bi-directional communication with said interface unit, said server adapted to

US 6,717,513 B1

19

receive said incoming messages generated by said interface unit, said computer server having a user interface, a user being capable of remotely accessing said computer server via said user interface to remotely configure a user-defined message profile containing 5 outgoing message routing instructions,

wherein a user may send a command message to the remote piece of equipment via said wireless communication link and said interface unit to thereby control the remote piece of equipment remotely, and

wherein when said message generating means generates an incoming message, said interface unit forwards said incoming message to said server.

20. A system for monitoring and controlling remote equipment, comprising:

an interface unit in bi-directional communication with a piece of remote equipment, said interface unit having a message generating means for generating an incoming message corresponding to a state of the remote equipment; and

a computer server in remote bi-directional communication with said interface unit, said server adapted to receive said incoming messages generated by said interface unit, said computer server having a user interface, a user being capable of remotely accessing said computer server via said user interface i) to remotely configure a user-defined message profile containing outgoing message routing instructions and ii) to remotely control the remote equipment via said user interface by sending command messages to said server,

20

wherein when said message generating means generates an incoming message, said interface unit forwards said incoming message to said server,

and wherein said server forwards at least one outgoing message to at least one predetermined user-defined remote communication device based on said incoming message as specified in said user-defined message profile.

21. A system for monitoring and controlling remote equipment, comprising:

an interface unit in bi-directional communication with a piece of remote equipment, said interface unit having a message generating means for generating an incoming message corresponding to a state of the remote equipment; and

a computer server in remote bi-directional communication with said interface unit, said server adapted to receive said incoming messages generated by said interface unit, said computer server having a user interface, a user being capable of remotely accessing said computer server via said user interface i) to remotely configure a user-defined message profile containing outgoing message routing instructions and ii) to remotely control the remote equipment via said user interface by sending command messages to said server,

wherein when said message generating means generates an incoming message, said interface unit forwards said incoming message to said server.

* * * * *

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 33255420 |
| **Application Number:** | 90020115 |
| **International Application Number:** | |
| **Confirmation Number:** | 8511 |
| **Title of Invention:** | ELECTRONIC MESSAGE DELIVERY SYSTEM UTILIZABLE IN THE MONITORING OF REMOTE EQUIPMENT AND METHOD OF SAME |
| **First Named Inventor/Applicant Name:** | 6717513  6717513 |
| **Customer Number:** | 26111 |
| **Filer:** | Joseph Edward Mutschelknaus/Mary Porras |
| **Filer Authorized By:** | Joseph Edward Mutschelknaus |
| **Attorney Docket Number:** | 3750.021REX5 |
| **Receipt Date:** | 23-JUL-2018 |
| **Filing Date:** | 02-AUG-2017 |
| **Time Stamp:** | 17:33:33 |
| **Application Type:** | Reexam (Patent Owner) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | CARD |
| Payment was successfully received in RAM | $ 1940 |
| RAM confirmation Number | 072418INTEFSW17341600 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 3750-021REX5_POSecondPetitionToVacate.pdf | 1692154 <br> 71971e5778cdddfc2e46768fbc3a1c275b0b0f29 | yes | 16 |

| | Multipart Description/PDF files in .zip description | | | |
|---|---|---|---|---|
| | **Document Description** | **Start** | | **End** |
| | Reexam Miscellaneous Incoming Letter | 1 | | 1 |
| | Receipt of Petition in a Reexam | 2 | | 15 |
| | Reexam Certificate of Service | 16 | | 16 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Fee Worksheet (SB06) | fee-info.pdf | 30922 <br> 69e04fe064816d2253b4d493e0adf2db00b4d3d4 | no | 2 |

**Warnings:**

**Information:**

| | | | |
|---|---|---|---|
| **Total Files Size (in bytes):** | | 1723076 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.



**ROBERT GREENE STERNE**
DIRECTOR
(202) 772-8555
RSTERNE@SKGF.COM

July 23, 2018

**Mail Stop "*Ex Parte* Reexam"**
Attn:  Central Reexamination Unit
Commissioner for Patents                                                *Confirmation No. 8511*
PO Box 1450                                                                              *Art Unit 3992*
Alexandria, VA  22313-1450

      Re:     Reexamination of U.S. Patent No. 6,717,513
              Control No. 90/020,115; Filed:  August 2, 2017
              For:   **ELECTRONIC MESSAGE DELIVERY SYSTEM UTILIZABLE IN THE
                      MONITORING OF REMOTE EQUIPMENT AND METHOD OF SAME**
              Inventors:  David Sandelman
              Our Ref:  3750.021REX5

Commissioner:

      Transmitted herewith for appropriate action are the following documents:

1. Patent Owner's Second Petition under 37 C.F.R. § 1.181 to Vacate the Reexamination Order;

2. Certificate of Service; and

3. Online Credit Card Payment Authorization in the amount of **$1,940.00** to cover the Petition fee under 37 C.F.R. § 1.20(c)(6).

      ***The above-listed documents are filed electronically***.

      Fee payment is provided through online credit card payment.  The U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 19-0036.

                    Respectfully submitted,

                    STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

                    *Robert Greene Sterne*

                    Robert Greene Sterne, Reg. No. 28,912
                    Jason D. Eisenberg, Reg. No. 43,447
                    Joseph E. Mutschelknaus, Reg. No. 63,285
                    Attorneys for Patent Owner

RGS/JEM/mep
Attachments

8351587_1.docx

Sterne, Kessler, Goldstein & Fox P.L.L.C.  |  1100 New York Avenue, NW  |  Washington, D.C. 20005
**P** 202.371.2600  |  **F** 202.371.2540  |  sternekessler.com

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reexam of: U.S. Patent No. 6,713,513 | Confirmation No.: 8511 |
| | Art Unit: 3992 |
| Reexam Control No.: 90/020,115 | Examiner: LEUNG, Christina Y |
| Filed: August 2, 2017 | Atty. Dkt. No.: 3750.021REX5 |
| For:   Electronic Message Delivery System | |

### Patent Owner's Second Petition Under 37 C.F.R. § 1.181 to Vacate the Reexamination Order

**Mail Stop *Ex Parte* Reexam**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

On August 2, 2017, Requester Alarm.com ("ADC") requested reexamination of U.S. Patent No. 6,717,513 ("the '513 patent"), which is assigned to Patent Owner Vivint. Approximately one month later—on September 7, 2017—three Examiners in the Central Reexamination Unit ("CRU") ordered ex parte reexamination of the patent.

Vivint petitions pursuant to 37 C.F.R. § 1.181(a)(3) to request that the Director exercise his supervisory authority to (1) reconsider the Office of Patent Legal Administration's ("OPLA's") June 15, 2018 decision dismissing Vivint's petition to vacate the reexamination order and (2) vacate the September 7, 2017 reexamination order. Prior to filing the instant request for reexamination, ADC had filed *three* petitions for inter partes review of the '513 patent on similar grounds to those asserted here. The Patent Trial and Appeal Board, acting on behalf of the Director, refused to institute in all three cases—and the third time, the Board denied review under 35 U.S.C. § 325(d), which provides that the Director may deny to institute inter partes review or ex parte reexamination if "the same or substantially the same prior art or arguments [for unpatentability] previously were presented to the Office." *Id.*

ADC's reexamination request contains arguments for unpatentability that are nearly word-for-word identical to those contained in its third IPR petition. Accordingly, the reexamination request and the petition—both of which were subject to § 325(d)—should have been met with an identical disposition. But CRU, without even mentioning § 325(d), granted the request for reexamination, and OPLA then dismissed Vivint's petition to vacate the reexamination order. In other words, the *same agency* applied the *same statute* to the *same factual scenario* but reached a different result. That is the epitome of "agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The order granting reexamination should be vacated as inconsistent with the Administrative Procedure Act, and the reexamination should be terminated.

This Petition is timely filed under 37 C.F.R. § 1.181(f) within two months of OPLA's June 15, 2018 decision dismissing Vivint's petition to vacate the reexamination order. Vivint submits herewith the requisite petition fee under 37 C.F.R. § 1.20(c)(6). Any additional fees required for consideration of this Petition may be charged to Deposit Account No. 19-0036.

**I.    Introduction and Relief Requested**

35 U.S.C. § 325(d) provides that the PTO Director may deny both inter partes reviews and ex parte reexaminations on the ground that "the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. § 325(d). The Board denied institution in IPR2016-01091 under this provision, concluding that ADC's petition ("the '1091 petition") was precisely the sort of cumulative and harassing invalidity challenge that § 325(d) was enacted to prohibit. The instant reexamination request is identical to the '1091 petition in all but one respect: ADC has used the Board's decisions in different IPRs of three related patents to bolster one argument that the Board previously found deficient.

The Office accordingly should have denied this reexamination request under § 325(d), just as the PTAB denied the '1091 petition under § 325(d). The maintenance of this reexamination request by CRU (and, by extension, the Patent Office) is flatly inconsistent with the Board's (and, by extension, the Patent Office's) denial of the '1091 petition, and thus is arbitrary and capricious, in violation of § 706(2)(A) of the Administrative Procedure Act. The reexamination order should be vacated.

## II.    Statement of Facts

Vivint's '513 patent relates to monitoring and control of remote equipment. In June 2015, Vivint filed a patent-infringement lawsuit against ADC asserting the '513 patent and three related patents. In September 2015, ADC began filing IPR petitions against the '513 patent and the other patents asserted in Vivint's lawsuit. All told, between September 2015 and June 2016 (the § 315(b) bar date), ADC filed four waves of IPR petitions—fourteen petitions total—against the four related patents. Of the fourteen petitions, only three have been granted—and none have been granted on the '513 patent.[1]

ADC filed three petitions against the '513 patent. The Board denied the first petition, based principally on a reference called Scadaware, on the ground that there was not a reasonable likelihood of Scadaware anticipating the claims or rendering them obvious. *See* IPR2015-01997, Paper 14, pp. 9, 26-28 (PTAB Apr. 7, 2016). The Board denied the second petition on the ground that there was not a reasonable likelihood that one of the asserted prior-art references—Johnson—was in fact prior art. *See* IPR2016-00129, Paper 13, pp. 16-17 (PTAB May 3, 2016).

The fourth petition ADC filed was the '1091 petition, which ADC acknowledges "was based on the same two primary references—Shetty and Joao—as [is this reexamination] request." Reexam Request, p. 4. Indeed, with the exception of claim 14, the arguments in ADC's reexamination request are *verbatim* identical to the arguments in ADC's '1091 petition. *Compare* '091 Petition, pp. 20-57, 64-67, *with* Reexam Request, pp. 17-57, 64-68.

The Board denied institution of the '1091 petition. *See* IPR2016-01091, Paper 11 (PTAB Nov. 23, 2016). The Board explained that every factor it generally considers in determining whether to exercise its discretion to institute review—including § 325(d)'s directive that an IPR petition may be rejected "because[] the same or substantially the same prior art or arguments previously were presented to the Office"—weighed against institution. *See id.*, pp. 5-14. Section 325(d), the Board observed, permits consideration of whether ADC has "use[d] information gleaned from [the Board's] earlier decisions to bolster challenges it advanced unsuccessfully." *Id.*, pp. 11-12. And ADC's '1091 petition did just that: ADC made the same basic arguments that it had asserted

---

[1] A table showing the details of the fourteen petitions can be found at p. 4 of Vivint's first Petition to Vacate the Reexamination Order.

previously, but simply added references to correct "deficiencies noted in references relied upon in earlier petitions." *Id.*, p. 11; *see also id.*, pp. 10-11 ("[T]he instant petition is essentially a composite response to our decisions in those earlier proceedings . . . . [based on] the information to be gleaned from [Vivint's] preliminary responses and our decisions on institution in the related cases."). This suggested that the '1091 petition was

> a case of undesirable, incremental petitioning, in which a petitioner relies on a patent owner's contentions and/or a Board decision in an earlier proceeding or proceedings involving the same parties, the same patent, and the same claims to mount another challenge after an earlier, unsuccessful or only partially successful challenge, by fixing deficiencies, noted by the Board, that were within the petitioner's capacity to avoid in the earlier petition or petitions.

*Id.*, p. 12. The Board remarked that "[a]llowing similar, serial challenges to the same patent, by the same petitioner, risks harassment of patent owners and frustration of Congress's intent in enacting the Leahy-Smith America Invents Act." *Id.* (citing H.R. Rep. No. 112-98, pt. 1, at 48 (2011)).

As noted above, ADC's reexamination request is a carbon copy of the '1091 petition, with the sole exception of claim 14. For claim 14, ADC replaced Britton—which the Board held in related IPRs did *not* render obvious features related to claim 14's "normal status message," *see, e.g.*, IPR2016-00116, Paper 39 (PTAB May 2, 2017)—with Cheng. Thus, ADC's reexamination request is just like the '1091 petition, only more so: ADC has again repackaged its earlier arguments and used "information gleaned from [the Board's] earlier decisions to bolster challenges it advanced unsuccessfully" in the IPRs. IPR2016-01091, Paper 11, pp. 11-12. ADC did not address § 325(d) in its reexamination request and did not acknowledge that its nearly identical '1091 petition had been denied under that statutory provision.

In response to ADC's request, the Examiners ordered reexamination. Order dated September 7, 2017, p. 6. Like ADC, the Examiners did not address § 325(d) and did not discuss whether the request included only the "same or substantially the same prior art or arguments [that] were previously presented to the Office." *Id.*, *passim*.

Vivint then timely filed a Petition Under 37 C.F.R. § 1.181 to Vacate the Reexamination Order. That petition argued that, because § 325(d) applies to both IPRs and ex parte reexaminations, CRU—which, just like the Board, exercises authority delegated by the Director of PTO—should have found the reexamination request barred by § 325(d), both because that result is correct on the

merits and because it would be arbitrary and capricious under the Administrative Procedure Act for the same agency applying the same statute to the same set of facts to reach divergent results.

OPLA dismissed Vivint's petition to vacate. *See* Decision dated June 15, 2018 ("OPLA Decision"). OPLA first concluded that it had no discretion under § 325(d) to terminate a reexamination that was already in progress because "35 U.S.C. [§] 305 *requires* the Office to conduct reexamination *once the* [reexamination] *order has been issued* pursuant to 35 U.S.C. [§] 304." *Id.*, p. 5; *see also id.* (""[T]he *discretionary* determination by the Office under 35 U.S.C. [§] 325(d) whether to reject the request is not petitionable once the order granting reexamination has issued."). (The OPLA Decision acknowledged, however, that a patent owner may petition the Office to vacate a reexamination owner on the ground that "the issuance of the order was an *ultra vires* action on the part of the Office." *Id.*, p. 5 n.2.)

The OPLA Decision also "provide[d] additional comments . . . to clarify Office policy" with regard to the application of § 325(d) in reexamination proceedings. *Id.*, p.5. OPLA concluded that CRU's decision to grant ex parte reexamination of the '513 patent was not inconsistent with the Board's denial of the '1091 petition. The Board's analysis, OPLA reasoned, was based primarily on its discretion under 35 U.S.C. § 314(a), which—unlike § 325(d)—does not apply in ex parte reexamination proceedings. "[A]n analysis pursuant to 35 U.S.C. [§] 325(d)," OPLA stated, is merely one "factor that may be considered by the PTAB *in addition to* the § 314(a) factors identified in *General Plastic* [*Industrial Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper No. 19 (PTAB Sept. 6, 2017)]."[2] OPLA Decision, p. 8. OPLA also concluded that "the considerations with respect to issues involving 35 U.S.C. [§] 325(d) are not identical" in IPRs and ex parte reexaminations, meaning that the outcome of a § 325(d) analysis may be different in the two proceedings even when the circumstances are otherwise the same. *See id.*, pp. 11-13.

This petition to vacate timely followed. *See* 37 C.F.R. § 1.181(f).

---

[2] The PTAB's decision in *General Plastic* sets forth seven factors that the Board may consider in exercising its discretion to deny institution of an IPR under § 314(a). *See* IPR2016-01357, Paper No. 19 at 9-10, 16. "Similarly," the *General Plastics* decision explained, "under § 325(d), whether 'the same or substantially the same prior art arguments previously were presented to the Office' is an issue that 'may' be taken into account in considering institution." *Id.* at 19.

III.    **Argument**

   A.   **The Director has the authority to vacate the order granting reexamination as *ultra vires* and contrary to the requirements of the Administrative Procedure Act.**

The OPLA Decision concluded that 35 U.S.C. § 305 precludes the Office from vacating the reexamination order "on the basis set forth in 35 U.S.C. [§] 325(d)" once an order granting reexamination has already issued. OPLA Decision, pp. 4-5. On OPLA's reasoning, § 325(d) "provides the Office with the discretion to 'reject' a request for reexamination *prior to* the order," but does not "provide the Office with the discretion to terminate an ongoing reexamination proceeding on the basis set forth in 35 U.S.C. [§] 325(d) if no petition requesting such relief is filed until *after* reexamination has been ordered." *Id.*, p. 4. It was on this basis that OPLA dismissed Vivint's petition to vacate. *Id.*, p. 5.

The OPLA Decision's reasoning is doubly flawed.

*First*, OPLA is *not* prohibited from terminating an ongoing reexamination proceeding pursuant to § 325(d). As the OPLA Decision recognized, the Office has in fact stated on two prior occasions that petitions to vacate an already-ordered examination under § 325(d) *are* proper. *See* OPLA Decision, p. 4 n.1. OPLA provided no reason for deviating from the Office's prior practice on this score, save for a conclusory statement that the Officer's previous statements "were in error." *Id.* Instead, the OPLA Decision suggested that Vivint should have raised its § 325(d) argument before reexamination was granted. *See id.*, pp. 4-5. *But that would have been impossible*: the Patent Office's Manual of Patent Examination Procedure prohibits a patent owner from making anything other than a narrow class of procedural filings prior to the order granting reexamination. *See* MPEP § 2225. In other words, the OPLA Decision denied Vivint relief on the ground that Vivint did not raise the § 325(d) issue in a way that Office policy expressly prohibits, and instead raised the issue in a way that previous Office decisions have expressly allowed. That is the epitome of "arbitrary and capricious" agency action prohibited by the APA. *See* 5 U.S.C. § 706(2)(A); *Johnson v. Ashcroft,*

286 F.3d 696, 700 (3d Cir. 2002) (agency acts arbitrarily if it departs from established rules and precedent without a "principled reason").[3]

*Second*, even if OPLA were correct that the Office is prohibited from terminating a reexamination *under § 325(d)* once the order granting reexamination has issued, the Office would still have the authority to terminate here. As discussed in the following section, Vivint's argument for vacatur is *not* based solely (or even primarily) under § 325(d); Vivint's argument is that CRU's decision to order reexamination violated the *Administrative Procedure Act* because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Even the OPLA Decision admits that the Office is authorized to vacate a reexamination order on the ground that "the issuance of the order was an *ultra vires* action on the part of the Office." OPLA Decision, p. 5 n.2. That is the case here. As discussed in the following section, the reexamination order was indeed *ultra vires* under § 706(2)(A) of the APA because it was irreconcilably inconsistent with Board's denial of the '091 petition under § 325(d).

**B.     CRU's decision to grant reexamination of the '513 patent was arbitrary and capricious under 5 U.S.C. § 706 because it was flatly inconsistent with the Board's denial of institution of the '091 petition.**

**1.     The Board denied the '1091 petition under § 325(d).**

As discussed above, *see supra* Statement of Facts, the Board denied the '1091 petition for inter partes review under § 325(d) because the invalidity arguments in that petition were "the same or substantially the same . . . as those previously presented to the Office" in ADC's earlier IPR petitions. IPR2016-01091, Paper 11, pp. 11-12. The '1091 petition, explained the Board, simply "appl[ied] new references" that "were intended merely to correct deficiencies noted in references relied upon in the earlier petitions." *Id.*, p. 11; *see also id.*, pp. 11-12 (ADC had "use[d] information gleaned from [the Board's] earlier decisions to bolster challenges it advanced unsuccessfully").

---

[3] Indeed, even if the Patent Office did not expressly prohibit a patent owner from making filings going to the merits prior to an order granting reexamination, such filings would be impossible from a practical standpoint. The Office typically decides whether to grant reexamination in a matter of weeks (approximately four, in this case), and patent owners are generally not notified of a request for ex parte reexamination until several days after it is filed—meaning patent owners will usually not have time to prepare and file a submission under § 325(d) prior to the Office's decision whether to grant reexamination.

"These facts suggest[ed] that [the '1091 petition was] a case of undesirable, incremental petitioning, in which a petitioner relies on a patent owner's contentions and/or a Board decision in an earlier proceeding or proceedings involving the same parties, the same patent, and the same claims to mount another challenge . . . by fixing deficiencies, noted by the Board, that were within the petitioner's capacity to avoid in the earlier petition or petitions." *Id.*, p. 12; *see also id.* ("[A] decision on a petition . . . is not simply part of a feedback loop by which a petitioner may perfect its challenges through subsequent filing.") (quoting *Travelocity.com L.P. v. Cronos Tech., LLC*, CBM2015-00047, Paper 7, p. 13 (PTAB June 15, 2015)). Allowing such serial petitioning, the Board concluded, would "risk[] harassment of patent owners and frustration of Congress's intent in enacting the [AIA]." *Id.* (quoting *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, IPR2014-00581, Paper 8, p. 13 (PTAB Oct. 14, 2014)).

The OPLA Decision stated that "the PTAB denied review [of the '1091 petition] pursuant to its discretion under *35 U.S.C. [§] 314(a)*, not 35 U.S.C. [§] 325(d)." OPLA Decision, p. 7 (emphasis added). Accordingly, OPLA reasoned that the Board's decision was of little relevance to CRU's determination whether to grant reexamination because § 314(a)—unlike § 325(d)—does not apply to reexamination proceedings. *See id.*, pp. 6-11. But OPLA's premise—that the Board's denial was based solely on § 314(a)—was simply wrong. To be sure, the Board considered the seven factors discussed in *General Plastics* that inform the Board's discretion under § 314(a), and the Board determined that those factors counseled against institution of the '080 patent. *See* IPR2016-01091, Paper 11, pp. 5-11. But the Board *also* addressed § 325(d) independently and concluded that denial of institution was appropriate under that provision as well. *See id.*, pp. 11-13. The Board concluded that the '1091 petition presented too great a risk of "inequity resulting from a petitioner's filing of serial attacks against the same claims of the same patent, while having the opportunity to adjust litigation positions along the way based on either the patent owner's contentions responding to prior challenges or the Board's decision on prior challenges"—which made institution inappropriate under § 325(d). *See id.*, pp. 12-13 (quoting *LG Elecs. Inc. v. Core Wireless Licensing S.A.R.L.*, IPR2016-00986, Paper 12, pp. 7-8 (PTAB Aug. 22, 2016)).

> 2.    **It would be arbitrary and capricious for the Office to conduct this reexamination after the Board's denial of the '1091 petition because the facts here vis-à-vis the application of § 325(d) are materially identical to those confronted by the Board.**

It is a bedrock principle of administrative law that an agency acts arbitrarily if it acts inconsistently "without 'announcing a principled reason'" for the inconsistency. *Johnson*, 286 F.3d at 700. That is precisely what happened here: the Office inexplicably granted ADC's reexamination request after *denying* a nearly identical petition for inter partes review under § 325(d). The order granting reexamination should accordingly be vacated.

The arguments in the reexamination request here are nearly identical to the arguments ADC made in the '1091 petition. Indeed, with the exception of claim 14, the arguments are *verbatim* copies. *Compare* '1091 Petition, pp. 20-57, 64-67, *with* Reexam Request, pp. 17-57, 64-68. For claim 14, ADC used the information gleaned from the Board's decisions in related IPRs—which held that Britton did not render obvious features related to claim 14's "normal status message"—and replaced Britton with a new reference, Cheng. This is thus another classic example of "undesirable, incremental petitioning" in which a patent challenger is using prior PTO decisions as a roadmap to assert arguments that could have—and should have—been asserted in earlier petitions. IPR2016-01091, Paper 11, p. 12. In other words, the facts here vis-à-vis the application of § 325(d) are essentially identical to those the Board faced in addressing the '1091 petition. Indeed, if anything, the instant reexamination request presents an even *more* compelling case for application of § 325(d), since ADC has copied the '1091 petition *except for* one argument that the Board already rejected.

CRU exercises authority delegated by the Patent Office in determining whether to grant reexamination requests, just as the Board exercises authority delegated by the Patent Office in determining whether to institute an inter partes review. CRU's decision to grant ADC's reexamination request notwithstanding § 325(d) thus amounted to this: on two different occasions, the *same agency* applied the *same statute* to the *same set of facts* and yet reached divergent results. That is the height of arbitrary and capricious agency action under the APA. *See Johnson*, 286 F.3d at 700. That the application of § 325(d) is discretionary does not change this result: even if an "agency's discretion is unfettered at the outset," it may not, consistent with the APA, irrationally

change the *manner* in which it exercises that discretion. *I.N.S. v. Yueh-Shai Yang*, 519 U.S. 26, 32 (1996). That is exactly what the Office did here.

It would be flatly inconsistent with Congress's intent in passing the America Invents Act to allow a petitioner to recycle the same invalidity challenges rejected by the Board under § 325(d) for use in follow-on requests for reexamination directed to CRU. Section 325(d) was specifically enacted in order to prevent this sort of gamesmanship and "protect[] against abuse of ex parte reexamination" by "prevent[ing] inter partes . . . review petitioners from seeking ex parte reexaminations of issues that were raised or could have been raised in" earlier IPRs. 157 Cong. Rec. S1376 (Mar. 8, 2011) (statement of Sen. Kyl). Under prior practice, Congress recognized, the Patent Office was "forced to accept many requests for ex parte and inter partes reexamination that raise challenges that are cumulative to or substantially overlap with issues previously considered by the Office with respect to the patent"; § 325(d) was passed to ameliorate that state of affairs. 157 Cong. Rec. S1376; *accord Liberty Mut. Ins. Co. v. Progressive Cas. Ins. Co.*, CBM2012-00002, Paper 10, pp. 32-33 (PTAB Jan. 25, 2013).

The '1091 petition and the instant reexamination request are thus precisely the sort of abusive, harassing, repeated, cumulative challenge that § 325(d) was designed to prohibit. The Board correctly rejected ADC's challenges under that provision, and CRU should have rejected ADC's challenges under it as well.

### 3.   OPLA's reasons for distinguishing § 325(d)'s application in IPRs from its application in reexaminations do not withstand scrutiny.

The OPLA Decision offered several reasons why, in its view, § 325(d) applies differently in inter partes review proceedings than it does in ex parte reexamination proceedings. *See* OPLA Decision, pp. 11-13. Putting aside the fact that nothing in the *text* of § 325(d) supports applying the statute differently in the two different contexts, none of the distinctions identified by OPLA supports OPLA's conclusion. Indeed, if anything, the differences between the two types of proceedings counsel in favor of applying § 325(d) *more* stringently in the reexamination context.

**a.** *First*, OPLA reasoned that, in IPRs, "both parties have a full right of participation throughout the entire procedure" and "a right to appeal the PTAB's final decision to the . . . Federal Circuit," whereas in reexamination proceedings, "the right of a third party requester is limited" and the third party has no right to appeal. OPLA Decision, pp. 11-12. But OPLA did not explain why this

means that § 325(d) should have less force in reexaminations, nor is any explanation immediately apparent. In both cases, § 325(d) prevents the patent owner from being subjected to repeated, cumulative, and harassing invalidity attacks that could have and should have been raised in an earlier proceeding.

    **b.**    *Second*, OPLA observed that the ex parte reexamination statute allows the Office to order reexamination on a claim-by-claim and ground-by-ground basis, whereas the IPR statute establishes "a regime where a reasonable prospect of success on a single claim justifies review of all," *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018). *See* OPLA Decision, p. 12. Again, it is not clear why this distinction has any bearing on the application of § 325(d); whether review is conducted on all challenged claims or just one, the patent owner is still forced to defend against repetitive and abusive challenges to the patent's validity.

    **c.**    *Third*, OPLA pointed out that "the standard used for ordering *ex parte* reexamination"—whether the request raises a "substantial new question of patentability"—"differs from the standard used for instituting *inter partes* review"—whether there is a reasonable likelihood that the petitioner would prevail on at least one of the challenges in the petition. OPLA Decision, p. 12. In OPLA's view, the SNQ standard "already substantially afford[s]" patent owners the "protection . . . against harassment based on repetitive arguments" that § 325(d) provides. *Id.* But this line of reasoning reads § 325(d) out of the statute entirely in the context of reexaminations. If the SNQ standard standing alone were sufficient "protection . . . against harassment," § 325(d)—which Congress *explicitly directed* would apply to "proceeding[s] under . . . chapter 30" (governing ex parte reexamination)—would be rendered a nullity. That reading of the statute cannot be correct. *See TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (courts should avoid interpretations that render a statutory provision "entirely superfluous in all but the most unusual circumstances").

    **d.**    *Fourth*, OPLA noted that the "IPR statute is permissive," whereas, "absent the provisions of 35 U.S.C. [§] 325(d), the *ex parte* reexamination statute *requires* the Office to order reexamination if the request is found to raise a substantial new question of patentability." OPLA Decision, p. 12. This amounts to saying that, if one *ignores the discretion to deny reexamination explicitly conferred by § 325(d)*, the Office has no discretion to deny reexamination—in other words, the Office has no discretion, other than the discretion it indisputably has. Again, the OPLA

- 12 -                    Reexam of U.S. Patent No. 6,717,513
                          Control No. 90/020,115

Decision's analysis is indefensible because it would, if followed, eviscerate § 325(d) as applied to reexaminations.

     **e.**    *Fifth*, OPLA stated that, unlike in inter partes reexaminations, "once an order granting reexamination has been issued, the Office is *required* to conduct reexamination." OPLA Decision, p. 13. As explained above, *see supra* Section III.A, that is wrong—but even if it were correct, it would suggest that 325(d)'s gatekeeping provision is even *more* important in ex parte reexaminations than in *inter partes* reviews, since there would be no other route through which a patent owner could pretermit an improperly filed reexamination request.

     **f.**    *Finally*, OPLA observed that "the ex parte reexamination statute does not provide for a filing of a response by the patent owner *prior to* an order granting reexamination." OPLA Decision, p. 13. Quite right—but this simply shows why Vivint could not have raised its § 325(d) argument before the order granting reexamination. *See supra* Section III.A. It certainly does not suggest that § 325(d) should apply with less force in ex parte reexaminations than it does in IPRs.

     **C.**    **This petition to vacate should not be expunged because Vivint has a statutory right "[t]o invoke the supervisory authority of the Director in appropriate circumstances"—for example, where, as here, the Office's grant of reexamination was *ultra vires* agency action.**

The final paragraph of OPLA's decision dismissing Vivint's first petition to vacate states that "[b]ecause any exercising of the Director's authority pursuant to 35 U.S.C. [§] 325(d) is purely discretionary, any further papers requesting the Office to take any action, or refrain from taking any action, in view of the provisions of 35 U.S.C. [§] 325(d) will not be entertained, and will be expunged." OPLA Decision, p. 14. The Office's regulations, however, explicitly provide Vivint the right "to invoke the supervisory authority of the Director in appropriate circumstances," 37 C.F.R. § 1.181, and the OPLA Decision explicitly recognized that an *ultra vires* reexamination order would be such an appropriate circumstance. *See* OPLA Decision, p. 5 n.2. Here, Vivint's contention is that CRU's grant of ADC's reexamination request was *ultra vires* because it was arbitrary and capricious under the Administrative Procedure Act. Accordingly, this petition is proper under 37 C.F.R. § 1.181 and should not be expunged.

**D.    If the Director does not vacate the order granting reexamination, Vivint's petition should be denied rather than dismissed so that Vivint may seek judicial review.**

If the Director declines to grant Vivint the relief it seeks—vacatur of the order granting reexamination—Vivint requests that the Director deny this petition on the merits, rather than dismiss it (as OPLA dismissed Vivint's first petition). As explained above, *see supra* Section III.A, this petition is timely—indeed, Vivint was *prohibited from filing it* prior to the reexamination order—and so the Director should address the petition on the merits and either grant it or deny it. This course will allow Vivint to either (a) obtain the relief it seeks or (b) secure a final agency decision from which Vivint can seek judicial review. *See* 5 U.S.C. § 704 (only "*final* agency action" is subject to judicial review); MPEP § 1002.02 ("dismissal of a petition" is not considered a "final agency decision[]").

## IV.    Conclusion

For these reasons, the Director should vacate and terminate the reexamination.

- 14 -                          Reexam of U.S. Patent No. 6,717,513
                                Control No. 90/020,115

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Robert Greene Sterne, Reg. No. 28,912
Jason D. Eisenberg, Reg. No. 43,447
Joseph E. Mutschelknaus, Reg. No. 63,285
Attorneys for Patent Owner

Date: 23 JULY 2018

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| *In re*: Reexam of U.S. Patent No. | Confirmation No.: 8511 |
| 6,717,513 | Art Unit: 3992 |
| Control No.: 90/020,115 | Examiner: Leung, Christina Y. |
| Filed: August 2, 2017 | Atty. Docket: 3750.021REX5 |
| For: **Electronic Message Delivery System Utilizable In The Monitoring Of Remote Equipment And Method Of Same** | |

## Certificate of Service

**Mail Stop "*Ex Parte* Reexam"**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

In compliance with 37 C.F.R. § 1.550(f) the undersigned, on behalf of the Third Party Requester, hereby certifies that a copy of the following documents are being served on the Patent Owner by first class mail on July 23, 2018:

1. Cover Letter;

2. Patent Owner's Second Petition under 37 C.F.R. § 1.181 to Vacate the Reexamination Order; and

3. Certificate of Service.

The name and address of the party being served is as follows:

      William H. Mandir
      **Sughrue Mion, P.L.L.C.**
      2100 Pennsylvania Avenue, NW, Suite 800
      Washington, DC 20037

      Respectfully submitted,

      STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

      *Robert Greene Sterne*

      Robert Greene Sterne, Reg. No. 28,912
      Jason D. Eisenberg, Reg. No. 43,447
      Joseph E. Mutschelknaus, Reg. No. 63,285
      Attorneys for Patent Owner

Date:    July 23, 2018

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600
9708881_1.docx

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 20-1992

**Short Case Caption:** In re: Vivint, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,694  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 11/13/2020

Signature: /s/ Robert Greene Sterne

Name: Robert Greene Sterne